## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | 3:21-CV-00932 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GULF OIL LIMITED PARTNERSHIP, | ) | September 29, 2022 |
| *Defendant*. | ) | |

## <u>RULING AND ORDER ON DEFENDANT'S MOTION TO DISMISS</u>

Sarala V. Nagala, United States District Judge.

Plaintiff Conservation Law Foundation, Inc. has brought this action against Defendant Gulf Oil Limited Partnership, alleging that Defendant is violating federal law by failing to prepare its bulk petroleum storage facility in New Haven, Connecticut for severe flooding and other weather-related risks that are increasing in severity due to climate change. The complaint consists of eighteen counts: Counts One through Fifteen allege various violations of the Clean Water Act (the "CWA"), 33 U.S.C. § 1251 *et seq.*; and Counts Sixteen through Eighteen allege violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* Plaintiff asserts that Defendant is violating the CWA by failing to comply with Connecticut's General Permit for Discharges Associated with Industrial Activity, and that Defendant is violating RCRA by failing to mitigate risks of hazardous waste discharges associated with climate change.

Defendant seeks to dismiss Counts One through Nine and Sixteen through Eighteen of Plaintiff's complaint, asserting both that Plaintiff has not alleged an injury in fact for Article III standing purposes and that Plaintiff has failed to state claims upon which relief can be granted. Plaintiff argues that it has standing because the complaint alleges that Defendant's failure to manage the risks of pollutant discharges associated with climate change is resulting in actual and

imminent harms to Plaintiff's members.  Plaintiff further argues that the allegations in the complaint are sufficient to state claims upon which relief can be granted.

For the reasons described below, the Court agrees with Defendant that Plaintiff has failed to establish standing with respect to Counts One through Nine and Sixteen through Eighteen of the complaint.  These counts of the complaint are thus DISMISSED without prejudice to Plaintiff seeking leave to file an amended complaint that addresses the deficiencies described in this ruling.  Because the Court dismisses these counts on standing grounds, it cannot and does not reach the question of whether Plaintiff has failed to state a claim upon which relief can be granted with respect to any of these counts.

## I.        FACTUAL BACKGROUND

### A.  Defendant's New Haven Terminal

The complaint contains the following relevant allegations, which the Court accepts as true for purposes of Defendant's motion to dismiss for lack of standing.[1]  The party's dispute centers on a bulk petroleum storage terminal Defendant owns and operates in New Haven, Connecticut (the "Terminal").  Compl., ECF No. 1, ¶¶ 20, 58–59, 62.  Plaintiff is a nonprofit organization that seeks to promote the conservation and protection of New England's public health, environment, and natural resources.  *Id.* ¶ 8.  Plaintiff has more than 5,000 members, including more than 190 members in Connecticut.  *Id.*  Some of these members live near and regularly visit, use, and enjoy the area and waters near the Terminal, which include New Haven Harbor, the Quinnipiac River, and the Mill River.  *Id.* ¶¶ 9, 11, 27, 101–23.  Plaintiff's members use these waters for activities such as boating, swimming, fishing, observing wildlife, and sightseeing, and they intend to

---

[1] Where, as here, standing is challenged on the basis of the pleadings, the Court must "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party."  *Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009).

continue to engage in these activities in the future. *Id.* ¶ 9.  Accordingly, Plaintiff's members are concerned about, and have an interest in, eliminating risks from the discharge and release of pollutants from the Terminal into nearby waters, communities, and ecosystems. *Id.* ¶ 11.

Defendant operates the Terminal in the following manner.  Tanker ships deliver oil products to the Terminal, where these products are stored in sixteen large aboveground storage tanks ("ASTs") until they are distributed to two truck loading racks. *Id.* ¶¶ 64, 66–67.  The ASTs at the Terminal are surrounded by berms intended to act as secondary containment structures and protect against flooding. *Id.* ¶ 73.  The Terminal also has drainage systems in place for purposes of stormwater management, and to prevent contaminants from being discharged into New Haven Harbor. *Id.* ¶¶ 82–91.  Stormwater from the "tank farm" at the Terminal either infiltrates into the ground or is directed to a catch basin in a low elevation area. *Id.* ¶ 81.

Defendant's operation of the Terminal is subject to the General Permit for Discharge of Stormwater Associated with Industrial Activity (the "General Permit") issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") pursuant to the CWA. *Id.* ¶¶ 80, 124.  The General Permit, which applies to any facility that registers for coverage under it, provides several requirements and restrictions regarding stormwater discharges. *Id.* ¶ 127.  Among other things, the General Permit requires that Defendant implement control measures to guard against the risk of pollutant discharges in the Terminal's stormwater, *id.* ¶¶ 141–49, and that Defendant's operation of the Terminal be consistent with the goals and policies of the Connecticut Coastal Management Act (the "CMA"), *id.* ¶ 137.  The goals and policies of the CMA include consideration of "the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and

minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards."  Conn. Gen. Stat. § 22a-92(a)(5).

In addition, under the General Permit, Defendant must develop a Stormwater Pollution Prevention Plan ("SWPPP") with respect to the Terminal.  Compl. ¶ 150.  Among other things, the SWPPP must identify potential pollutant sources, describe the control measures implemented at the Terminal to minimize the discharge of pollutants, and include a certification by an engineer. *Id.* ¶¶ 142, 151.  The SWPPP must be amended within 120 days of various events, such as certain changes to the site, and when necessary to address any significant sources of potential pollution identified by inspection or visual monitoring.  *Id.* ¶ 157.  Plaintiff references Defendant's 2017 SWPPP throughout the complaint and alleges that Defendant has failed to comply with the General Permit, and thereby violated the CWA, by omitting certain information from the SWPPP and by failing to properly update the SWPPP.  *See, e.g.*, *id.* ¶¶ 67, 211, 369.

Defendant's operation of the Terminal is also regulated under RCRA because it generates hazardous waste.  *Id.* ¶ 95.  Specifically, the Terminal is classified as a "Small Quantity Generator" under RCRA.  *Id.* ¶ 96.  Several toxic and hazardous wastes and pollutants, including petroleum hydrocarbons, are present at the Terminal, and many of these substances are highly carcinogenic. *Id.* ¶ 97.  In addition, the soil and groundwater within the Terminal contain petroleum-related contaminants.  *Id.* ¶ 98.  Remediation activities to address this contamination have been ongoing since the 1990s.  *Id.* ¶ 99.

### B.  Effects of Climate Change

The complaint alleges that, according to numerous sources, climate change has affected— and will continue to affect—New Haven in various ways.  *Id.* ¶¶ 21–23; *see generally id.* ¶¶ 158– 255.  Such impacts include the following:  first, New Haven experiences frequent flooding due to

heavy rainfall and increasingly severe hurricanes, winter storms, and storm surges, *id.* ¶¶ 21, 175–211, 247–55; second, the average surface temperature of Long Island Sound, where New Haven Harbor is located, is increasing, which has led to a higher frequency and magnitude of storm events, *id.* ¶¶ 21, 236–46; and third, the sea level has risen by approximately one foot since 1900, and continues to rise, *id.* ¶¶ 21, 212–35. Plaintiff asserts that these climate impacts are projected to worsen and that, by 2050, a "100-year flood" will visit the Connecticut coast every twelve and a half years, on average, rather than every 100 years. *Id.* ¶¶ 22, 160. Plaintiff further asserts that sea level rise is likely to greatly increase the odds of flooding in the next fifty years and that, by 2100, today's "once-in-a-lifetime" coastal flood level may be exceeded daily during the highest tide. *Id.* ¶ 23. According to Plaintiff, while many of the sources referenced in the complaint discuss projected harms in 2050 and 2100, the "acceleration of the negative impacts of climate change is happening now and will only get more pronounced as each year goes by." *Id.* ¶ 24.

Plaintiff asserts that the Terminal has not been designed, maintained, modified, or operated to account for the effects of climate change or to address the risk of pollutant discharges. *Id.* ¶¶ 13, 25, 310–13. Accordingly, Plaintiff asserts that the Terminal is likely to discharge pollutants into surrounding surface waters, groundwater, the community, and the air, which puts Plaintiff's members at risk. *Id.* ¶¶ 13, 25. Specifically, Plaintiff claims that this risk is due to inadequate infrastructure design and Defendant's failure to adequately prepare for precipitation and flooding, which is exacerbated by impacts of climate change such as sea level rise, increasing sea surface temperatures, and the increasing severity of storms and storm surge. *Id.* ¶¶ 14, 25. Plaintiff states that this risk is not merely theoretical because the Terminal was inundated when Superstorm Sandy impacted New Haven in October of 2012, *id.* ¶¶ 203–04, though Plaintiff acknowledged at oral

argument that it has not alleged that such inundation actually led to the release of contaminants into New Haven Harbor.

The complaint asserts eighteen counts. First, Counts One through Fifteen allege the following violations of the CWA: (1) failure to eliminate non-stormwater discharges; (2) activity inconsistent with the CMA and causing adverse impacts to coastal resources; (3) unlawful certification of an SWPPP; (4) failure to identify potential pollution sources; (5) failure to describe and implement practices to reduce pollutants and ensure permit compliance; (6) failure to implement measures to manage runoff; (7) failure to minimize the potential for leaks and spills; (8) failure to submit required facts or information to CT DEEP; (9) failure to amend or update an SWPPP; (10) failure to identify discharges to impaired waters in an SWPPP; (11) failure to conduct monitoring for discharges to impaired waters; (12) failure to identify outfalls in an SWPPP; (13) failure to monitor discharges from all outfalls; (14) illegal infiltration of stormwater; and (15) failure to maintain an impervious containment area. Counts Sixteen through Eighteen allege the following violations of RCRA: (1) open dumping; (2) imminent and substantial endangerment to human health and the environment; and (3) failure to comply with state and federal RCRA regulations applicable to generators of hazardous wastes. Plaintiff seeks, among other things, declaratory and injunctive relief and civil penalties. Defendant seeks to dismiss the first nine CWA counts, as well as all three RCRA counts.[2]

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), defendants may move to dismiss a case for lack of subject matter jurisdiction. A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court "'lacks the statutory or constitutional

---

[2] Defendant concedes that Plaintiff has standing to pursue the remaining CWA counts (Counts 10–15).

power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

The doctrine of standing is "rooted in the traditional understanding of a case or controversy" and serves to "ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). To establish Article III standing, a plaintiff must demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A.*, ___ U.S. ___, 140 S. Ct. 1615, 1618 (2020); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff bears the burden of establishing these three elements, and must demonstrate standing for each claim and form of relief it seeks. *Lujan*, 504 U.S. at 560; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

Injury in fact is the "first and foremost" of standing's three elements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Plaintiffs seeking injunctive relief must prove that the identified injury in fact presents a "real and immediate threat of future injury," often termed "a likelihood of future harm." *Bernstein v. City of New York*, 621 F. App'x 56, 57 (2d Cir. 2015). The Supreme Court has made clear that "'allegations of possible future injury' or even an 'objectively reasonable likelihood' of future injury are insufficient to confer standing." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013)). Rather, a future injury constitutes an injury in fact only "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). This ensures that "the court

avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).

When a defendant's Rule 12(b)(1) motion is "based solely on the allegations of the complaint or the complaint and exhibits attached to it," the plaintiff "has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Rather, in examining such a "facial" challenge to a plaintiff's standing, the Court is tasked with determining whether the complaint "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id.* (alterations in original). In this case, the parties have not completed discovery or submitted evidence to the Court on the issue of standing.[3] Accordingly, the Court must look to the complaint to determine whether Plaintiff has alleged facts that affirmatively and plausibly suggest that it has standing.

## III.   DISCUSSION

Defendant's motion to dismiss for lack of standing asserts only that Plaintiff has failed to allege an injury in fact. Specifically, Defendant moves to dismiss twelve counts of the complaint on the ground that Plaintiff has failed to plausibly allege an injury that is actual or imminent. Plaintiff asserts that it has established standing because its claims are based on an increasing risk of harms that could occur at any time. For the reasons below, the Court agrees with Defendant and thus dismisses Counts One through Nine and Counts Sixteen through Eighteen for lack of standing.

---

[3] Pursuant to the Court's order at ECF No. 53, the parties briefed the issue of whether the Court should consider a Facility Response Plan Defendant submitted as an exhibit to its reply in support of its motion to dismiss. *See* ECF Nos. 56, 57, 59. The Facility Response Plan pertains only to Defendant's arguments for dismissal pursuant to Rule 12(b)(6), not Defendant's arguments for dismissal for lack of standing. Accordingly, at this time, the Court does not decide whether it can consider the Facility Response Plan in connection with Defendant's motion, and the Court has not considered the Facility Response Plan in connection with this ruling.

A. <u>Background Regarding Relevant Statutes</u>

Plaintiff's claims are best understood in the regulatory context in which they arise. Accordingly, the Court begins with a discussion of the relevant provisions of the CWA and RCRA.

The CWA prohibits the "discharge of any pollutant by any person," unless the discharge is carried out in compliance with the Act.  33 U.S.C. § 1311(a).  Under the CWA's National Pollutant Discharge Elimination System ("NPDES"), dischargers of pollutants must obtain permits that limit the type and quantity of pollutants that can be released into the waters of the United States. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) (citing 33 U.S.C. § 1342).  States typically control NPDES permitting programs to the extent they apply to waters within their borders, subject to Environmental Protection Agency approval. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 502 (2d Cir. 2017).  In Connecticut, CT DEEP is responsible for issuing permits under the NPDES program. *See Burton v. Comm'r of Env't Prot.*, 970 A.2d 640, 645 n.4 (Conn. 2009).  Under Connecticut General Statutes §§ 22a-430 and 22a-430b, CT DEEP may issue a "general permit for a category or categories of discharges" that it regulates pursuant to its CWA authority.  The General Permit Plaintiff references throughout its complaint is an example of such a permit. *See* Compl. ¶ 124. In the absence of government enforcement, citizens may enforce the CWA through civil suits seeking penalties or equitable relief "against any person alleged to be in violation of the conditions of either a federal or state NPDES permit." *Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. # 1*, 16 F. Supp. 3d 294, 301 (S.D.N.Y. 2014) (citing, in part, 33 U.S.C. § 1365(a)).

RCRA is a comprehensive environmental statute designed to "reduce the generation of hazardous waste" and "ensure the proper treatment, storage, and disposal of that waste which is

nonetheless generated," with the ultimate goal of "minimiz[ing] the present and future threat to human health and the environment." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting, in part, 42 U.S.C. § 6902(b)).  Like the CWA, RCRA contains a citizen suit provision, 42 U.S.C. § 6972.  The citizen suit provision provides that "any person may commence a civil action on his own behalf" against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order" that has become effective under RCRA. *Id.* § 6972(a)(1)(A).  The provision also allows citizen suits against "any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B).

Importantly, general Article III principles apply equally to CWA and RCRA claims.  *See Missud v. Oakland Coliseum Joint Venture*, No. 12-02967 JCS, 2013 WL 812428, at *16 (N.D. Cal. Mar. 5, 2013) ("The same Article III standing requirements discussed in connection with the CWA apply equally to cases brought under the RCRA.").  Accordingly, the Court applies the same general standing analysis to all counts at issue in Defendant's motion to dismiss.

B.  Defendant's Motion to Dismiss for Lack of Standing

Turning to the substance of Plaintiff's claims, the Court finds that the complaint fails to "affirmatively and plausibly" allege standing with respect to Counts One through Nine and Sixteen through Eighteen.  *See Carter*, 822 F.3d at 56.  Relying on the worsening impacts of climate change on New Haven, Plaintiff asserts that it has standing to pursue its claims because they are based on harms that could occur at any time, and because there is a substantial risk that severe weather

events will cause the Terminal to discharge pollutants when such a weather event occurs.  Despite these general assertions, however, the complaint is devoid of allegations specifying how any injury to Plaintiff's members is "certainly impending" or why there is a "substantial risk that such harm will occur."  *Driehaus*, 573 U.S. at 158.  Specifically, although the complaint discusses the worsening impacts of climate change on New Haven at great length, Plaintiff does not articulate whether or how such impacts will imminently lead to the discharge of pollutants from Defendant's Terminal.

Plaintiff relies predominantly on the increased risk of future harm due to climate change to establish its injury in fact.  In doing so, Plaintiff devotes dozens of paragraphs in its complaint to how climate change is affecting New Haven.  The impacts described in the complaint include frequent flooding, increasingly severe storm events and storm surges, increasing water surface temperature, and sea level rise.  Compl. ¶¶ 21, 175–255.  Plaintiff further alleges that these climate impacts are projected to worsen over the next 50 to 100 years, including through greatly increased odds of flooding and the increased frequency of so-called "100-year floods."  *Id.* ¶¶ 22–23, 160.  The complaint states that the "acceleration of the negative impacts of climate change is happening now and will only get more pronounced as each year goes by."  *Id.* ¶ 24.

Plaintiff's attempt to establish standing based on an increased risk of future harm is not without basis in the law.  Indeed, the Supreme Court has held that "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Driehaus*, 573 U.S. at 158.  Moreover, when discussing standing with respect to environmental suits, the Supreme Court has acknowledged that "[t]he harms associated with climate change are serious and well recognized."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 521 (2007).  But, while Plaintiff's complaint focuses predominantly on the harms to the environment

that climate change is causing, "[t]he relevant showing for Article III standing is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 169.  And "[w]hile 'enhanced risk' of future injury may constitute injury-in-fact in certain circumstances, such injuries are only cognizable where the plaintiff alleges actual future exposure to that increased risk." *Nicosia v. Amazon.com*, *Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).  *See also Lafleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (plaintiff who worked near a proposed facility that would emit sulfur dioxide had standing because she would have "likely exposure" to additional sulfur dioxide in the area where she worked).  Thus, Plaintiff must allege more than simply that the risk of a severe weather event and flooding is increasing; it must allege that such increased risk presents a "real and immediate threat of future injury" to its members.  *See Bernstein*, 621 F. App'x at 57.

To be sure, several courts have held that standing may be established in environmental cases based on risks of flooding and severe weather events that present a real and immediate threat to plaintiffs.  Plaintiff itself has succeeded in establishing standing in multiple other cases based on allegations regarding risks of near-term harms associated with climate change.  *See Conservation L. Found., Inc. v. Shell Oil Prods. US*, No. CV 17-396 WES, 2020 WL 5775874, at *1 (D.R.I. Sept. 28, 2020) ("[A]s to near-term harms from foreseeable weather events, Plaintiff has asserted certainly impending harm, at least at this stage."); Order at 2, *Conservation L. Found., Inc. v. ExxonMobil Corp.*, No. 16-cv-11950 (D. Mass. Sept. 13, 2017), ECF No. 29 (holding that Plaintiff had established standing based on near term risks of "severe weather events, such as storm surges, heavy rainfall, or flooding").  Indeed, another court in this District recently held that Plaintiff had established standing in a similar suit regarding alleged violations of the CWA and RCRA.  *See Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-CV-933 (SALM), 2022 WL 4292183, at *8 (D. Conn. Sept. 16, 2022) (finding that Plaintiff had sufficiently alleged injuries

that were "certainly impending" and/or presented a "substantial risk" based, in part, on allegations that made clear that "a major weather event, magnified by the effects of climate change, could happen at virtually any time").

But, crucially, in each of those other cases, the courts found that Plaintiff had plausibly alleged more than just the likely future occurrence of major and foreseeable weather events. Rather, these courts discussed how such weather events would result in the discharge of pollutants, thereby validating Plaintiff's theory of increased risk of exposure to such pollutants as its near-term injury.   For example, in *ExxonMobil Corp.*, the district court found that Plaintiff had sufficiently pleaded a plausible claim of a substantial risk that severe weather events "will cause the [defendant's terminal] to discharge pollutants . . . in the near future and while [the permit at issue is] in effect."  Order at 2, *ExxonMobil Corp.*, No. 16-cv-11950 (D. Mass. Sept. 13, 2017), ECF No. 29; *see Shell Oil Prods. US*, 2020 WL 5775874, at *1 (complaint made clear that "a major weather event, magnified by the effects of climate change, could happen at virtually any time, *resulting in the catastrophic release of pollutants* due to [the defendants'] alleged failure to adapt [their terminal] to address those impending effects" (emphasis added)); *Shell Oil Co.*, 2022 WL 4292183, at *8 (same).  The complaint in the present case, on the other hand, alleges generally that the Terminal "is likely to discharge and/or release pollutants into surrounding surface waters, groundwater, the community, and the air because it has not been designed to withstand flooding associated with storm events and storm surge, tides, sea level rise, and increasing sea surface temperatures." Compl. ¶ 13.  It also states that Defendant "has not designed, maintained, modified, and/or operated its Terminal to account for the numerous effects of climate change," putting "[Plaintiff], its members, and the New Haven community at great risk."  *Id.* ¶ 25; *see also id.* ¶ 313 (alleging that Defendant has failed to "protect the Terminal against" the risks of climate

13

change). These are merely conclusory allegations, the factual support for which is founded on Plaintiff's allegations about longer-term impacts, without any specificity as to why or how Plaintiff's members would be injured in the near term. As a result, they are insufficient to demonstrate the imminence of Plaintiff's alleged injury.

More specifically, Plaintiff's complaint in this case is devoid of any allegations articulating how the impacts of climate change, including the threat of a foreseeable weather event, present a real and immediate risk of a discharge of pollutants by Defendant's Terminal into the waters Plaintiff's members enjoy. Instead, Plaintiff relies heavily on allegations of longer-term impacts, such as the increased frequency of strong storms, projected sea level rise, and the increased risk of flooding over the next several years and decades. For example, Plaintiff cites a source indicating that, based on projected sea level rise, New Haven has an "18 percent multi-year risk of at least one flood exceeding 6 feet from 2016 to 2030, a 49 percent risk . . . from 2016 to midcentury, and a 100 percent risk by 2100." Compl. ¶ 231. Similarly, Plaintiff cites to a source asserting that a "100 year flood" will revisit the Connecticut coast, on average, not every 100 years, but once every 12.5 to 25 years in the future. *Id.* ¶ 160. But, while imminence is "a somewhat elastic concept," it "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Lujan*, 504 U.S. at 564 n.2). Plaintiff's assertions that there is an eighteen percent risk that a severe flood will occur by 2030, and that the risk will increase in the decades that follow, are precisely the kind of "allegations of *possible* future injury" that the Supreme Court has "repeatedly" held to be insufficient for standing purposes. *Id.* (collecting cases, including *Lujan*, 504 U.S. at 565 n.2, 567 n.3, and *Laidlaw*, 528 U.S. at 190). Notably, when pressed at oral argument, Plaintiff's counsel could not point to any specific allegations in the

14

complaint that articulated any real and immediate threat of discharge of pollutants.  Thus, by alleging only an injury that may occur "at some indefinite future time," without demonstrating any real and immediate threat of harm, Plaintiff has stretched the elastic concept of imminence "beyond [its] breaking point."  *See Lujan*, 504 U.S. at 564 n.2.

This case is also distinguishable from Plaintiff's other matters in Massachusetts, Rhode Island, and this District because the complaint here is unsupported by allegations that severe storms in the past caused the discharge of pollutants at the Terminal.  While a showing of past injury is not a prerequisite to standing, it can help demonstrate that a plaintiff has alleged a real and immediate threat of future injury.  *See Nicosia*, 834 F.3d at 239 (noting that past injuries may provide a basis for standing for injunctive relief where the plaintiff can demonstrate that it is "likely to be harmed again in the future in a similar way").  Here, Plaintiff alleges that Superstorm Sandy inundated the Terminal in October of 2012, Compl. ¶¶ 203–07, but Plaintiff's counsel conceded at oral argument that Plaintiff is not alleging that such inundation resulted in any illegal pollutant discharges into New Haven Harbor.  This presents a sharp contrast to the complaint in *Shell Oil Co.*, in which Plaintiff specifically alleged "that the [terminal at issue] flooded during Tropical Storm Irene in 2011, causing [it] to discharge several pollutants well beyond Benchmark levels." 2022 WL 4292183, at *13.  Similarly, in the cases Plaintiff has litigated in Massachusetts and Rhode Island, the finding of imminent injury was supported by allegations that previous storms had struck the area and that discharge of pollutants had in fact occurred after such storms.  *See* Third Amended Complaint ¶ 161, *Shell Oil Prods. US*, No. 1:17-cv-396-WES-LDA (D.R.I. Oct. 8, 2019), ECF No. 45 (describing a 2010 Emergency Response Report documenting "heavy sheen" and significant spillage out of storm drains along the shore after a heavy rain event); Declaration of Wendi Goldsmith ¶ 11, *ExxonMobil Corp.*, No. 16-cv-11950 (D. Mass. Dec. 20, 2016), ECF

15

No. 21-11 (noting that an "intense" storm on July 10, 2010, "already caused discharge of pollutants from the tank farm").  In the present complaint, Plaintiff's allegations that Superstorm Sandy severely impacted New Haven—without any accompanying allegations that the storm caused the illegal discharge of pollutants from the Terminal—do not suffice to demonstrate that there is a substantial risk that Plaintiff will be injured by a future storm or that such harm is certainly impending, even drawing all reasonable inferences in favor of Plaintiff.  The Court is likewise unconvinced by Plaintiff's assertions that, while Superstorm Sandy was only a category one storm, a future storm *could be* of a higher category.  Even if this is so, the complaint provides no allegations sufficient to demonstrate that a storm severe enough to cause pollutant discharges from Defendant's Terminal is "certainly impending." *Clapper*, 568 U.S. at 409.

The Court's holding is further supported by decisions from its sister courts.  Applying Supreme Court standing precedent in the environmental context, other district courts have held that allegations of harms that will occur in the distant future are insufficient to establish an injury in fact for Article III standing. *See, e.g.*, *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1130 (D.N.M. 2011) ("If the increases in temperature and water shortages that the reports predict are not anticipated to occur for many years or decades, then it is questionable whether they represent an actual and imminent threat to Declarants' interests.").  Indeed, even in cases in which other courts have allowed Plaintiff's claims regarding near-term risks of pollutant discharges to proceed, those courts have stated that Plaintiff did not have standing to pursue claims solely alleging injury that will occur in the distant future. *See Shell Oil Prods. US*, 2020 WL 5775874, at *1 ("[T]o the extent that its claims rely on future harms, Plaintiff lacks standing. . . . These flawed allegations include, for example, those detailing that, by 2100, the National Oceanic and Atmospheric Administration predicts — worst-case scenario — a greater-than-eight-foot sea

level increase, and it is 'virtually certain' the global mean sea level will continue to rise beyond then."); *Shell Oil Co.*, 2022 WL 4292183, at *8 n.9 ("Plaintiff may not pursue its claims to the extent those claims rely solely on *possible* future injury."); Order at 2, *ExxonMobil Corp.*, No. 16-cv-11950 (D. Mass. Sept. 13, 2017), ECF No. 29 ("[P]laintiff does not have standing for injuries that allegedly will result from rises in sea level, or increases in the severity and frequency of storms and flooding, that will occur in the far future, such as in 2050 or 2100."). Accordingly, Plaintiff's allegations that it *may* suffer injury in the next several years or decades, without more, are insufficient to establish standing.[4]

In sum, Plaintiff's allegations of how climate change is impacting New Haven, without allegations of how such impacts present a real and immediate threat of harm to Plaintiff's members, are insufficient to establish Article III standing. Because the complaint fails to plausibly suggest that the impacts of climate change will imminently result in injury to Plaintiff's members or that there is a substantial risk that such harm will occur, Plaintiff lacks standing with respect to Counts 1–9 and 16–18.

## IV.    CONCLUSION

For the reasons described herein, Defendant's motion to dismiss is GRANTED to the extent it seeks dismissal pursuant to Federal Rule of Procedure 12(b)(1). Counts One through Nine and Sixteen through Eighteen of the complaint are dismissed without prejudice for lack of standing. If Plaintiff wishes to file an amended complaint that attempts to address the deficiencies described in this ruling, it may seek leave of the Court to do so pursuant to Federal Rule of Civil

---

[4] At oral argument, Plaintiff attempted to characterize Defendant's failure to comply with the requirements of the General Permit as an independent injury for purposes of its CWA claims. As this contention was raised for the first time at oral argument, the Court will not address it. *See Kosachuk v. Selective Advisors Grp., LLC*, 827 F. App'x 58, 62 (2d Cir. 2020) (arguments made for the first time at oral argument are waived).

Procedure 15(a) by October 20, 2022.  If Plaintiff seeks to amend the complaint after that date, its

request will be governed by the good cause standard in Federal Rule of Civil Procedure 16(b).

      **SO ORDERED** at Hartford, Connecticut, this 29th day of September, 2022.


                         */s/ Sarala V. Nagala*
                         SARALA V. NAGALA
                         UNITED STATES DISTRICT JUDGE