# EXHIBIT B



Conservation Law Foundation

For a thriving New England

CLF Connecticut
195 Church Street
Mezzanine Suite B
New Haven, CT 06510
P: 203.298.7690
www.clf.org

John Doroghazi
Michael Miller
Pike Fuels Limited Partnership
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
jdoroghazi@wiggin.com
mmiller@wiggin.com

June 25, 2025

**RE: *Conservation L. Found., Inc. v. Pike Fuels Ltd. P'ship*, No. 3:21-cv-00932-SVN (D. Conn.) – Pike's responses and objections to CLF's Fifth Set of Requests for Production, Third Set of Interrogatories, and First Set of Requests for Admission**

Counsel,

I write in response to Pike Fuels Limited Partnership's ("Pike") responses and objections to Conservation Law Foundation, Inc.'s ("CLF") Fifth Set of Requests for Production ("Fifth RFPs"), Third Set of Interrogatories ("Third ROGs"), and First Set of Requests for Admission ("First RFAs"). CLF served those discovery requests on April 30, 2025. Pike served its responses and objections on May 30, 2025.

During May and June, CLF completed three more depositions and produced additional discovery in accordance with its ongoing obligation to supplement its disclosures and responses to discovery requests. *See* Fed. R. Civ. P. 26(e). Most recently, CLF deposed Pike on June 20, 2025. Currently, CLF is preparing its designee for its Rule 30(b)(6) deposition scheduled for June 26, 2025. In short, the previous two months of fact discovery have been productive yet time-consuming as the Parties endeavor to complete fact discovery in a timely manner.

CLF's deadline to file any motion to compel responses to its discovery requests is June 30. Given this deadline and the fact that Pike does not consent to CLF seeking a 14-day extension of that deadline, CLF proposes that the Parties meet and confer regarding CLF's Fifth RFPS, Third ROGs, and First RFAs on June 26 or 27. Please provide Pike's availability to confer on any of those dates.

## I. PIKE'S GENERAL OBJECTIONS

Pike has posed multiple general objections to CLF's Fifth RFPs, Third ROGs, and First RFAs. Fifth RFP Responses at 1–2; Third ROG Responses at 1–3; First RFA Responses at 1–2. As CLF has previously mentioned, these general objections are improper. *See Burns v. Imagine Films Ent., Inc.*, 164 F.R.D. 589, 593 (W.D.N.Y. 1996) (holding that general objections to discovery requests are improper and do not excuse objecting party from providing responses). Furthermore, please clarify whether Pike is withholding documents on the basis of these general objections. *See* Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest.").




## II. PIKE'S CATEGORICAL OBJECTIONS

In the following paragraphs, CLF attempts to address objections that Pike has raised to all or at least more than one RFP or RFA.

**RFPs: Undue Burden**

Pike objects to RFPs 81, 82, 83, and 85 on the grounds that they are "overly broad, unduly burdensome, and not proportional in relation to the reasonable needs of the case." Pike's RFP Responses at 3, 4, 5–6. Pike claims that it "has already produced no less than 7,787 documents (91,835 pages), and its contractors have produced no less than 17,391 documents (281,000 pages) to CLF and spent approximately $380,000 on its own document review and production in assisting its contractors' document review and production efforts." Id. Pike further asserts that the requests are solely meant to harass and oppress Pike and will subject Pike to undue expense. Id. Pike claims that these RFPs are examples of an "abuse of the discovery process" and that "[w]ritten discovery was contemplated to be closed long ago, but CLF refused to abandon its fishing expedition for documents." Id.

Pike has made essentially the same claims in response to CLF's prior requests for production in this matter. As CLF previously stated, although responding to corporate discovery requests might be "burdensome," "this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business." *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C.), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (responding to undue burden argument regarding Rule 30(b)(6) deposition). Furthermore, Pike may have already produced many documents and spent over $380,000 to satisfy its discovery obligations in this case thus far, but Pike has put forth no reasons as to why it would be subject to undue burden or undue expense in responding to these particular RFPs. For example, Pike has not indicated whether or how conducting searches for the requested documents or reviewing documents gathered through such searches would be burdensome or expensive. Finally, prior fact discovery deadlines have no bearing here; the current fact discovery deadline is June 30, and CLF has issued these requests, not to harass or oppress Pike or as part of any "fishing expedition" but, rather, to obtain relevant information as it is entitled to do. *See* Fed. R. Civ. P. 26(b)(1).

**RFPs: Legal Conclusion**

Pike objects to RFPs 82 and 83 on the ground that they are "tantamount to or otherwise premised upon an inappropriate and unsupported legal conclusion or erroneous interpretation by CLF that the documents being requested are required under the General Permit." Pike's RFP Responses at 4.

Pike is incorrect. CLF is seeking factual information relating to Pike's "system for ensuring that information submitted in or with the SWPPP was true, accurate, and complete and was gathered and evaluated by qualified personnel," CLF's RFP 82, and to Pike's "system for ensuring that all terms and conditions of the General Permit would continue to be met for all discharges authorized by the General Permit at the Terminal." CLF's RFP 83. These requests do not seek legal conclusions, but facts directly relevant to CLF's claims.

**RFAs: Lack of Sufficient Information**

Pike claims that it "does not have sufficient information to admit or deny" 59 out of 74 (i.e., approximately 80%) of CLF's RFAs, namely, RFAs 1–7, 10–13, 15–31, 33–42, 48–54, and 56–74. Pike may give lack of information or knowledge as a reason for its failure to admit or deny an RFA "only if [Pike] states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." Fed. R. Civ. P. 36(a)(4); *see also, e.g., Napolitano v. Synthes*




*USA, LLC*, 297 F.R.D. 194, 198, 199 (D. Conn. 2014) (finding defendant may not give lack of information or knowledge as reason for failure to admit or deny unless it has made reasonably inquiry and ordering defendant to amend its responses). Pike has not done so for any of the 59 RFAs that it claims not to have sufficient information to admit or deny. Furthermore, as Pike noted in its responses and objections, it has produced over 90,000 pages worth of documents, the majority of which are likely to have information that would enable Pike to admit or deny CLF's RFAs. Accordingly, please amend Pike's responses to those RFAs, indicating whether Pike has made reasonable inquiry.

**RFAs: Existence of Duty**

Pike objects to multiple RFAs—RFAs 3, 5, 6, 7, 8, 12, 13, 16, 19, 20, 21, 23, 24, 27–29, 34–36, 38–40, 44, 45–47, 49, and 72—on the ground that CLF is asking Pike to admit the existence of a duty without citing the source of the alleged duty. For purposes of clarity, CLF is not seeking an admission from Pike that it does or does not have a particular duty.

**III. PIKE'S RFP-SPECIFIC OBJECTIONS**

CLF issued five requests in its Fifth Set of Requests for Production, RFPs 81, 82, 83, 84, and 85. In response to Pike's objections to those RFPs, CLF directs Pike to Sections I and II of this letter. CLF also directs Pike to the following subsections, in which CLF addresses specific objections or portions of Pike's responses to each RFP.

**RFP 81**

Please confirm whether it is Pike's position that the actions or practices identified in Pike's June 2018 Facility Response Plan (GULFNH-25538), January 2020 Emergency Response Plan Best Management Practices (GULFNH-53438), July 2020 Construction Specifications Secondary Containment Area Site Improvements (TE-25629), March 2021 Stormwater Pollution Control Plan (GULFNH-22752), and September 2023 Spill Prevention Control & Countermeasure Plan and Stormwater Pollution Prevention Plan (GULFNH-96983) constitute documents sufficient to show the actions that Pike has taken or practices it has engaged in to eliminate discharges from the Terminal due to flooding or storm surge associated with a Category 1 hurricane or higher during the period of 2011 through April 2024.

**RFP 82**

In its response, Pike identified a Code of Conduct at GULFNH-18380. Upon review, the document with Bates GULFNH-18380 appears to be email correspondence. Please clarify whether Pike intended to cite to that document or a different document.

**RFP 83**

Among other reasons, Pike objects to RFP 83 on the ground that "the term 'system' is not sufficiently defined and is otherwise vague, ambiguous and capable of multiple interpretations, and without further clarification Pike is unable to respond to this request." RFP Responses at 4.

RFP 83 simply tracks the language in the General Permit, which requires the registrant and those responsible for preparing the permit registration to certify, among other things, "that a system is in place to ensure that all terms and conditions of this general permit will continue to be met for all discharges authorized by this general permit at the site." General Permit § 4(c)(2)(I). The General Permit does not define the term "system." *See* General Permit § 2. RFP 83 seeks documents sufficient to show that such a system is in place at the Terminal. Please confirm whether it is Pike's position that the portion of the August




2019 email from Triton Environmental to Gulf (GULFNH-24376), the July 9, 2020 letter from Triton Environmental to Gulf regarding 2019–2020 semi-annual stormwater sampling (GULFNH-19582), the February 12, 2021 Weekly/Rainfall Event Inspection Log (GULFNH-84042), the two Stormwater Quarterly Monitoring Forms from 2023 (TE-5513), and the January 2024 Stormwater Pollution Prevention Plan (GULFNH-114938) constitute documents sufficient to show Pike's system in place for ensuring that all terms of the General Permit would continue to be met for all discharges authorized by the General Permit at the Terminal during the period of 2011 through April 2024.

**RFP 84**

CLF has revised its First RFAs. Please indicate whether Pike's objections to RFP 84 have changed in light of those revisions.

**RFP 85**

As part of its First Set of Requests for Production, Pike made a similar request, seeking "All Documents relied upon in the preparation of, or referenced in, Your responses to Gulf's First Interrogatories, including any supplemental responses thereto." *See* Pike's First Set of Requests for Production, dated April 6, 2022, at 10 (RFP 33). CLF agreed to and did produce any other documents referenced in or relied upon in the preparation of, or referenced in, Pike's First Set of Interrogatories not otherwise included in CLF's response to Pike's RFPs 1 and 2. *See* CLF's Response to Pike's First Set of Requests for Production, dated May 25, 2022, at 30.

In RFP 85, CLF is simply requesting that, like CLF, Pike produce documents and communications that it relied on when preparing or referred to in its responses to CLF's interrogatories. Should Pike believe that any such documents are protected by the attorney work product doctrine, attorney-client privilege, or other applicable privilege, Pike may identify a document as such and provide a corresponding privilege log. *See* Local Rule 26(e). Please confirm whether it is Pike's position that it has already produced all documents and communications that it relied upon in preparing or referred to in its responses to CLF's First, Second, and Third Sets of Interrogatories, dated March 14, 2022, December 8, 2023, and April 30, 2025, respectively.

**IV. PIKE'S INTERROGATORY-SPECIFIC OBJECTIONS**

CLF issued three interrogatories in its Third Set of Interrogatories, Interrogatories 23, 24, and 25. In response to Pike's objections to those interrogatories, CLF directs Pike to Section I of this letter. CLF also directs Pike to the following subsections of this letter, addressing any specific objections to Interrogatories 23 and 24.

**Interrogatory 23**

Among other reasons, Pike objects to Interrogatory 23 on the ground that it is "overly broad and unduly burdensome and not proportional in relation to the reasonable needs of the case to the extent it requires Pike to spend an inordinate amount of time interviewing various former Pike employees in order to determine who, if anyone, possesses the relevant information." Pike's ROG Responses at 3.

Pike provides no support for its general statement that responding to this interrogatory would require Pike "to spend an inordinate amount of time" interviewing former employees. Without more than this bald statement, CLF is unable to address this objection.

clf
Conservation
Law Foundation

Additionally, Pike objects to Interrogatory 23 on the ground that it is "vague and ambiguous because the term 'process(es)' is subject to various subjective interpretations and because it is not clear what information Plaintiff is actually seeking." Pike's ROG Responses at 3.

To provide clarification, CLF offers the following revision for its Interrogatory 23:

> Describe how Defendant utilized Arclight Questionnaires, such as the one produced at GULFNH-0000080127, to interpret or analyze its compliance with the General Permit and what practice(s) at the Terminal it replaced, if any, after the sale to Arclight on or about January 1, 2016. *See* Mazzoli Decl., ECF no. 161-3 ¶ 9.

Please indicate whether the foregoing revision resolves Pike's objection on the grounds that Interrogatory 23 is vague and ambiguous.

**Interrogatory 24**

In response to Interrogatory 24, Pike stated "that during its ownership of the Terminal, Tank 123 was never in service." Pike's ROG Responses at 4. Please clarify whether Pike's use of the phrase "during its ownership" includes the period of 2011 through April 2024.

## V. PIKE'S RFA-SPECIFIC OBJECTIONS

CLF issued 74 requests in its First Set of Requests for Admission. In response to Pike's objections to those RFAs, CLF directs Pike to Sections I and II of this letter. CLF also directs Pike to the following subsections of this letter, in which CLF attempts to respond to Pike's answers and numerous objections to specific RFAs.

**RFA 1**

To address Pike's objections, CLF revises RFA 1 as follows:

*Admit that Pike manages or treats discharges from storm surge as non-stormwater discharges under the General Permit.*

The General Permit defines "stormwater" as "waters consisting of rainfall runoff, including snow or ice melt during a rain event but not including mine dewatering waters." General Permit § 2. The General Permit does not define "non-stormwater" or "discharge." For purposes of responding to this RFA, the term "discharge" refers to a release.

**RFA 4**

RFA 4 does not call for a legal conclusion; rather, RFA 4 asks Pike to admit or deny the factual matter of whether the General Permit or any other permit in the State of Connecticut authorizes storm surge discharges. The term "storm surge" refers to the abnormal rise in sea level caused by a storm, measured as the height of the water above the normal predicted astronomical tide. The term "discharge" refers to a release.

**RFA 5**

RFA 5 does not call for a legal conclusion; rather, RFA 5 asks Pike to admit or deny the factual matter of whether Pike includes in any of its Terminal SWPPPs a description of any process or criteria that

clf
Conservation
Law Foundation

it uses to evaluate whether non-stormwater discharges occur at the Terminal site. The term "processes" refers to any series of actions or operations. The term "criteria" refers to any standard on which a judgment or decision may be based. The term "evaluate" refers to making a determination. The term "non-stormwater" refers to non-stormwater discharges as stated in the General Permit. The term "discharge" refers to a release.

**RFA 8**

RFA 8 does not call for a legal conclusion; rather, RFA 8 asks Pike to admit or deny the factual matter of whether Pike designed the Terminal to minimize the risk of oil and chemical spills resulting from climate change factors, including flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge. As CLF stated in its First RFAs, "Unless otherwise stated, the applicable time frame for these Requests for Admission is January 1, 2011, to April 10, 2024." CLF's First RFAs at 2.

**RFA 9**

To address Pike's objections, the term "above ground storage tanks" refers to any fuel storage tank that is not located in the ground at the Terminal site.

**RFA 10**

RFA 10 does not call for a legal conclusion; rather, RFA 10 asks Pike to admit or deny the factual matter of whether the information that was submitted in or with any Terminal SWPPP was gathered and evaluated in a manner designed to assure that qualified personnel considered the reasonably foreseeable risks of pollutant discharges associated with climate change. The General Permit requires permittees to certify that the SWPPPs and attachments were prepared in accordance with a system designed to assure that qualified personnel properly gathered and evaluated information submitted and that such information was true, accurate, and complete to the best of their knowledge and belief. *See* General Permit §§ 4(c)(2)(I), 5(c)(4)(A), 6(d).

**RFA 11**

RFA 11 does not call for a legal conclusion; rather, RFA 11 asks Pike to admit or deny the factual matter of whether Pike knew (or did not know) that there was a risk of loss of primary containment at the Terminal due to climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge. CLF has already defined "climate change factors" in the request itself. The term "sea level rise" refers generally to the increase in the average height of the ocean's surface relative to land. The term "severe weather" refers to weather that is severe or of great degree; intense. The term "storm surge" refers to the abnormal rise in sea level caused by a storm, measured as the height of the water above the normal predicted astronomical tide. The phrase "risk of loss of primary containment" refers generally to the risk of an unplanned or uncontrolled release of fuel from an above ground storage tank at the Terminal.

**RFA 12**

RFA 12 does not call for a legal conclusion; rather RFA 12 asks Pike to admit or deny the factual matter of whether Pike's responsible corporate officer inquired of persons who manage Pike's system for ensuring that all terms and conditions of the General Permit continued to be met for all discharges authorized by the General Permit, including ensuring that qualified personnel properly gathered and evaluated information submitted in or with any Terminal SWPPP. *See* General Permit §§ 4(c)(2)(I),

clf
Conservation
Law Foundation

5(c)(4)(A), 6(d). To address Pike's claim that this request is vague and ambiguous, CLF directs Pike to the terms of the General Permit. *See* id.

**RFA 13**

RFA 13 does not call for a legal conclusion; rather, RFA 13 asks Pike to admit or deny the factual matter of whether Pike's responsible corporate officer did or did not inquire of persons responsible for gathering information submitted in or with the Terminal SWPPPs as the officer must do. *See* General Permit §§ 4(c)(2)(I), 5(c)(4)(A), 6(d).

**RFA 14**

To address Pike's objection, CLF offers the following revision:

*Admit that Pike determined, by its own calculations or otherwise, that the Terminal's secondary containment area is insufficient under the terms of the General Permit.*

**RFA 15**

To address Pike's objections, CLF offers the following revision:

*Admit that Pike determined, by its own calculations or otherwise, that the Terminal's secondary containment area was not impermeable as required by the General Permit § 5(b)(9)(A)(i).*

**RFA 16**

RFA 16 does not call for a legal conclusion; rather, RFA 16 asks Pike to admit or deny the factual matter of whether it had a system in place at the Terminal to ensure that all terms and conditions of the General Permit would continue be met for all discharges authorized by the General Permit at the Terminal site. *See* General Permit §§ 4(c)(2)(I), 5(c)(4)(A), 6(d).

**RFA 21**

To address Pike's objections, CLF offers the following revision:

*Admit that Defendant did not consider the impact of climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, on the potential of various sources at the Terminal to contribute pollutants to stormwater discharges when implementing stormwater management or treatments measures at the Terminal.*

The term "implementing" refers to the act of carrying out or putting into effect a stormwater management or treatment measure. The term "climate change factors" is defined in the request itself. The term "sea level rise" refers generally to the increase in the average height of the ocean's surface relative to land. The term "storm surge" refers to the abnormal rise in sea level caused by a storm, measured as the height of the water above the normal predicted astronomical tide.

**RFA 22**

To address Pike's objections, CLF offers the following revision:




*Admit that Defendant considers the impacts of climate change factors, such as such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, on the diversion of uncontaminated run-on to avoid areas that may contribute pollutants.*

The term "diversion" refers to the act of diverting or changing course or direction. The terms "uncontaminated run-on" refers generally to liquid that moves onto the Terminal site that is not contaminated with pollutants.

**RFA 27**

To address Pike's objections, CLF offers the following revision:

*Admit that information Defendant submitted to CT DEEP, in its SWPPPs or via another medium or manner, regarding the Terminal did not include information relating to the potential impacts of climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, on the Terminal.*

**RFA 28**

To address Pike's objections, CLF offers the following revision:

*Admit that Defendant was aware of the potential impacts of climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, on the Terminal when it submitted information regarding the Terminal to CT DEEP in its SWPPPs or via another medium or manner.*

**RFA 33**

To address Pike's objections, CLF offers the following revision:

*Admit that Defendant was aware of the potential for climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, to impact the Terminal and cause the New Haven Harbor and/or the Long Island Sound to become polluted.*

**RFA 37**

To address Pike's objections, CLF offers the following revision:

*Admit that climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, create significant sources or potential sources of pollution at the Terminal if and/or when they occur at the Terminal.*

The term "create" refers to bringing into existence. The term "significant" refers to having or likely have influence or effect. The term "sources" refers to a point of origin. The term climate change factors is defined in the request itself. The term "sea level rise" refers generally to the increase in the average height of the ocean's surface relative to land. The term "storm surge" refers to the abnormal rise in sea level caused by a storm, measured as the height of the water above the normal predicted astronomical tide. The term "potential" sources refers to possible sources.




**RFA 38**

To address Pike's objections, CLF offers the following revision:

*Admit that Defendant became aware that it must amend its SWPPP to address significant sources or potential sources of pollution due to climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, at the Terminal.*

The term "significant" refers to having or likely have influence or effect. The term "sources" refers to a point of origin. The term climate change factors is defined in the request itself. The term "sea level rise" refers generally to the increase in the average height of the ocean's surface relative to land. The term "storm surge" refers to the abnormal rise in sea level caused by a storm, measured as the height of the water above the normal predicted astronomical tide. The term "potential" sources refers to possible sources.

**RFA 43**

RFA 43 is limited in time. As CLF stated in its First RFAs, "Unless otherwise stated, the applicable time frame for these Requests for Admission is January 1, 2011, to April 10, 2024." CLF's First RFAs at 2. To address Pike's objection regarding location, CLF offers the following revision:

*Admit that the Terminal discharges stormwater to the New Haven Harbor via a municipal separate stormwater system at Outfall 001-1.*

**RFA 48**

RFA 48 is limited in time. As CLF stated in its First RFAs, "Unless otherwise stated, the applicable time frame for these Requests for Admission is January 1, 2011, to April 10, 2024." CLF's First RFAs at 2. To address Pike's other objections, CLF offers the following revision:

*Admit that stormwater has seeped into the ground at the Terminal, including the ground within the Terminal's secondary containment area.*

**RFA 49**

RFA 49 is limited in time. As CLF stated in its First RFAs, "Unless otherwise stated, the applicable time frame for these Requests for Admission is January 1, 2011, to April 10, 2024." CLF's First RFAs at 2. To address Pike's other objections, CLF offers the following revision:

*Admit that CT DEEP did not communicate to or inform Defendant that it could allow stormwater to seep into the ground at the Terminal, including the ground within the Terminal's secondary containment area.*

**RFA 51**

To address Pike's objections, CLF offers the following revision:

*Admit that stormwater has seeped into the ground in the Terminal's secondary containment area at various points in time during the period of January 1, 2011, through April 2024.*




**RFA 53**

RFA 53 is relevant to CLF's CWA claims because those claims are premised, in part, on Pike's failure to account for climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, at the Terminal. To address Pike's other objections, CLF offers the following revision:

*Admit that Defendant, such as Defendant's employees involved in preparing and/or approving the SWPPP, has been aware of and knows that climate change is occurring and is primarily caused by human activity.*

**RFA 54**

RFA 54 is relevant to CLF's CWA claims because those claims are premised, in part, on Pike's failure to account for climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, at the Terminal. To address Pike's other objections, CLF offers the following revision:

*Admit that Defendant has been aware of and knows about any publications by any organizations, governmental bodies, or oil and gas entities concerning the impacts of climate change to coastal communities or coastal infrastructure.*

**RFA 56**

RFA 56 is relevant to CLF's CWA claims because those claims are premised, in part, on Pike's failure to account for climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, at the Terminal. Additionally, this RFA is not vague or confusing or "so general that it is impossible to answer." Pike's RFA Responses at 27. Rather, the request simply asks whether Pike has knowledge of any steps or actions that other oil and gas entities have taken to adapt and prepare their infrastructure, like above ground storage tanks, to withstand the impacts of climate change. If Pike has no knowledge of any such steps or actions that other related entities have taken, then Pike must deny this request.

**RFA 57**

RFA 57 is relevant to CLF's CWA claims because those claims are premised, in part, on Pike's failure to account for climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, at the Terminal. Additionally, The term "expertise" refers to expert skill or knowledge. To address Pike's other objections, CLF provides the following revision:

*Admit that Defendant has employed individuals with expertise regarding the impact of climate change factors, such as flooding, sea level rise, increased frequency and severity of storms, increased precipitation, severe weather, and storm surge, generally and at coastal bulk fuel storage facilities, such as the Terminal.*

**RFA 61**

To address Pike's objections, CLF offers the following revision:

clf
Conservation
Law Foundation

*Admit that the Terminal's stormwater management system cannot manage stormwater pollutant discharges when it is inundated by stormwater or otherwise covered by a flood of water.*

**RFA 64**

To address Pike's objections, CLF offers the following revision:

*Admit that the Terminal's stormwater management system cannot contain leaks and spills when it is inundated by stormwater or otherwise covered by a flood of water.*

**RFA 67**

To address Pike's objections, CLF offers the following revision:

*Admit that the Terminal cannot operate its oil and water separators when they are inundated by stormwater or otherwise covered by a flood of water.*

* * *

As mentioned previously, CLF hopes that the Parties are able to meet and confer on June 26 or June 27 given that CLF's deadline to move to compel responses to any of the foregoing discovery requests is June 30, and Pike does not consent to CLF seeking an extension of that deadline. Please provide Pike's availability to meet and confer on those dates.

Best,

/s/ Ana McMonigle
Ana McMonigle
CONSERVATION LAW FOUNDATION, INC.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
(203) 298-7692
amcmonigle@clf.org

CC: Christopher Kilian (ckilian@clf.org)
Zachary Manley (zmanley@clf.org)
Ameya Gehi (agehi@clf.org)
Stephanie Yu (syu@clf.org)
Chance Raymond (chancethelawyer@gmail.com)
Chloe Booth (cbooth@wiggin.com)
Joshua Taylor (jtaylor@wiggin.com)