**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | Civil Action No. 3:21-cv-00932-SVN |
| *Plaintiff*, | |
| v. | |
| PIKE FUELS LIMITED PARTNERSHIP, | |
| | February 6, 2026 |
| *Defendant*. | |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S**
**MOTION TO PRECLUDE EXPERT TESTIMONY OF NANCY E. GARDINER**

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................................ iii

EXHIBIT LIST ............................................................................................................................. v

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND .............................................................................................................. 2

III.  LEGAL STANDARD ...................................................................................................... 2

      A.  Qualifications .......................................................................................................... 3

      B.  Reliable Methodology ............................................................................................. 3

IV.   ARGUMENT ................................................................................................................... 6

      A.  Ms. Gardiner's Opinion on Impermeability Are Inadmissible Because Ms.
          Gardiner Does Not Know How to Evaluate Permeability and Uses Unreliable
          Methodology, Including Speculation on the Adequacy of a Non-existent
          Liner. .................................................................................................................... 6

      B.  Ms. Gardiner's Internally Inconsistent Opinions on Climate Change and Its
          Effects Are Inadmissible Because Ms. Gardiner is Unqualified to Assess the
          Likelihood of Future Weather Events and Cannot Testify as an Expert Based
          on Her Subjective Beliefs. .................................................................................... 10

      C.  Ms. Gardiner's Opinions on the Adequacy of Pike's Secondary Containment
          Area Are Inadmissible Because Ms. Gardiner Is Unaware of How to
          Determine Appropriate Berm Height ..................................................................... 15

      D.  Ms. Gardiner's Legal Opinions Do Not Assist the Trier of Fact, and She Is
          Unqualified to Render Legal Opinions ................................................................... 17

V.    CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

***Cases***

*Algarin v. N.Y.C. Dep't of Corr.*,
460 F. Supp. 2d 469 (S.D.N.Y. 2006),
*aff'd*, 267 F. App'x 24 (2d Cir. 2008) ........................................................................ 5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...................................................................................... 4

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005) ........................................................................ 5

*Carroll v. Trump*,
No. 22-CV-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023),
*aff'd*, 124 F.4th 140 (2d Cir. 2024) ................................................................. 5, 9, 16

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021) ....................................................................................... 14

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 589 (1993) ............................................................................................. 3, 11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ............................................................................................. 5, 17

*Grdinich v. Bradlees*,
187 F.R.D. 77 (S.D.N.Y. 1999) ................................................................................. 9

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
508 F. Supp. 2d 295 (D. Vt. 2007) ........................................................................... 14

*Hunt v. CNH Am. LLC*,
511 F. App'x 43 (2d Cir. 2013) ................................................................................ 12

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ..................................................................................... 18

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ................................................................................................... 4

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ................................................................................................. 14

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018),
*aff'd sub nom.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*
*(No. II)*, 982 F.3d 113 (2d Cir. 2020)................................................................................. 5

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)................................................................................................. 3

*Old Gate Partners v. Paddock Enters.*,
No. 3:18-CV-01657 (JCH), 2024 WL 3520168 (D. Conn. May 30, 2024).................... 3, 4, 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720 (MKB), 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022)............................ 5

*In re Rezulin Prod. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................... passim

*Rodman v. Otsuka Am. Pharm., Inc.*,
564 F. Supp. 3d 879 (N.D. Cal. 2020),
*aff'd*, No. 20-16646, 2021 WL 5850914 (9th Cir. Dec. 9, 2021) ........................................ 6

*Scentsational Techs., LLC v. Pepsi, Inc.*,
No. 13-CV-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018),
*aff'd sub nom.*, *ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607
(Fed. Cir. 2019)................................................................................................................... 12

*SLSJ, LLC v. Kleban*,
277 F. Supp. 3d 258 (D. Conn. 2017)........................................................................... 3, 4, 19

**Rules**
Fed. R. Evid. 702. .......................................................................................................................... 3

**EXHIBIT LIST**

Exhibit A.      Nancy E. Gardiner Expert Report[1]

Exhibit B.      Nancy E. Gardiner Deposition Transcript

---

[1] Certain exhibits, including Ms. Gardiner's expert report, are stamped as confidential. CLF and Pike have agreed to de-designate such documents and, thus, are not filing the exhibits under seal.

## I.    INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF") respectfully moves to exclude the testimony of Nancy E. Gardiner. Defendant seeks to offer Ms. Gardiner to provide opinions that are not relevant to the issues before the Court, and opinions on topics such as climate change and the probability of climate change-intensified weather events that she is not qualified to testify to and use unreliable methodologies when a methodology is even discernable.

First, Defendant seeks to offer Ms. Gardiner to testify that the installation of a liner in the secondary containment area of Pike's New Haven Terminal would comply with the requirement under its Permit that this containment area be impermeable. Given that it is undisputed that Pike did not even begin to install such a liner until 2020 and the liner was incomplete when it sold the Terminal in 2024, Ms. Gardiner's speculative testimony about whether such a liner would result in compliance is irrelevant. Second, Ms. Gardiner lacks any qualifications to testify about climate change and the probability of climate-change intensified weather events. Her subjective belief that climate change is not happening cannot form the basis of an expert opinion on that issue or other opinions she seeks to offer that are premised on this subjective view. Third, Ms. Gardiner, who is a geologist with California-specific licenses related to erosion, sediment control, and water quality, lacks the knowledge, skill, experience, training, and education to opine on whether Pike implemented best management practices and assessed risk of discharges from climate change effects in accordance with the governing permit. Finally, Ms. Gardiner's testimony on the Clean Water Act and opinions based on interpretations of statutes and the Permit at issue in this case are improper legal opinions that are not helpful to the trier of fact and are inadmissible under Second Circuit precedent. Therefore, Ms. Gardiner's testimony is not only irrelevant and unhelpful to the trier of fact, but is also unreliable and inadmissible, and her report and testimony should be excluded.

## II.    BACKGROUND

CLF sued Pike for its violations of the Clean Water Act ("CWA") and its General National Pollutant Discharge Elimination System ("NPDES") permit (the "Permit"), including failure to update its bulk petroleum storage terminal (the "Terminal") to withstand oil-spill-causing precipitation events. Second Am. Compl. ("SAC"), ECF[1] 230 ¶¶ 14, 23–27, 44. The Permit requires Pike to develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") that must identify potential pollutant sources an implement "control measures." General Permit § 5(c)(e), ECF 230-5, at 25. "Control Measures" are "required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." General Permit § 5(b). Climate change-induced severe weather events cause and contribute to substantial risk of pollutant discharges for which Pike did not account. SAC, ¶¶ 170–295. Among the BMPs that Pike must implement, the Permit requires that Pike install an "impermeable secondary containment area" to "prevent authorized discharges of liquid chemicals or wastewater from commingling with or polluting a facility's stormwater discharges, or otherwise causing pollution to the waters of the state." General Permit, ECF 230-5 at 17, 19.

## III.    LEGAL STANDARD

The proper scope of an expert's testimony is delineated by Federal Rule of Evidence 702. Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or

---

[1] Pin cites to docket entries refer to the ECF header page number.

education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

### A. Qualifications

The first prong of Rule 702 requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "A witness is qualified where he or she has 'superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Old Gate Partners v. Paddock Enters.*, No. 3:18-CV-01657 (JCH), 2024 WL 3520168, at *6 (D. Conn. May 30, 2024) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

### B. Reliable Methodology

The United States Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals* that Rule 702 governs the district court's responsibility to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 589, 589 (1993). Since *Daubert*, the Second Circuit maintains that judges play a "screening function" to ensure courts admit only reliable expert testimony. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 264 (D. Conn. 2017) (quoting *Washington v. Kellwood*

*Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015)).

"If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable." *Old Gate Partners*, 2024 WL 3520168, at *6. In *Daubert*, the Supreme Court identified four factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation'" and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94). However, these factors are not a "definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* For nonscientific evidence, the Court still "must act as a 'gatekeeper,' following general standards 'in deciding whether the evidence is reliable and helpful.'" *SLSJ, LLC*, 277 F. Supp. 3d at 274 (citation omitted).

In determining the reliability of an expert's analysis, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. If an expert's opinion "is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266. If the "the flaw is large enough that the expert lacks good grounds for his or her conclusions," the expert must be excluded. *Id.* at 267 (internal quotations and citations omitted). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S.

4

136, 146 (1997).

Moreover, courts exclude expert testimony that is not based on a discernable methodology and instead based only on general experience, evidenced by failure to cite literature or use supportive evidence. *See Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636, at *4–5 (S.D.N.Y. Mar. 27, 2023), *aff'd*, 124 F.4th 140 (2d Cir. 2024) (excluding testimony where expert did not rely on "any specific facts, data, or evidence" and "blanket invocation" of experience in the field was insufficient); *Algarin v. N.Y.C. Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006), *aff'd*, 267 F. App'x 24 (2d Cir. 2008) (excluding testimony where expert did not cite literature or evaluate facts according to an accepted methodology and simply relied on "common sense" and "personal experience"). In the same vein, "personal anecdotes are not a reliable basis for an expert opinion." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2022 WL 15053250, at *42 (E.D.N.Y. Oct. 26, 2022); *see Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) ("An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology.").

Also, experts "may not 'pick and chose' [sic] from the scientific landscape and present the Court with what he believes the final picture looks like." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (citation omitted). Courts exclude expert testimony when the expert's conclusions do not flow from the sources they relied upon or when experts "ignore[]" relevant data. *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242, 242 (S.D.N.Y. 2018), *aff'd sub nom.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (excluding expert opinions where expert cited studies but did not discuss or analyze the study and failed to recognize "vital limitations" in

5

cited studies); *Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 891 (N.D. Cal. 2020), *aff'd*, No. 20-16646, 2021 WL 5850914 (9th Cir. Dec. 9, 2021) (excluding opinion because expert "extrapolated conclusions beyond the scope of her sources").

## IV.    ARGUMENT

Ms. Gardiner's testimony is inadmissible under Rule 702 and should be excluded from this case because: (1) her opinion that the installation of a liner would ensure that the Terminal's secondary containment area is impermeable is a speculative, counter-factual opinion given that Pike did not begin installing a liner until 2020 and had completed that installation at the time it sold the Terminal in 2024; (2) she lacks scientific, technical, and other specialized knowledge to opine on technical Permit requirements and compliance as well as the likelihood of climate change-intensified weather events; and (3) uses unreliable methodology in forming her opinions by ignoring facts, standards, and contradictory data from her own sources; and (4) she offers legal opinions on the interpretation of applicable law and the Permit that are not helpful to the trier of fact. Therefore, the Cout should exclude Ms. Gardiner's opinions on impermeability, climate change, the secondary containment area requirements, and legal interpretation of the law and Permit.

### A.    Ms. Gardiner's Opinion on Impermeability Are Inadmissible Because Ms. Gardiner Does Not Know How to Evaluate Permeability and Uses Unreliable Methodology, Including Speculation on the Adequacy of a Non-existent Liner.

A key issue in this case is the undisputed fact that the secondary containment area at the Terminal was permeable during from 2011 until 2024, when Pike sold the Terminal. It is also undisputed that Pike began to install a liner to address this issue in 2020, but the liner was not yet completed by the time of the sale.

Defendant seeks to offer Ms. Gardiner as an expert to opine "that the installation of a liner . . . is a proper means of ensuring that a secondary containment area is sufficiently impermeable

and its installation and use would be in compliance with the Permit and related Clean Water Act requirements." Gardiner Report, Ex. A at 4. This opinion is inadmissible because 1) Ms. Gardiner is unqualified to offer this opinion; 2) the opinion is based on speculation as to future conditions rather than on actual facts and is therefore unhelpful to the trier of fact; and 3) the opinion relies on unreliable methodology.

*First*, Ms. Gardiner lacks the scientific, technical, and specialized knowledge to opine on Permit requirements and compliance, such as the impermeability requirement. Ms. Gardiner offers opinions on Pike's implementation of BMPs, which she admits requires "technical expertise," but lacks the technical knowledge to opine thereon. Gardiner Tr., Ex. B at 113:11–13. She understands that permittees hire environmental consultants because "a reputable environmental consultant understands what the options are, what the costs are, and how to properly implement those in order to uphold their standard of care." *Id.* at 102:8–14; *id.* at 114:9–11 ("[T]here's a tremendous range of BMPs that . . . you could have an engineer design."). But Ms. Gardiner is not an engineer and has no coastal engineering experience. *Id.* at 40:23–24, 41:8–9. She testified that she is not familiar with the code of ethics or standard of care that engineers are subject to and has not conducted any calculations or cost-benefit analyses that engineers would. *See id.* at 39:25–40:21, 129:18:22.[2]

The fact that Ms. Gardiner has various licenses and certifications does not cure her lack of technical expertise and qualifications for the opinions she seeks to offer in this case. Gardiner Report, Ex. A at 2. Ms. Gardiner holds one license that is specific to erosion and sediment, which is not at issue here. *Id.* And she acknowledges that her other credentials are "California-specific." *Id.* Simply stated, there is an unbridged gap between Ms. Gardiner's experience and the expert

---

[2] Even another operator in the same bulk fuel storage industry recently agreed that "a non-engineer would be ill-equipped to understand many of the technicalities and language used in SWPPPs in assessing the aim and purpose of those plans" in this very Court. Defs.' Opp'n to Pl.'s Mot. to Preclude, *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-cv-933-VDO (D. Conn. Nov. 3, 2025), ECF 820 at 17.

opinions she seeks to testify about regarding best industry practice, proper BMPs, and risk of climate change effects for coastal critical infrastructure in New Haven, Connecticut.

*Second*, Ms. Gardiner's opinion on Pike's compliance with the Permit's impermeability requirement is not helpful to the trier of fact because, throughout Pike's ownership and control over the Terminal, a complete liner was never in place. It is undisputed that Pike did not even begin installation of a liner to address the permeability of the secondary containment area at the Terminal until 2020. *See, e.g.*, Gardiner Report, Ex. A at 4 (liner "was in the process of being installed by Pike beginning in 2020"). Since the liner was never completed during Pike's period of ownership, Ms. Gardiner's opinion on the liner complying with the Permit is not based on the undisputed factual condition of the Terminal site (no liner or a partial liner); it is instead based on a counter-factual assumption (the existence of a complete liner) and pure speculation as to whether such a liner could potentially meet the Permit's impermeability requirement. *See In re Rezulin*, 309 F. Supp. 2d at 547 (excluding expert testimony based on "speculative inferences"). Ms. Gardiner has no opinion as to Pike's compliance with the Permit's impermeability requirement based on the undisputed fact that no liner ever covered the entire secondary containment area at any point during Pike's ownership and operation. Gardiner Tr., Ex. B at 193:15–22. Besides, Ms. Gardiner seems unclear whether she is providing an opinion on impermeability, as shown by her contradictory deposition testimony, which is confusing and misleading for the trier of fact:

- "I have not been asked to offer and am not offering an opinion about whether the secondary containment area complied with the Permit's requirements about permeability/impermeability." Gardiner Report, Ex. A at 4.

- "[I]f they were to have a leak or spill as a result of something that happens, their impermeable liner would catch it. But again, I'm not really here to opine on the adequacy of that." Gardiner Tr., Ex. B at 163:2–6.

- "Q. Are you indicating -- do you have an opinion as to whether Pike complied with the

impermeability requirement of the secondary containment requirement under the permit? A. So I've not really been retained to comment on the adequacy of it." *Id.* at 183:22–184:2.

- "Q. Okay. So is it your opinion that had the liner been complete, they would have been in compliance with the impermeability requirement? A. Well, again, I'm not here to offer a true opinion on that." *Id.* at 186:7–12.

- "Q. And you used the term 'sufficiently impermeable.' Is that the same as the permit on page 22 where it says an impermeable secondary containment? The permit was previously stamped as Exhibit 17. A. My opinion is that -- and again, this is really not what I'm supposed to be opining on." *Id.* at 188:10–17.

*Third*, Ms. Gardiner does not employ a reliable methodology or any discernible methodology. Like the expert witness in *Carroll*, Ms. Gardiner relies on a "blanket invocation" of her experience generally to support her opinions—not any "specific facts, data, or evidence." *Carroll*, 2023 WL 2652636, at *4–5. She based her opinion solely on what she has "read" and "heard" from Pike's documents and that it "sound[ed] like they inspected the product." Gardiner Tr., Ex. B at 186:12–19. Ms. Gardiner admits she "did not conduct any permeability tests by myself. You know, I didn't go out and inspect [the liner]." *Id.* at 184:12–17. She did not do any research on impermeability calculations or test the liner for impermeability. *Id.* at 187:23–25, 188:21–22; *id.* at 193:19–22 ("I was not there to see it and take permeability calculations and tests."). Ms. Gardiner also did not conduct a site visit and did not review the deposition transcripts of Pike's fact witnesses[3] or consultants, much less talk to them. *Id.* at 18:10–19:4, 19:18–20, 58:21–59:2.

While Ms. Gardiner does invoke "good practice" in general to opine that the liner "appears to be right," *Id.* at 188:21–23, that reasoning is insufficient to meet Rule 702 requirements in this Circuit. *See Grdinich v. Bradlees*, 187 F.R.D. 77, 81–82 (S.D.N.Y. 1999) (excluding expert opinion allegedly based on industry standards as unsupported speculation where only basis for

---

[3] Ms. Gardiner reviewed the deposition transcript of Ms. Foxworth, Pike's second 30(b)(6) designee, but that witness refused to answer most questions following improper directions not to answer, which is an issue pending before the Court. Pl.'s Second Mot. To Compel Dep. Test. of the Def., ECF 317; Hearing Tr., ECF 337.

9

standards were general "common-sense" guidelines and the expert's "own authority"). Therefore, because Ms. Gardiner's opinion on Pike's compliance with the Permit's impermeability requirement is based on speculation about future compliance rather than compliance during the period of Pike's ownership, that opinion is neither helpful to the trier of fact nor based on reliable methodology, this opinion is inadmissible as expert testimony and should be excluded.

### B. Ms. Gardiner's Internally Inconsistent Opinions on Climate Change and Its Effects Are Inadmissible Because Ms. Gardiner is Unqualified to Assess the Likelihood of Future Weather Events and Cannot Testify as an Expert Based on Her Subjective Beliefs.

Defendant next seeks to offer Ms. Gardiner as an expert witness to opine that the Permit "did not require any special consideration of climate change and that Pike's activities were in compliance with the Permit." Gardiner Report, Ex. A at 4. This opinion extends to sea level rise, storm surge, extreme precipitation events, hurricanes, and natural disasters. Gardiner Tr., Ex. B at 67:18–24, 72:10–14, 74:22–75:1, 85:22–86:1, 109:21–25, 124:5–9, 164:14–165:2. She forms this opinion based on assessing the likelihood of weather events and climate change that can cause unauthorized discharges and devastating consequences. *See, e.g.*, Gardiner Report, Ex. A at 5 ("long-term sea level rise or potential stronger storms . . . are not likely to manifest in the near term"); *id.* at 8 (opining that hurricanes that are "severe enough to overtop Gulf's levees . . . are not reasonably foreseeable . . . are not reasonably likely to occur in the near term"); *id.* at 11 ("theoretical rises in temperature and sea level, an increased frequency of severe storms and hurricanes, storm surge"); *id.* at 17 ("the amount of potential sea level rise changes from year to year during the permit period is small"). This opinion is inadmissible because: (1) Ms. Gardiner is unqualified; and (2) the opinion relies on unreliable methodology.

*First*, Ms. Gardiner does not have the expertise to assess the likelihood of future weather events. She is not a meteorologist, climate scientist, or atmospheric scientist. Gardiner Tr., Ex. B

10

at 41:11–16. She also lacks experience in oceanography and climatology. *Id.* at 41:17–21. When asked if she considered whether Hurricane Sandy[4] is relevant to the historical record of weather events that informs future risk, she herself testified that she is "not sure [she's] qualified to provide an opinion on that because that's a meteorologic question." *Id.* at 127:7–22. Similarly, when asked how to determine whether a storm is reasonably foreseeable, Ms. Gardiner replied: "We don't know what's going to happen in five years or 150 years. You know, I don't know." *Id.* at 126:16–127:1 (discussing Gardiner Report, Ex. A at 8). Given this complete lack of any education, training, or experience, Ms. Gardiner is not qualified to offer any expert opinions on the likelihood of weather events or climate change effects, and the Court should exclude any such expert testimony. Beyond her lack of relevant qualifications, Ms. Gardiner acknowledged that she does not even believe that climate change is happening and is relying on her subjective belief. *See infra.* However, an expert's testimony must be based on more than subjective belief or speculation. *Daubert*, 509 U.S. at 589–90; *see In re Rezulin*, 309 F. Supp. 2d 541 n.17 (S.D.N.Y. 2004) ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation.") (quoting *Daubert*, 509 U.S. at 590)).

*Second*, Ms. Gardiner does not use a reliable methodology, if any at all. She (1) relies on the Permit text, which is not a methodology; and (2) assesses the likelihood of weather events and climate change effects without data. Ms. Gardiner opines that "the permit is very specific about what the requirements are, and if it doesn't expressly say that something should be considered, then, no, it does not require it." Gardiner Tr., Ex. B at 70:15–20; *id.* at 73:5–8 (Q. "If the permit does not contain that requirement, then permittees are not required to consider that topic? A. Correct."). In Ms. Gardiner's logic, because the Permit does not expressly mention consideration

---

[4] Hurricane Sandy made landfall near Atlantic City, New Jersey on October 29, 2012. *See Hurricane Sandy: 5 Year Anniversary*, National Weather Service, https://www.weather.gov/okx/HurricaneSandy5Year.

of sea level rise, storm surge, extreme precipitation events, hurricanes, natural disasters, and climate change, then the Permit does not require Pike to consider these risks regardless of the General Permit's requirement to use best industry practices to avoid discharging pollutants to the New Haven Harbor. *Id.* at 67:18–24, 72:10–14, 74:22–75:1, 85:22–86:1, 109:21–25, 124:5–9, 164:14–165:2. However, simply reading the Permit is not a methodology, and purported expert testimony is not the appropriate vehicle to argue permit interpretation (read like a contract) on the merits. *See Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom.*, *ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019) (It is "inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story."); *see also* Section IV.D., *infra* (legal opinions by experts are inadmissible).

In any event, Ms. Gardiner's reasoning that the Permit does not require something simply because it does not expressly say so contradicts her own understanding of BMPs. The Second Circuit excludes expert opinions that are "unsupported and internally inconsistent." *Hunt v. CNH Am. LLC*, 511 F. App'x 43, 47 (2d Cir. 2013); *see In re Rezulin*, 309 F. Supp. 2d at 563 n.146 (S.D.N.Y. 2004) (noting expert contradicting his own standards was dispositive in excluding him). Ms. Gardiner recognizes that the "permit is not sufficiently detailed and never could be, I don't think, to list every single BMP that's available out there." Gardiner Tr., Ex. B at 114:12–19. Ms. Gardiner admits that

> the implementation of a permit like this one requires that you look at your site-specific conditions and you select and implement BMPs that make sense in the context of that facility. And that includes the condition of the facility, what you're doing there, your expected life expect—life expectancy of the facility, and so forth.

*Id.* at 107:22–108:6. Ms. Gardiner testified that to determine what BMPs to implement, permittees

12

do not simply read permits; they hire environmental consultants, consult "various sources of information that are out there in the public realm," and attend conferences and trade shows. *Id.* at 94:2–95:9. For Ms. Gardiner, there is no "limit" to what sources can be relied upon in choosing BMPs, except for her asserted limitations on relying on other industry actors to choose BMPs relating to climate change. *Id.* at 96:20–24; Gardiner Report, Ex. A at 12.

Additionally, Ms. Gardiner fails to cite any literature or facts to support her conclusions that an increase in severe storms and rises in temperature and sea level are not likely to occur in the near term and thus Pike need not consider them in managing discharges. *See* Gardiner Report, Ex. A at 5, 8, 11, 17. Ms. Gardiner does not consider relevant the 2019 Connecticut Physical Climate Science Assessment Report, which discusses increases in local weather events due to climate change and is in the "public realm," to determine Pike's compliance with the Permit. Gardiner Tr., Ex. B at 120:6–16, 94:16–19; *see, e.g.*, SAC ¶ 274.

Instead, Ms. Gardiner relies solely on her personal subjective beliefs about climate change and its effects, which according to her, is not happening:

> Q. Does climate change have real-world impacts in New Haven? . . .
> A. As I said, I am not convinced it's necessarily happening. So maybe.
> Q. And what do you mean by "not convinced"?
> A. Well, I'm a geologist by training. Climate goes up and down all through geologic history. Are we in a period right now where it's happening? I have no idea.

Gardiner Tr., Ex. B at 69:3–16.

> Q. So during the course -- or during the period when the permit is active, including when it's administratively continued, should permittees consider the changing climate?
> A. I don't think so. I mean, climate change doesn't happen -- if it really is happening, it's not going to happen in five years, you know.

*Id.* at 81:25–82:7.

13

Q. Yeah, you mentioned that long-term future risks would entail changes that we're not sure or that we don't know. Are you saying that we don't know how to determine or whether climate change is happening?

A. I don't know that we do . . .

*Id.* at 83:15–20.

Q. Does near-term risk and the way you described it here, would that cover sea level rise? . . .

A. Again, it's not in the permit, so -- and my understanding is if it is happening, it happens incrementally over a long, long time, 100 years, 500 years. I don't know.

*Id.* at 85:12–20.

Q. Would you consider 'global warming' and 'climate change' to be interchangeable terms?

A. I think if it's really happening, you could say that global warming is one aspect of climate change.

*Id.* at 68:19–24. Ms. Gardiner's subjective opinions on climate change are also internally inconsistent, which is grounds for exclusion under *Hunt* and *In re Rezulin*. In her report, Ms. Gardiner acknowledges that climate change is a "slow, evolving process," Gardiner Report, Ex. A at 17, yet testified that she does not believe climate change is happening and that all its effects are speculative. *Supra*. Regardless, whether climate change is, in fact, occurring is not—or at least should not be—in dispute. For decades, federal courts have recognized the onset of climate change.[5] Ms. Gardiner is entitled to her subjective beliefs on this subject; but she should not be permitted to offer an opinion as an expert based on those subjective beliefs. *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 543–44 (rejecting the notion that courts "should permit 'experts' to tender

---

[5] Almost twenty years ago, the Supreme Court expressly acknowledged that the "harms associated with climate change are serious and well recognized." *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007). The Second Circuit acknowledges that "[g]lobal warming is one of the greatest challenges facing humanity today. Among the scientific community, there is near universal consensus that global warming is primarily caused, or at least accelerated, by the burning of fossil fuels." *City of New York v. Chevron Corp.*, 993 F.3d 81, 86 (2d Cir. 2021); *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 319–20 (D. Vt. 2007) (dismissing *Daubert* motion to exclude testimony on the impacts of climate change and acknowledging there is "widespread acceptance" that climate change is happening).

14

purely subjective views in the guise of expert opinions" because it "would border on the absurd.").

### C. Ms. Gardiner's Opinions on the Adequacy of Pike's Secondary Containment Area Are Inadmissible Because Ms. Gardiner Is Unaware of How to Determine Appropriate Berm Height.

A second issue in this case related to the secondary containment area at the Terminal is whether that containment area is adequate to protect against "discharges of liquid chemicals or wastewater from commingling with or polluting a facility's stormwater discharges, or otherwise causing pollution to the waters of the state." General Permit, ECF 230-5 at 17, 19.

Defendant seeks to offer Ms. Gardiner as an expert to opine that Pike's planning for "major storm events . . . based on the 100-year storm[6] and base flood elevation . . . is reasonable." Gardiner Report, Ex. A at 6. She bases this opinion on the fact that Pike raised the berm height of the secondary containment area to thirteen feet, stating that "FEMA flood maps +1 [foot] is an acceptable method." *Id.* at 15. This opinion is inadmissible because: (1) Ms. Gardiner is unqualified; and (2) the opinion relies on unreliable methodology.

*First*, Ms. Gardiner once again lacks the scientific, technical, and specialized knowledge to opine on Permit requirements and compliance, such as whether Pike has properly constructed a secondary containment area that will protect against "discharges of liquid chemicals or wastewater from commingling with or polluting a facility's stormwater discharges, or otherwise causing pollution to the waters of the state." General Permit, ECF 230-5 at 17, 19. In addition to the reasons mentioned *supra*, Section IV.A, Ms. Gardiner cannot justify which source should be consulted when deciding what height Pike should construct the berm surrounding the secondary containment area to prevent flooding and unauthorized discharges. Gardiner Tr., Ex. B at 176:17–25.

*Second*, Ms. Gardiner does not employ a reliable methodology or any discernible

---

[6] A 100-year storm has a 1/100 chance or 1% chance of occurring in a given year.

15

methodology at all. Ms. Gardiner bases her opinion on the fact that reliance on the FEMA flood map is reasonable—but does not even know whether Pike relied on FEMA to determine berm height, and therefore cannot comment on the reasonableness of its approach:

> You know, I'm not sure what Gulf looked at specifically. I mean, the fact that they used the hundred-foot standard and based, you know, the height of the berm on that plus 1 foot base flood elevation suggests to me they were relying on FEMA. But, you know, I don't know. That was not part of my research . . .

*Id.* at 176:4–12. With another general, unsupported statement, Ms. Gardiner steps out beyond her expertise to opine on industry practice. Gardiner Report, Ex. A at 9 ("[I]t is far more common for facilities to rely on FEMA floodplain maps, and to construct berms robust enough to withstand the 100-year event identified on those maps."). Similarly, without any citation or support in her expert report, she states that "permittees often rely on guidance such as the [FEMA] Floodplain Insurance Risk Maps." *Id.* at 11. Yet Ms. Gardiner testified that she did not conduct a review of industry practice (the bulk petroleum storage industry specifically) on preparing for flooding. Gardiner Tr., Ex. B at 171:7–11. As previously mentioned, "blanket invocation" of experience is not a valid basis to support expert testimony. *Carroll*, 2023 WL 2652636, at *4–5.

Furthermore, Ms. Gardiner cannot explain the bases for her opinion that relying on FEMA maps to plan for a 100-year storm event instead of other types of storms is acceptable for a bulk oil facility in a coastal location. In her report, Ms. Gardiner disagrees with CLF's expert witnesses' reliance on publications by the American Society of Civil Engineers ("ASCE") that suggest new or modified bulk oil terminals should plan for a 500-year or 1,000-year event. Gardiner Report, Ex. A at 11, 15. But Ms. Gardiner, who is not an engineer and has no coastal engineering experience, cannot explain when the FEMA or ASCE standard should be used and acknowledges that guidance from either FEMA or ASCE can be used to plan for major storm events: "[T]here aren't any set standards that you have to use, right? You can use [ASCE] if you want or you can

use FEMA, and that's what they used, as far as I know." Gardiner Tr., Ex. B at 176:17–25.

Ms. Gardiner goes on to criticize CLF's expert witnesses for not deeming FEMA as appropriate for design and failing to consider the American Petroleum Institute's Publication 656, Natural Hazard Triggered Technological Storage Tank Events ("API 656"), a "guidance publication" according to Ms. Gardiner. Gardiner Report, Ex. A at 12. Relying on API 656, Ms. Gardiner opines that the "costs of preparing for what it refers to as low probability, high consequence events must be considered and be shown to yield a benefit" and thus planning for a 500-year or 1,000-year event (theoretically less likely to occur than a 100-year event) is unreasonable. *Id*. at 6, 9, 12. But this conclusory opinion is unsupported by any analysis. *Id*. at 9; *id.* at 9 ("I have not done a specific financial analysis ").

Also, Ms. Gardiner is unaware of why the additional one foot was chosen for the berm height over other numbers and can only speculate: "Q. Do you know what that plus 1 was based off of? A. I don't know the specifics, no. I think it was probably best professional judgment." Gardiner Tr., Ex. B at 78:16–20. She did not find relevant the fact that Pike's own employees wanted to "adjust the dike walls according[]" to new maps that were redone due to "global warming and sea level rises." *Id.* at 77:20–78:11. "[T]oo great an analytical gap" exists between Ms. Gardiner's conclusions and her reasoning and sources. *See Joiner*, 522 U.S. at 146.

For all of these reasons, Ms. Gardiner's opinion on the secondary containment requirement is inadmissible and should be excluded.

### D. Ms. Gardiner's Legal Opinions Do Not Assist the Trier of Fact, and She Is Unqualified to Render Legal Opinions.

Finally, in addition to the other flaws that make her opinions inadmissible as expert testimony in this case, Ms. Gardiner also seeks to offer an improper legal opinion regarding the interpretation of the Permit at issue.

17

"[T]he court must decide whether the expert's testimony is relevant, i.e., whether it will 'help the trier of fact.'" *Old Gate Partners*, 2024 WL 3520168, at *7 (citing *In re Mirena*, 169 F. Supp. 3d at 413). Expert testimony offering legal opinions or conclusions is unhelpful to the trier of fact and thus inadmissible in the Second Circuit. *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Old Gate Partners*, 2024 WL 3520168, at *7 ("However, expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it' does not aid the jury in making a decision.") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Here, Ms. Gardiner's testimony on the purpose and interpretation of governing statutes and regulations is improper legal opinion and should be excluded. Ms. Gardiner is a geologist; she is not a lawyer. Gardiner Report, Ex. A at 2; Gardiner Tr., Ex. B at 20:9–14. Specifically, Ms. Gardiner's opinions on the purpose of the Clean Water Act and NPDES Permits in Section 3 of her report are inadmissible. Gardiner Report, Ex. A at 4–5. In Section 3, Ms. Gardiner summarizes CWA statutes, regulatory documents, and legislative history—traditionally within the purview of the court—to support improper legal opinions. *Id.* (citing 33 U.S.C. §§ 1251, 1342 and defining statutory terms). This testimony is improper legal opinion.

In addition, Ms. Gardiner attempts to interpret two regulatorily defined terms to form her opinions related to hurricanes and storm surge. *Id.* at 7, 9. Ms. Gardiner opines that

> A hurricane is an upset condition and if a hurricane hit that was severe enough to overtop Gulf's levees, it likely would be a storm the types of which are not reasonably foreseeable in the near term . . . [and] In my opinion, the NPDES permitting scheme and the Connecticut Permits that were in effect at the time did not require regulated facilities to build or retrofit existing locations for theoretically possible events that have never been recorded and are not reasonably likely to occur in the near term.

*Id.* at 8. Ms. Gardiner's opinion is based on her textual interpretation of "upset," which EPA

18

defined at 40 C.F.R. § 122.41(n). *Id.* at 7 (interpreting regulation). She goes even further and opines that "Pike's activities were in compliance with the Permit." *Id.* at 4.

Ms. Gardiner opines that "storm surge would be considered and treated as naturally occurring ocean water mobilized as a result of an upset condition, such as a hurricane, and is not a non-stormwater discharge as intended in the NPDES permit." *Id.* at 9. This opinion is based on her textual interpretation of a Permit term that excepts from permitting certain discharges, some of which are defined by regulation. *Id.* (citing Permit and regulation). During her deposition, Ms. Gardiner confirmed that her opinion that storm surge is "naturally occurring ocean water" is based solely on the textual reading of the Permit. Gardiner Tr., Ex. B at 203:6–204:8 ("Q. And you didn't consider anything else? A. Permit is what I'm looking at.").

Courts are the experts on the law, including statutory interpretation. Defendant's attorneys may present their legal arguments in briefs filed with the Court, but Defendant cannot present legal opinions, analysis of the law, and legal conclusions through the testimony of its experts. *See SLSJ, LLC*, 277 F. Supp. 3d at 268 ("[T]he expert cannot give testimony stating *ultimate legal conclusions* based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating." (emphasis in original)). Therefore, Ms. Gardiner's legal opinions set forth in Section 3 of her expert report are unhelpful to the trier of fact, inadmissible as expert opinions, and should be excluded.

## V.    CONCLUSION

For the foregoing reasons, CLF respectfully requests that the Court grant its Motion and exclude the expert testimony of Nancy E. Gardiner.

19

Dated: February 6, 2026

Respectfully submitted,
CONSERVATION LAW FOUNDATION,
INC., by its attorneys

*/s/ Kristine S. Tardiff*

Kristine S. Tardiff (phv208597)*
Conservation Law Foundation, Inc.
27 North Main Street
Concord, NH 03301
Tel: (603) 573-9144
Email: ktardiff@clf.org

Ana McMonigle (ct31370)
Andrea Leshak (phv208945)*
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
Tel: (203) 902-2157
E-mail: amcmonigle@clf.org
E-mail: aleshak@clf.org

Christopher M. Kilian (ct31122)
Kenneth  J. Rumelt (phv207130)*
Conservation Law Foundation, Inc.
15 East State Street, Suite
4  Montpelier, VT 05602
Tel: (802) 622-3020
Tel: (802) 223-5992
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org

Chance Raymond (ct31311)
Chance  the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Tel: (832) 671-6381
E-mail: chancethelawyer@gmail.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

20

*Admitted as Visiting Attorney