# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Civil Action No.
3:21-cv-00932-SVN
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
CONSERVATION LAW FOUNDATION,
INC.,
              Plaintiff,
        v.
PIKE FUELS LIMITED
PARTNERSHIP,

              Defendant.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REMOTE VIDEOTAPED DEPOSITION OF
NANCY E. GARDINER

December 9th, 2025
9:01 a.m.

Reported by:
Maureen O'Connor Pollard, RDR
CA CSR #14449

                    - - -

Golkow, a Veritext division

Page 18

breakdown of the duration of each meeting?

A.    Approximately two hours per meeting.

Q.    Did you take any notes during those meetings?

A.    Scribbles.  I don't have them in front of me, though.

Q.    Did you keep the copy of your scribbles?

A.    I did.

Q.    Did you speak with any former or current Pike Fuels employees to prepare for this deposition?

A.    No.

Q.    Did you speak to any former or current Pike Fuels employees to prepare your expert report?

A.    No.

Q.    Did you ask to speak with any current or former Pike employees for your report?

A.    No.

Q.    Did you speak to any of Pike's environmental consultants to prepare your report?

A.    No.

Page 19

Q.    Did you speak with any of Pike's environmental consultants to prepare for this deposition?

A.    No.

Q.    Did you meet with anyone else to prepare for this deposition --

A.    No.

Q.    -- other than Wiggin and Dana? Okay.

Did you meet with the other expert witnesses in this matter to prepare for this deposition?

A.    No.

Q.    And you said you didn't bring anything with you to the deposition today, correct?

A.    Nothing.

Q.    And did you do a site visit at the terminal ever?

A.    No, I have not.

Q.    I'm going to turn now to your experience, starting with education.

So, Ms. Gardiner, what is your highest level of education?

A.    I have a master's degree in

Page 20

hydrogeology from the University of Wisconsin-Madison.

Q.    And when did you receive that degree?

A.    1988.

Q.    Do you have any other degrees?

A.    I have an ABD in geology from Smith College, Northampton, Massachusetts 1986.

Q.    Do you have a law degree?

A.    No.

Q.    Did you go to law school?

A.    No.

Q.    Did you do a legal apprenticeship?

A.    No.

Q.    Are you currently employed?

A.    Yes.

Q.    Where is your place of employment?

A.    San Diego, California.

Q.    Is the name of your employer TRC Environmental?

A.    Yes.

Q.    And what is your title at TRC?

A.    I'm a vice president and principal consultant.

Q.    Have you had any other titles at TRC

Page 39

ones were on the coast?

A.    The Department of Transportation in California has a lot of roadways that are right on the coast, and we got involved in those projects.  They were pretty interesting.

Department of Transportation -- airports in Hawaii, the international airport is on the coast, the San Diego International Airport is on the coast, San Francisco International Airport is on the coast.  Those are all good examples of that.

Q.    And those states, the states that represent those facilities, that was California and Hawaii and Georgia, correct?

A.    Yes.

Q.    Any other states?

A.    I did a little bit with King County International Airport up in Washington, but those are mostly it.

Q.    That would be Washington State, right, on the West Coast?

A.    Correct.

Q.    Are you an engineer, Ms. Gardiner?

A.    No.

Q.    Are you aware of obligations that

Page 40

professional engineers have?

MR. DOROGHAZI:  Object to the form.

You can answer if you understand.

THE WITNESS:  To a certain extent. I mean, I know they have to be licensed, they have pretty rigorous examination, and they have a code of ethics and standard of care they must maintain.

BY MS. GEHI:

Q.    Are you familiar with the standard -- or, sorry, the code of ethics that professional engineers are bound to?

A.    I don't think I can comment on that because I'm not a professional engineer.

Q.    Are you familiar with the standard of care that professional engineers have?

MR. DOROGHAZI:  Object to the form.

You can answer.

THE WITNESS:  I would say same answer.  I mean, generally yes, but I'm not an engineer.

BY MS. GEHI:

Q.    Do you have any coastal engineering experience?

MR. DOROGHAZI:  Object to the form.

Page 41

If you can --

THE WITNESS:  As I said --

MR. DOROGHAZI:  -- answer, please answer.

THE WITNESS:  Sorry.

MR. DOROGHAZI:  Go ahead, you can answer.

THE WITNESS:  Same thing, I'm not an engineer, coastal or otherwise.

BY MS. GEHI:

Q.   Are you a meteorologist?

A.   No.

Q.   Are you a climate scientist?

A.   No.

Q.   Are you an atmospheric scientist?

A.   No.

Q.   Do you have expertise in oceanography?

A.   No.

Q.   Do you have expert in climatology?

A.   No.

Q.   And you mentioned you've never been deposed before, correct?

A.   Correct.

Q.   In what capacity have you worked on

Page 58

A.    Same response.

Q.    Did you review any of the references that Dr. Nairn relied on in his report?

A.    Same response.

Q.    Did you review any of the references that Dr. O'Donnell relied on for his report?

A.    Same response.

Q.    Did you review any of the references that Rob Roseen relied on in his report?

A.    Same response.

Q.    Did you read the expert reports of the other disclosed expert witnesses for this matter?

A.    No.

Q.    Did you read any deposition transcripts from this case other than the CLF expert witnesses?

A.    No.  All of those documents are listed here at the back of my expert report, all of the ones I reviewed.

Q.    Other than Ms. Foxworth's deposition transcript, you didn't read or review any of the deposition transcripts from Pike employees?

A.    No.

Q.    Did you review any of the deposition

Page 59

transcripts of any of Pike's consultants?

A.   No.

Q.   Do you keep a -- do you have a file for this case?

A.   I have copies of documents that I was provided to review for the case.

Q.   And did you -- did we already go through all those documents, or is there anything that you haven't already mentioned?

A.   There were some additional documents that I looked at but I didn't rely on for my report.

Q.   Which ones are those?

A.   There were some facility response plans.

Q.   Do you remember which versions or which years those facility response plans were?

A.   Not specifically.  There were several of them.

Q.   Were there any other documents that you looked at but did not rely on?

A.   Not that I recall.

MS. GEHI:  John, we might follow up on that list of facility response plans that Ms. Gardiner looked at.

Page 67

this is outside of her expert report.  I don't think she was disclosed as an expert on climate change.

But subject to that objection, you can answer.

THE WITNESS:  Could you repeat the question?

BY MS. GEHI:

Q.    Is climate change currently occurring?

A.    I don't know.

Q.    Is there anything you would need to know to know an answer to that question?

MR. DOROGHAZI:  Same objection.

THE WITNESS:  That's not what I'm opining on today.

BY MS. GEHI:

Q.    Is it one of your opinions that the NPDES permit doesn't require consideration of climate change?

A.    2021 permit that Pike was operating under for compliance with the industrial stormwater permit did not mention climate change.

Q.    But you're not able to say whether

Page 68

climate change is currently occurring?

A.    I don't know.

Q.    Is there anything that would be helpful to review to have an answer to that question?

MR. DOROGHAZI:  Same objection.

THE WITNESS:  That's not what I was retained to comment on.

BY MS. GEHI:

Q.    Would you consider "global warming" and "climate change" to be interchangeable terms?

MR. DOROGHAZI:  Same objection.

You can answer.

THE WITNESS:  Could you repeat the question?

BY MS. GEHI:

Q.    Sure.

Would you consider "global warming" and "climate change" to be interchangeable terms?

A.    I think if it's really happening, you could say that global warming is one aspect of climate change.

Q.    And when you say "it," do you mean

Page 69

climate change?

A.    Yes.

Q.    Does climate change have real-world impacts in New Haven?

MR. DOROGHAZI:  Same objection.

You can answer.

THE WITNESS:  As I said, I am not convinced it's necessarily happening.  So maybe.

BY MS. GEHI:

Q.    And what do you mean by "not convinced"?

A.    Well, I'm a geologist by training. Climate goes up and down all through geologic history.  Are we in a period right now where it's happening?  I have no idea.

Q.    Is it your opinion that there's no evidence of increased severity of rainfall in Connecticut?

MR. DOROGHAZI:  Same objection. Beyond the scope of the opinion.

THE WITNESS:  I mean, again, I think we're looking at a very short period of time, so I can't comment that we're seeing a long-term trend of anything like that,

Page 70

nor do I think it's particularly relevant to my opinion.

BY MS. GEHI:

Q.    You don't think increased severity of rainfall in Connecticut is relevant to your opinion?

A.    I'm here to talk to you about what the permit requires, not projections of long-term change.

Q.    In other words, you don't think the permit requires consideration of increased severity of rainfall in Connecticut?

A.    I think the permit says what it requires, and that's not on the list.

Q.    Does a permit list everything that a permittee should consider?

A.    I think the permit is very specific about what the requirements are, and if it doesn't expressly say that something should be considered, then, no, it does not require it.

Q.    Is it your opinion there's no evidence of increased flash flooding in Connecticut?

MR. DOROGHAZI:  Just let me object to the extent it's beyond the scope of the

Page 72

a few years.  I've seen that with other permits, but I'm not 100 percent sure for this particular permit.

Q.    Should infrastructure like the bulk petroleum storage facility be designed to take sea level into account?

A.    We're not designing a facility here, we're dealing with a facility that dates possibly back as far as 1926.

Q.    In the design of best management practices under the permit, should the terminal consider sea level rise?

A.    The permit does not say anything about sea level rise.

Q.    Regardless of what the permit says about sea level rise, should Pike consider sea level rise in designing best management practices?

MR. DOROGHAZI:  Object to the form, and asked and answered.

You can answer.

THE WITNESS:  Well, again, the permit does not say you have to consider that.

///

Page 73

BY MS. GEHI:

Q. Okay. So if the permit doesn't require -- or doesn't contain -- I'm sorry, I don't know why I'm blurry.

If the permit does not contain that requirement, then permittees are not required to consider that topic?

A. Correct.

Q. Should Pike consider extreme precipitation events when designing best management practices?

A. Same comment, I think you look at the record, the current record, what's going on under normal operating conditions, and you select the MPs accordingly.

Q. What do you mean by "normal operating conditions"?

A. What's happening right now during the time the permit is in place.

Q. If climate change were happening right now, should climate change be considered when designing best management practices?

A. Well, that's --

MR. DOROGHAZI: Object to form.

Sorry. Object to the form.

Page 74

You can answer.  Go ahead.

THE WITNESS:  Sorry, John.  I'll pause a little longer.

MR. DOROGHAZI:  No, I'll try to be faster.  I'm sorry.

THE WITNESS:  Well, it doesn't say that.  You know, people comply with permits based on what the permit, you know, says, and so a future scenario like you're posing I would say is not necessary for permit compliance.

BY MS. GEHI:

Q.   If sea level rise were occurring right now, would Pike be required to consider that in designing best management practices?

MR. DOROGHAZI:  Same objection.

You can answer.

THE WITNESS:  That's a hypothetical question.  Not based on what the permit says.

BY MS. GEHI:

Q.   Should storm surge be considered when designing best management practices for a facility like the terminal?

A.   Again that's not what the permit

Page 75

requires.  Don't know.

Q.    Are you aware that when planning for the height of the containment berms Pike employees considered global warming because of the increased risk of flooding?

A.    I don't know.

Q.    Would that have been something relevant to know for your opinion?

A.    My understanding is that they raised the height of the berm in order to accommodate base flood elevation plus 1 foot.

Q.    Do you know what they based that height on?

A.    I believe a 1-percent recurrence interval of the storm, 100-year event.

Q.    Are you aware that when planning for the height of containment berms Pike employees considered sea level rise because of the increased risk of flooding?

A.    I don't know.

Q.    Would that information be relevant to forming your opinion for this case?

MR. DOROGHAZI:  Object to the form.

You can answer.

THE WITNESS:  Okay.  Sorry.

few words of the title right before the .pdf.

A.    Oh, yeah.  Okay.  Here it is.

Q.    Do you have the document up?

A.    Yep.  Thank you.

MS. GEHI:  Maureen, this is previously stamped as Plaintiffs' Exhibit 104 with Bates stamp GULFNH-55991.

A.    Okay.

Q.    Ms. Gardiner, do you recognize this document?

A.    I'm not sure.  This might have been produced, like, in early 2024.  If I did see it, I didn't use it for any basis of my opinion.  I can't say for sure.

Q.    Okay.  Do you see the third full paragraph I'm reading, "Can you also verify the height of the dikes with Triton?"

Do you see that sentence?

A.    Yes, I do.

Q.    "With global warming and sea level rises, FEMA has redone their flood map planning. We should look at not only tank containment, but also potential flooding and adjust the dike walls accordingly.  A footnote that we looked at the sea level rise should be included in the

Page 78

plans."

Did I read that right?

A.    You did.

Q.    Now that you've seen this correspondence, would this e-mail have been relevant in forming your opinions?

MR. DOROGHAZI:  Object to form.

You can answer.

THE WITNESS:  Well, not really, because they added another foot over base flood elevation in their design.

BY MS. GEHI:

Q.    And what would adding 1 foot have done?

A.    More protective.

Q.    Do you know what that plus 1 was based off of?

A.    I don't know the specifics, no.  I think it was probably best professional judgment.

Q.    Now that you've seen this correspondence, do any parts of your opinions change?

A.    No.

Q.    We can turn to your report, which is

Page 81

extended, may have a few more years.  But that's -- you know, it's a pretty well-defined period of time.

Q.    Earlier you testified that having the permit administratively continued is a common experience, correct?

A.    It is common.

Q.    So it's common for the permit period to last longer than five years, right?

A.    Sure.  I've seen that.

Q.    Would a permittee ever consider -- in the selection of best management practices, consider the risks that the facility faces over the lifetime?

A.    I think when a facility is first designed and built it's constructed with that in mind.

Q.    Going back to the definition of "near term," because a permit duration can be longer than five years, near term can also mean longer than five years, correct?

A.    It can, but generally in my experience it's been, you know, a few -- a handful of years, not decades.

Q.    So during the course -- or during

Page 82

the period when the permit is active, including when it's administratively continued, should permittees consider the changing climate?

A. I don't think so. I mean, climate change doesn't happen -- if it really is happening, it's not going to happen in five years, you know.

Permittees prepare for what's reasonable. Something that occurs over 50, 100, 500 years is not reasonable. If you had a volcano blow up right next to your facility, that might be something you would worry about.

Q. So if climate change were to happen, were to take place over the course of the permit period, would that be something that the permittee should consider?

A. I don't think that's reasonable.

Q. What do you mean by "reasonable"?

A. Well, again, having a background as a geologist, changes like that, as I mentioned, do happen over geologic time, but that's not near term. That's decades, that's maybe thousands of years.

Q. What do you mean by "long-term future risks" here on page 5?

Page 83

A.    Where is that?  Long-term...

Q.    The first paragraph.

A.    Okay.  I got it.

Well, that's what I meant.  If something, you know, were to happen over 150 years, that's not near term, that's long-term.  Not something we know, not something we can reasonably plan for.

Q.    What influences whether a permittee can consider something that we don't know?  Sorry, let me rephrase that.

What -- is climate change something that we don't know?

A.    Could you clarify the question?

Q.    Yeah, you mentioned that long-term future risks would entail changes that we're not sure or that we don't know.  Are you saying that we don't know how to determine or whether climate change is happening?

A.    I don't know that we do.  I think there's some people that are starting to do modeling and stuff like that, but, I mean, if it is happening, it's a very incremental, long-term change.  And some of the models I saw were looking out to 2100, so I don't think that's

Page 85

permit, I'm just talking about the way you're talking about near-term risk.  Is storm surge part of that near-term risk?

MR. DOROGHAZI:  Object to the extent it calls for an opinion outside the scope of her report.

You can answer.

THE WITNESS:  I don't know.  I don't think I read anything that suggested that was an issue in New Haven.

BY MS. GEHI:

Q.  Does near-term risk and the way you described it here, would that cover sea level rise?

MR. DOROGHAZI:  Same objection.

THE WITNESS:  Again, it's not in the permit, so -- and my understanding is if it is happening, it happens incrementally over a long, long time, 100 years, 500 years.  I don't know.

BY MS. GEHI:

Q.  The way you use the term "near-term risk," does that include extreme precipitation events?

A.  Same answer.  It's not in the

Page 86

permit.

Q.    Earlier you mentioned that the berm height was based on a 1 percent -- sorry, a 100-year storm.  Would that be considered an extreme precipitation event?

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  Well, that's the common standard that's used to protect against larger events.

BY MS. GEHI:

Q.    What do you mean by "larger events"?

A.    Well, 1 percent recurrence interval events and storms that occur on average every 100 years.

Q.    And a 1 percent recurrence interval would be considered a larger event?

A.    I don't know that there's any definition of that, but in common parlance, yeah.

Q.    Would a 1-percent recurrence -- a storm with a 1-percent recurrence interval be a near-term risk that permittees should plan for?

A.    Yeah, I think so, and so Pike did.

Q.    Does the permit require Pike to consider potential sources of pollution?

Page 94

BY MS. GEHI:

Q.    How does a permittee determine what BMPs to implement?

A.    Well, there are many ways that a permittee can do that.  One common way is to hire an environmental consultant that specializes in stormwater permit compliance, and that consultant will typically know a lot about different BMP options and will make recommendations that are site specific and appropriate for controlling the contact of stormwater runoff with those either materials or equipment or operations that could result in pollutants entering that stormwater runoff. That's one way.

Another way would be for the permittee to consult various sources of information that are out there in the public realm.  So like, for example, in California we have the California Stormwater Quality Association's Best Management Practices Handbooks which provide a lot of information about BMPs and how they work, and what they're designed to do and how you maintain them, and that type of thing.

Page 95

Or they might go to a conference or a trade show and look at what's out there in terms of what other people that are in their same line of business are doing.  They might go to a vendor show, see what new sorts of controls are out on the market, available for proprietary control, available for purchase.

All of those options are in the mix, right?  That's how they would select the BMPs.

Q.    Are there any other options on how to -- how permittees may select BMPs?

A.    Can you clarify the question?  Do you have something in mind you're specifically asking?

Q.    Sure.

You mentioned the three ways.  One, you said hire an environmental consultant, then you said consult sources in the public realm, and then going to conferences or buying relevant documents.

Are there any other ways that permittees determine best management practices?

A.    I have sometimes run into some clients where they came up with things on their own.  They, you know -- recent example for

Page 96

working for the Port of Tacoma, they designed their own downspout filters, and they were able to treat runoff coming off their roofs through these little downspout filters completely on their own.

So, you know, it depends on the sophistication of the client and what their issues are.

Q.    Would you say the Port of Tacoma is a more sophisticated client?

A.    Relatively speaking.

MR. DOROGHAZI:  Object to form.

You can answer.

THE WITNESS:  Relatively speaking. I'd say they're creative.  That's how I'd characterize it.  I don't know if sophisticated is the right word, but, you know...

BY MS. GEHI:

Q.    What sources do you rely on in choosing best management practices, in your experience?

A.    Everything I mentioned.  I don't limit it.

Q.    Are there any particular documents

pollutants.

Q.    In terms of the permit language, how do permittees determine that their best management practices are implemented to minimize the discharge of pollutants in the way that minimize is defined on page 18?

A.    Well, again going back to your prior question, a lot of companies decide to hire environmental consultants to help guide them in that decision-making process, and a reputable environmental consultant understands what the options are, what the costs are, and how to properly implement those in order to uphold their standard of care.

So that's not the only way to do it, people do it themselves, but that's common.

Q.    And how does the term the permit here uses "best industry practice," how does that inform which BMPs a permittee should implement?

A.    So best industry practice is a bit of a term of art.  There is no universal definition for what constitutes best industry practice.  And while that term is used in the permit, it's not a term that's commonly used

Page 107

their BMPs?

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  Could you restate the question?

BY MS. GEHI:

Q.    Sure.  What about my question do you not understand?

A.    Could you repeat it, I guess?

MS. GEHI:  Maureen, do you mind repeating my question?

(Whereupon, the reporter read back the following:

"QUESTION:  So in terms of what is best industry practice, because there's a requirement in the permit to update the SWPPP, would best industry practice still consider what other terminals, even if they're more newly built, are doing with their BMPs?")

MR. DOROGHAZI:  Still don't withdraw the objection.

THE WITNESS:  Well, the implementation of a permit like this one requires that you look at your site-specific conditions and you select

Page 108

and implement BMPs that make sense in the context of that facility.  And that includes the condition of the facility, what you're doing there, your expected life expect- -- life expectancy of the facility, and so forth.

So you might be right next-door to another facility, you may have nothing in common, or you might be next-door to someone that, you know, is doing the same operations and you would, you know, potentially implement -- make some of the same choices about BMP implementation.  So it really varies.

BY MS. GEHI:

Q.    So if the conditions at the facility were to change, that would result in an update to the SWPPP, right, an update to the best management practices?

A.    It might.

MR. DOROGHAZI:  Objection.  Asked and answered.

THE WITNESS:  Sorry.

It might.  It depends on what you're doing.  You know, if you're just doing

some maintenance or something like that, no. But if you're adding a new -- you know, a new process line or new material storage, substantive changes to your drainage system or things like that, yes.

BY MS. GEHI:

Q. Best management practices aren't frozen in time, right? They can change?

A. That is right, yes. They should change. SWPPP is a living document. You should keep it up to date.

Q. What do you mean by "keep it up to date"?

A. Make changes, like I said, when there are material changes at the facility, so you're, you know, adding new process line, different material storage, or maybe you're putting in another big BMP. You know, those are all things that would trigger an update to a SWPPP.

Q. Would an increase in the facility's vulnerability to a national disaster be a material change?

A. There's no mention of natural disaster in the permit. That's not the --

Page 113

that site.

Q.    So these environmental consultants come up with best management practices that aren't already expressly mentioned in the permit, right?

A.    Absolutely.

Q.    Would you say that the environmental consultants have technical knowledge of what BMPs are?

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  Well, yeah, technical expertise in selecting, implementing, maintaining, and operating BMPs, sure.

BY MS. GEHI:

Q.    Is it because the selection of best management practices itself is technical?

A.    It can be.  It can be.  Look, there are some really simple facilities out there that don't have a lot of exposure.  You know, they may not have to do very much, maybe sweep the streets or something like that.  But there are others that are more complex and technical.  So it depends on the site.

Q.    Would you say that sometimes in the cases of more complicated facilities that best

Page 114

management practices aren't obvious from the permit alone?

MR. DOROGHAZI:  Object to the form.

You can answer.

THE WITNESS:  Okay, thank you.

I mean, the permit does provide a list of things you can do, but, you know, as we've been discussing all morning, there's a tremendous range of BMPs that are available on the market or that you could have an engineer design.

So I think you have to look at the site-specific conditions and the pollutants that you're trying to control, and then you make your decision.  There's no one size fits all, right?  The permit is not sufficiently detailed and never could be, I don't think, to list every single BMP that's available out there.

BY MS. GEHI:

Q.    Does best industry practice account for the risk of flooding when determining best management practices?

A.    Not that I'm aware of.

Q.    Does best industry practice account

Page 120

Q.     Would that have been relevant in forming your opinion?

A.     I don't recall that document getting specific to bulk oil terminals, according to my memory at least.

Q.     And then earlier you mentioned that consulting various sources in the public realm would also be helpful in determining BMPs.  How about the 2019 Connecticut Physical Climate Science Assessment Report, would that be relevant to determining best management practices at the terminal?

A.     Well, the permit doesn't require you to look at climate change, and so for purposes of complying with the industrial general permit, probably not.

Q.     What about the Connecticut -- excuse me.

What about the Connecticut Stormwater Quality Manual?

A.     Possibly.

Q.     Did you reference the Connecticut stormwater quality control manual?

A.     I don't believe --

MR. DOROGHAZI:  Object to --

Page 124

Q.   Did you consider that Hurricane Sandy made landfall in Connecticut?

A.   Yeah, I believe I read that in one of the technical reports, expert reports.

Q.   But you still don't think that hurricanes are relevant in determining best management practices at the terminal?

A.   Well, as I said, you know, the permit does not ask that you do that, and looking at the historical record where storms that technically qualify as hurricanes and not cause a lot of damage at the terminal, so no.

Q.   Let's pull up your report.  I'll turn to -- which is Exhibit 4, and I'm looking at page 8.

A.   One second.  You mean page 8, not of the PDF, just page 8?

Q.   Page 8 of your report, right, page number 8.

A.   Yeah, I have it.

Q.   And do you see -- reading from the first paragraph, the latter third, do you see the sentence that begins with, "A hurricane is an upset condition"?

A.   Yes.

Page 126

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  To my knowledge, flooding has never overtopped the berms, so they designed to a level that most reasonable companies would do.

BY MS. GEHI:

Q.    What types of companies would matter for what's reasonable?

A.    Facilities that are located within a floodplain of a 100-year event.

Q.    How do you determine which types of storms are reasonably foreseeable or not?

A.    Could you restate the question?  I'm not sure I understand you.

Q.    Sure.

In the sentence I just read, you said, "it likely would be a storm the type of which are not reasonably foreseeable."

How would you determine -- what does it mean for a storm to be "reasonable foreseeable"?

A.    Well, based on recent history.  I mean, like I said before, there's no crystal ball here.  We don't know what's going to happen in five years or 150 years.  You know, I don't

Page 127

know.  You base it on what you have observed, that's what I mean.

Q.    So in your opinion the historical record is sufficient to determine future risk of a facility?

A.    Yes, that's what I am saying.

Q.    Did you consider that during Hurricane Sandy there was a terminal in New Jersey that spilled 300,000 gallons of petroleum products?

A.    I believe I read that in Dr. Goldstein's report, yeah.

Q.    You mean Dr. Goldsmith?

A.    Excuse me.

Q.    Would that type of event be relevant to the historical record that you're considering?

MR. DOROGHAZI:  Object to the form.

You can answer.

THE WITNESS:  Yeah, I'm not sure I'm qualified to provide an opinion on that because that's a meteorologic question.

BY MS. GEHI:

Q.    Did you consider what the API 656 publication says about being able to predict

Page 129

analysis, considering the expected life standard of the facility.

BY MS. GEHI:

Q.    If an event were a high probability -- sorry, medium probability, high impact, would that tip the scales in favor considering that in designing best management practices?

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  I think my answer is pretty much the same.  You have to do a cost-benefit analysis in the context of the expected lifespan of the facility and make a reasonable determination of whether it makes sense to retrofit the facility in that event.

BY MS. GEHI:

Q.    Did you do that analysis for this terminal?

A.    No.  I was not --

MR. DOROGHAZI:  Object to --

THE WITNESS:  -- asked to do that.

BY MS. GEHI:

Q.    Let me just introduce another exhibit.

Page 163

process of installing an impermeable liner, and so if they were to have a leak or spill as a result of something that happens, their impermeable liner would catch it.  But again, I'm not really here to opine on the adequacy of that.

Q.    What do you mean?  "Adequacy of that," you mean the -- what do you mean by that?

A.    The adequacy of the secondary containment or the liner.  But if they were, say, to have a spill in the secondary containment of the tank farm, the liner would keep it from going anywhere.

Q.    Turning back to your report now. Sorry, I'm just trying to catch up with my notes.

Actually let's go back to the 656 report.

A.    All right.  Got it.

Q.    That reference to the cost-benefit analysis is on page 11 of the API 656, right?

A.    Okay.

Q.    "Motivation for Considering Natech"?

A.    Yes.

Q.    Is a Natech assessment relevant to

Page 164

designing BMPs under the permit?

A.    I don't believe so, because the permit doesn't speak to a need to address those kind of events.

Q.    "Events" meaning the Natech events that we discussed earlier including from a hurricane?

A.    Correct.  There's no reference to that in the permit.

Q.    Even though on page 10 of API 656 -- the first paragraph, the last sentence, "For example," do you see that sentence?

A.    Yes.

Q.    "For example, when there is a hurricane, the likelihood of heavy rain, storm surge, flooding, high winds, increase damage mechanisms jointly making every aspect of preventing further mitigation of the problem more difficult as well as impeding emergency response efforts."

Reading this statement in the context of API 656 and the permit, would consideration of hurricane and the compounded effects described here, would that be relevant to determining best management practices?

Page 165

A.    The permit doesn't require that, so no.

Q.    Is your opinion the same considering -- the next sentence which I'll read is on page 22 of -- 22 of the PDF of API 656.  Let me know when you're there.

A.    Okay.  Yeah.

Q.    And do you see the second paragraph below the bigger -- the last sentence, "In another example, when hurricanes occur the likelihood of high rainfall, storm surge, and high winds can occur together"?

Did I read that right?

A.    Yes.

Q.    And in light of these sentences, do any parts of your opinion change?

A.    No, because this is just a guidance document, and this is not required by the permit.

Q.    So you don't consider API 656 relevant to best industry practice?

MR. DOROGHAZI:  Object.  Misstates the witness's testimony.

You can answer.

THE WITNESS:  Yeah, there's no

A.    Reasonable for flood protection using the FEMA standard of a hundred-year storm.

Q.    And you said it was commonly used. Commonly used by who?

A.    Anyone at the facility within the hundred-year flood zone.

Q.    Did you look at other bulk petroleum storage facilities in terms of what they consider -- how they carry out their planning based on storms if they're in a floodplain?

A.    No.  That was not in my scope.

Q.    Are you saying that what is commonly used is what's reasonable under the permit?

A.    It's not really -- it's not in the permit.  I mean, they did that for other reasons.  They did that because they have, you know, secondary containment, and under their scope, prevention, control and plan and in terms of being able to contain a spill of hazardous materials, that's why they raised their berms and made them more consistent in elevation. That's the driver, not the stormwater permit.

Q.    You mentioned that the other reasons include the requirement to have a secondary containment, right?

Page 176

MR. DOROGHAZI:  I have not been objecting, but I just objected there.

Object to the form.

THE WITNESS:  You know, I'm not sure what Gulf looked at specifically.  I mean, the fact that they used the hundred-foot standard and based, you know, the height of the berm on that plus 1 foot base flood elevation suggests to me they were relying on FEMA.

But, you know, I don't know.  That was not part of my research to go and figure out all that they discussed or all the documents they might have looked at in forming that conclusion.

BY MS. GEHI:

Q.    You didn't consider -- in forming this opinion that the way Gulf planned for major events was reasonable, you didn't consider guidance from the American Society of Civil Engineers?

A.    No, because there aren't any set standards that you have to use, right?  You can use that if you want or you can use FEMA, and that's what they used, as far as I know.

Page 183

AFTERNOON SESSION

THE VIDEOGRAPHER:  The time is 1:37. We're back on the record.

BY MS. GEHI:

Q.   Ms. Gardiner, still working on your report, and so I'm on page 4.  Let me know when you're there.

A.   I'm on page 4.

Q.   Okay.  And my next set of questions are related to your opinion in the second half of the first full paragraph.

Do you see where the sentence starts with, "My opinion is that the Permit in effect at the time"?

A.   Yes.

Q.   Do you want to just take a minute to read that full paragraph -- those sentences and let me know when you're done?

A.   Yep.

(Witness reviewing document.)

A.   Got it.  All done.

Q.   Are you indicating -- do you have an opinion as to whether Pike complied with the impermeability requirement of the secondary containment requirement under the permit?

Page 184

A.    So I've not really been retained to comment on the adequacy of it.  However, what I understand is it's a 60-mil liner, and these kind of liners are typically constructed of high-density polyethylene plastic material, or HDPE, and that type of material is very impervious.

So I would have to say, you know, if no water is going to flow through it because it's plastic, seems to be compliant with the permit, yes.

Q.    But you didn't look at -- you mentioned you didn't look at the adequacy of the liner.  What did you mean by that?

A.    Well, I did not conduct any permeability tests by myself.  You know, I didn't go out and inspect it.  I understand there were some discussions with DEEP that perhaps delayed some of the implementation of it.  But what I've read, sounds like it's a good plan.

Q.    And you mean by what you read is -- are the documents you put in your references in the report?

A.    Yes.

Page 186

to the exact status of it right now.

Q.    But they haven't -- when Pike owned the terminal, the liner was not complete, correct?

A.    In April of 2024 it was not complete, correct.

Q.    Okay.  So is it your opinion that had the liner been complete, they would have been in compliance with the impermeability requirement?

A.    Well, again, I'm not here to offer a true opinion on that.  What I've read, what I've heard from the reports, I mean, it sounds like they inspected the product that would be compliant with the permit.

Q.    Okay.  And you said you didn't rely on anything except for the documents in your references, correct, for this statement?

A.    Yes, that's correct.

Q.    Did you review any of the pictures from site visits of the liner?

A.    I did see when the Goldsmith's photographs, from when she was out near the terminal, I don't recall any pictures of the liner because she was outside of the facility

Page 187

when she took the pictures.  So I'm not really sure.

I think there were also some pictures in, I want to say it was Dr. Roseen's report that showed some pictures of the liner, and it looked like a heavy-duty black liner.  I don't know that I saw pictures of the extent of it, but it did look like a, you know, heavy-duty liner.

Q.    How did you determine that a liner is a proper means of ensuring that the secondary containment area is sufficiently impermeable?

A.    I've seen this approach taken at other facilities, specifically at the sites I mentioned earlier on.  The electric power-generating facilities had installed similar kinds of products around their bulk, doing areas inside of secondary containment.

Q.    Did you ever look at a facility using a liner in Connecticut under the -- that was subject to the permit?

A.    Not other than height.

Q.    And you did not do any research on the permeability calculations, correct?

A.    I did not review calculations, no.

Page 188

That was not part of my scope.

Q.    So you're also not offering an opinion about any other part of the secondary containment area, correct?

A.    That's correct.  But like I said, I've worked on other facilities where this type of issue has come up, and similar liners have been implemented in order to provide impermeable secondary containment.

Q.    And you used the term "sufficiently impermeable."  Is that the same as the permit on page 22 where it says an impermeable secondary containment?  The permit was previously stamped as Exhibit 17.

A.    My opinion is that -- and again, this is really not what I'm supposed to be opining on, but I would say that what I observed, the type of liner that they are using at the Pike facility does meet the requirement of the permit in terms of its impermeability should.  I mean, I didn't test it so I can't tell you, but in good practice it appears to be right, appears to be consistent with the permit.

Q.    So you didn't consider any of the studies done on permeability at the terminal,

Page 193

would essentially take care of the secondary containment impermeability.

Q.    But without the liner you don't have -- do you have any opinion as to whether Pike was in compliance with the impermeability requirement of the permit?

A.    I think they did the right thing. They installed a BMP that meets the requirement of the permit, meaning the impermeable layer, liner.

Q.    But the liner construction began in 2019 or 2020, correct?

A.    That's what I believe, yeah.  I think so -- or I recall, I should say.

Q.    Without the liner do you have an opinion on whether Pike complied with the impermeability requirement before the construction of the liner?

A.    I really haven't been asked to opine on that, and I was not there to see it and take permeability calculations and tests, so I can't really comment.

Q.    Okay.  You're not familiar with how the hydraulic conductivity calculations are done, correct?

Page 203

Do you see that?

A.    Which paragraph?

Q.    The last sentence of the second full paragraph.

A.    Oh, yeah.  I see it.

Q.    Earlier you mentioned that you did not consider storm surge in forming your opinions.  And did you consider the impacts -- what factors influenced storm surge in New Haven?

A.    Could you be more specific?

Q.    I guess to begin with, for this sentence what are you relying on to form this sentence?

MR. DOROGHAZI:  Object to the form.

THE WITNESS:  It's the words of the permit.  The permit had exceptions for certain categories of discharges, including naturally occurring discharges such as rising groundwater, uncontaminated groundwater infiltration, and flows from riparian, habitats, and wetlands.

So if you did have storm surge, that's ocean water.  That's naturally occurring.  That's not a non-storm with a

Page 204

discharge, say, from dumping or hosing things off.

BY MS. GEHI:

Q. And you didn't consider anything else?

A. Permit is what I'm looking at. Permit is really what I'm in charge of looking at.

Q. Did you consider any special properties of the East Coast shelf with respect to storm surge?

A. Well --

MR. DOROGHAZI: Object to the form.

THE WITNESS: I'm sorry. Go ahead, John.

MR. DOROGHAZI: I said object to the form.

You can answer.

THE WITNESS: I'm not an oceanographer, so I think that was in some of the reports I read, but didn't influence my opinion.

BY MS. GEHI:

Q. On page 6 of your report, page 7 of the PDF, reading the last paragraph, "In my