**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | 3:21-CV-00932 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PIKE FUELS LIMITED PARTNERSHIP, | ) | July 24, 2026 |
| *Defendant*. | ) | |

<u>**RULING AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND THE PARTIES' RELATED MOTIONS TO PRECLUDE**</u>

Sarala V. Nagala, United States District Judge.

In this environmental suit, Plaintiff Conservation Law Foundation, Inc. alleges that Defendant Pike Fuels Limited Partnership ("Pike") violated the Clean Water Act (the "CWA"), 33 U.S.C. § 1251 *et seq.*, by failing to account for the effects of climate change and violating certain permit requirements in its operation of a bulk petroleum storage terminal in New Haven, Connecticut (the "Terminal"). *See* Second Am. Compl. ("SAC"), ECF No. 230. Pending before the Court are Pike's motion for summary judgment, Plaintiff's motion for partial summary judgment, and the parties' related motions to preclude expert testimony.

For the reasons explained below, the Court GRANTS Pike's summary judgment motion as to Counts One through Nine and, consequently, DENIES Plaintiff's summary judgment motion as to Counts Three, Five and Six. The Court also GRANTS IN PART AND DENIES IN PART Pike's summary judgment motion as to Count Ten, and GRANTS Pike's summary judgment motion as to Count Eleven. As to Count Fourteen, the Court DENIES both parties' motions for summary judgment. As to Count Fifteen, the Court GRANTS Plaintiff's summary judgment

motion and DENIES Pike's summary judgment motion.  In light of the Court's rulings, it DENIES as moot the various motions to preclude expert testimony, without prejudice to renewal.

## I.     CLEAN WATER ACT CITIZEN SUIT PROVISION

The purpose of the CWA is to protect the Nation's waters.  *See* 33 U.S.C. § 1251(a).  Under the CWA, the holder of a state National Pollutant Discharge Elimination System ("NPDES") permit is subject to both federal and state enforcement action if it fails to comply with the requirements of its permit or the statute.  *See* 33 U.S.C. §§ 1319, 1342(b)(7); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 52 (1987).  "Noncompliance with a permit constitutes a violation of the [CWA]."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 175 (2000) ("*Laidlaw*") (citing 33 U.S.C. § 1342(h)); *see also* 40 C.F.R. § 122.41(a) ("The permittee must comply with all conditions of [the] permit.  Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action. . . ").

Plaintiff pursues this suit under the CWA's "citizen suit" provision.  "In the absence of federal or state enforcement, private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit."  *Gwaltney*, 484 U.S. at 53 (quoting 33 U.S.C. § 1365(a)(1)).  After giving 60 days' advance notice to the Administrator of the Environmental Protection Agency ("EPA"), to the state in which the alleged violation has occurred, and to the alleged violator, a citizen may sue the alleged violator, provided that neither the EPA nor the state have commenced and are diligently prosecuting the violator.  33 U.S.C. § 1365(a) & (b).  If the citizen prevails in the action, the federal court may "order injunctive relief and/or impose civil penalties payable to the United States treasury."  *Gwaltney*, 484 U.S. at

53; 33 U.S.C. § 1365(a).  The court may also award costs of litigation, including reasonable attorney and expert witness fees, to the citizen plaintiff if it prevails in the suit.  *Id.* § 1365(d).

## II.    FACTUAL BACKGROUND

The following facts, drawn primarily from the parties' Local Rule 56 statements, are undisputed except as otherwise noted.[1]

### A.  The Terminal and Pike's Ownership

The Terminal, located at 500 Waterfront Street in New Haven, Connecticut, has been in operation since at least 1926.  Pl.'s L.R. 56(a)2 St., ECF No. 403-1 ¶ 1.  Between 2011 and 2024, Pike was the owner and operator of the Terminal.  *Id.* ¶ 2.  During Pike's ownership period, the Terminal received, stored and distributed gasoline and other petroleum products.  Def.'s L.R. 56(a)2 St., ECF No. 400-1 ¶ 4.  On April 9, 2024, Pike sold the Terminal; it no longer had any ownership interest or operation control over the Terminal as of that date.  ECF No. 403-1 ¶¶ 4, 5.

Between 2016 and 2024, Pike owned and operated four other coastal bulk fuel storage terminals, located in New Jersey, Massachusetts, and Maine.  *Id.* ¶ 3.  On April 9, 2024, and August 30, 2024, Pike sold these terminals.  *Id.* ¶¶ 4, 6.  Pike states that, as of August 30, 2024, it no longer owns or operates any coastal bulk fuel storage terminals in Connecticut or any other state.  *Id.* ¶ 7.  Pike also contends that the individuals who previously managed Pike's coastal bulk fuel storage terminals are no longer affiliated with it; Plaintiff disputes this fact.  *Id.* ¶ 8.  Additionally, Pike contends that it does not currently own or operate any businesses based in Connecticut, and does not have current operations in Connecticut that are subject to any permits.  *Id.* ¶ 9.  Plaintiff responds that Pike remains a registered business in Connecticut.  *Id.*  Finally, Plaintiff states that

---

[1] The Court cites to both parties' Local Rule 56(a)2 Statements, submitted in opposition to each other's motions for summary judgment, to set forth the relevant facts.

Pike's parent company, ArcLight Capital Partners, LLC, continues to invest in the oil and gas industry.  Pl. Add'l Mat. Facts, ECF No. 403-1 (pages 40–48) ¶ 33.

>    B.  The 2011 General Permit

In Connecticut, the Commissioner of the Connecticut Department of Energy & Environmental Protection ("the DEEP") has been delegated authority to implement the NPDES permit program.  *See* 40 C.F.R. Part 123, § 123.1(d)(1) ("Upon approval of a State program, the [EPA] Administrator shall suspend the issuance of Federal permits for those activities subjected to the approved State program."); *see also* Conn. Gen. Stat. § 22a-430; Conn. Regs. §§ 22a-430-3; 22a-430-4; ECF No. 400-1 ¶ 9.  It is undisputed that the DEEP issued Connecticut's General Permit for the Discharge of Stormwater Associated with Industrial Activity ("Permit"), which became effective on October 1, 2011, and that the Terminal was subject to its requirements.  ECF No. 400-1 ¶¶ 10, 12; ECF No. 403-1 ¶ 10.  The DEEP thereafter reissued the Permit four additional times, in 2016, 2018, 2019 and 2021; the Permit remained "essentially unchanged" until the DEEP issued the most recent version on October 1, 2025.  *Id*.

>    In relevant part, the Permit provides:

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility.  The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

*See* 2021 General Permit, Section 5(b), ECF No. 357-14 at 19.  Following this language, the Permit lists the following items with descriptions:  (1) Good Housekeeping; (2) Vehicle or Equipment Washing; (3) Floor Drains; (4) Roof Areas; (5) Minimize Exposure; (6) Sediment and Erosion Control; (7) Management of Runoff; (8) Preventive Maintenance; (9) Spill Prevention and

Response Procedures; (10) Employee Training; (11) Non-Stormwater Discharges; (12) Solid De-icing Material Storage; and (13) Sector-Based Control Measures. *Id.* at 19–23.

Additionally, the Permit requires permittees to develop and implement a Stormwater Pollution Prevention Plan ("SWPPP"), and requires that a professional engineer or Certified Hazardous Materials Manager certify that the SWPPP complies with the terms of the Permit. ECF No. 403-1 ¶ 11; *see* ECF No. 357-14 at 24–31. Within the SWPPP, the permittee "must document the location and type of control measures installed and implemented at the site in accordance with 'Control Measures' (Section 5(*b*))." ECF No. 357-14 at 27. Additionally, the permittee "shall discuss the appropriateness and priorities of control measures" in the SWPPP and "how they address identified potential sources of pollutants at the site." *Id.* The SWPPP must "include a schedule for implementing such control measures if not already implemented." *Id.*

Pike prepared SWPPPs for the Terminal with the assistance of Triton Environmental Inc. ("Triton"), an environmental and engineering services consulting company that has provided stormwater management and other environmental consulting services to various Connecticut regulated entities, including coastal bulk fuel oil terminals such as the Shell terminal in New Haven. *Id.* ¶¶ 13, 14. Pike contends that it updated and amended its SWPPP at least thirteen times between 2011 and 2024. *Id.* ¶ 13.

It is undisputed that the Permit does not contain the terms "climate change," "resiliency," "resilience," "adapt," or "adaptive." ECF No. 403-1 ¶ 12. The parties do dispute, however, whether the Permit nonetheless required Pike to consider the effects of climate change. *Id.* ¶¶ 12, 29. Pike contends it does not, while Plaintiff contends that the Permit's use of the term "best industry practice" encompasses consideration of climate change. *Id.* According to Pike, both it and Triton understood that the Permit did not require consideration of climate change. *Id.* ¶¶ 17,

18.  Pike also contends that Triton contacted the EPA and the DEEP "a number of times" over several years about what does and does not need to be included in SWPPPs, and was allegedly never told that climate change was required to be addressed in SWPPPs under the Permit.  *Id.* ¶ 38.  Pike further states that it produced SWPPPs for its other terminals, and none of those SWPPPs considered or addressed climate change.  *Id.* ¶ 24.

In August of 2023, Pike prepared a Facility Response Plan.  *Id.* ¶ 28.  Pike contends that this plan addressed how to handle inclement weather, including hurricanes.  *Id.*  Plaintiff disputes this fact, stating that the plan did not contain any discussion regarding how to handle inclement weather, including hurricanes, that describe actions to be taken more than two days before such a storm's landfall at the Terminal.  *Id.*

The parties do not dispute that the Terminal and New Haven, CT have been subject to historical Category 1 and 2 storms, including Hurricanes Gloria and Sandy.  *Id.* ¶ 39.  Pike contends that multiple hurricanes have impacted New Haven, CT between 1900 and 2024, and the Terminal has sustained little to no damage—a fact Plaintiff disputes.  *Id.* ¶ 51.  Pike also contends that the Terminal is sufficiently prepared to withstand Category 1 or 2 storms.  *Id.* ¶ 58.

C.  The 2025 New Permit

On October 1, 2025, the DEEP issued a new version of the Permit, which went into effect on November 1, 2025 (the "New Permit").  ECF No. 403-1 ¶ 30.  It is undisputed that the New Permit requires the permittee to "[d]escribe measures to increase site resilience to extreme weather events and long-term climate impacts" as part of the "Content Requirements" of a SWPPP.  *Id.* ¶ 31; *see* New Permit, ECF No. 356-23 at 34.  In a section entitled "Resilience Measures," the New Permit also states that these resilience measures are intended to "help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events."  ECF No. 403-1 ¶ 31; *see* New Permit, ECF No. 356-23 at 45.

6

Pike contends that in November of 2024, the DEEP released a draft Fact Sheet, which describes the "Resiliency Measures element" as "a new component of the SWPPP [that] was added in response to Connecticut's commitment to prepare for ongoing climate changes."  ECF No. 403-1 ¶ 34.  Pike further states that the Fact Sheet notes that these "new" measures were added "[i]n order to prepare for ongoing climate changes, including increasing temperatures, changes in precipitation patterns, and drought frequency [that] are amid the climate impacts that currently and are projected to affect water quality and quantity in CT."  *Id.* ¶ 35.  Plaintiff does not appear to dispute that the draft Fact Sheet said as much, but contends that it is irrelevant.  *Id.* ¶¶ 30, 34–35.

D.  Outfall Discharges

It is undisputed that the Terminal discharged to three stormwater outfalls:  Outfall 001-1, 001-2, and 001-3.  ECF No. 403-1 ¶ 59.  The parties agree that Outfalls 001-2 and 001-3 discharge directly to the New Haven Harbor.  ECF No. 403-1 ¶ 59.  Pike contends that Outfall 001-1 discharges to the City of New Haven's Municipal Separate Storm Sewer System ("MS4"), whereas Plaintiff contends that Outfall 001-1 ultimately discharges to the New Haven Harbor via the MS4.  *Id.*  It is undisputed that the Permit defines the terms "Municipal separate storm sewer system" and "MS4" as a conveyance for stormwater "owned and operated by any municipality and discharging to surface waters of the state."  *Id.* ¶ 62; ECF No. 357-14 at 9.

Outfalls 001-2 and 001-3 were inactive until 2020; until then, discharges from the Terminal were directed to Outfall 001-1 and then to the MS4.  ECF No. 403-1 ¶ 60.  Pike disclosed discharges for Outfalls 001-2 and 001-3 starting in its August 2020 SWPPP and in its subsequent iterations of its SWPPP.  *Id.* ¶¶ 61, 71.

Further facts are set forth below as relevant.

### III.     PLAINTIFF'S CLAIMS AND PENDING MOTIONS

A.     <u>Summary of Claims</u>

Plaintiff's SAC details various ways that Pike allegedly violated the Permit and, as a result, the CWA.  In Counts One through Nine, which the Court collectively refers to as the "Climate Change Counts," Plaintiff alleges that Pike failed to both (1) consider climate change factors in its SWPPP and (2) implement certain best management practices and/or control measures, as required by the Permit.  *See* ECF No. 403 at 33 ("Pike's purported evidence does not in any way address [Plaintiff's] claims that it failed to *consider and implement* [best management practices] to avoid discharging pollutants via stormwater by failing to consider the foreseeable impacts of climate change.") (emphasis added).

Specifically, in Count One, Plaintiff alleges that Pike failed to eliminate non-stormwater discharges, such as pollutant discharges from storm surge flooding and sea-level rise.  SAC ¶¶ 343–49.  In Count Two, Plaintiff alleges that Pike acted inconsistently with "the applicable goals and policies in section 22a-92 of the Connecticut General Statutes," the Connecticut Coastal Management Act, by failing to "consider in the planning process the potential impact of a rise in seal level, coastal flooding, and erosion patterns" and implement control measures to minimize damage to life, property and the "necessity of public expenditure and shoreline armoring to prevent new development from such hazards." *Id.* ¶¶ 350–58.  In Count Three, Plaintiff alleges that Pike certified its SWPPP without disclosing climate change-related risks allegedly known to it, and without developing and implementing a SWPPP that "included discussion or disclosure of information known to it about climate change and the reasonably foreseeable substantial risks of pollutant discharges associated with climate change." *Id.* ¶¶ 359–71.  In Count Four, Plaintiff alleges that Pike failed to identify possible sources of pollutants resulting from climate change in its SWPPP, as required by the Permit. *Id.* ¶¶ 372–77.  In Count Five, Plaintiff alleges that Pike

failed to describe and implement best management practices to minimize unpermitted discharges that may result from flooding caused by storm surge and increased rainfall. *Id.* ¶¶ 378–84. In Count Six, Plaintiff alleges that Pike failed to implement measures to manage runoff in the event of flooding caused by storm surge and increased rainfall. *Id.* ¶¶ 385–89. In Count Seven, Plaintiff alleges that Pike's SWPPP failed to describe or ensure implementation of best management practices that will minimize the potential for leaks and spills. *Id.* ¶¶ 390–94. In Count Eight, Plaintiff alleges that Pike failed to submit required facts or information to the DEEP concerning the risks of pollutant discharges that may be caused by climate change. *Id.* ¶¶ 395–401. In Count Nine, Plaintiff alleges that Pike failed to amend or update its SWPPP regarding the substantial risks of pollutant discharges that may be caused by climate change, among other risks and factors. *Id.* ¶¶ 402–09. To varying degrees, each of the Climate Change Counts consists of allegations that Pike failed to *implement* practices to minimize the risk of pollutant discharges that are exacerbated by climate change, and that Pike failed to *consider* such risk in documents such as the SWPPPs.

Plaintiff's remaining counts largely concern pollutant discharges.[2] In Count Ten, Plaintiff alleges that Pike failed to identify discharges to impaired waters in its SWPPP and to document procedures for implementing impaired waters monitoring. *Id.* ¶¶ 410–418. In Count Eleven, Plaintiff alleges that Pike failed to comply with special monitoring requirements for certain pollutants: "dissolved oxygen, nutrients, oil and grease, and PCBs [polychlorinated biphenyls]." *Id.* ¶¶ 419–24.[3] In Count Fourteen, Plaintiff alleges that Pike allowed stormwater to infiltrate into the ground, without appropriate pretreatment and without the DEEP's approval, in violation of

---

[2] Plaintiff withdrew Counts Twelve, Thirteen, Sixteen and Eighteen. *See* SAC at 82, 85.
[3] At one place in the SAC, Plaintiff alleges that the waters surrounding the Terminal, including the New Haven Harbor, are "impaired for oil and grease, fecal coliform, dissolved oxygen saturation, dissolved oxygen, and enterococcus." SAC ¶¶ 123–24. Later in the SAC, Plaintiff states that the New Haven Harbor is impaired for "dissolved oxygen, nutrients, oil and grease, and PCBs." *Id.* ¶ 421.

Section 5(b)(7) and Appendix C of the Permit. *Id.* ¶¶ 425–432. Finally, in Count Fifteen, Plaintiff alleges that Pike failed to maintain an impermeable secondary containment area. *Id.* ¶¶ 433–38.

As relief, Plaintiff seeks declaratory relief, civil penalties and attorney's fees. *Id.* at 85. Plaintiff withdrew its claims for injunctive relief after Pike sold the Terminal. *See Conservation L. Found., Inc. v. Gulf Oil Ltd. P'ship*, 810 F. Supp. 3d 314, 317 (D. Conn. 2025) ("*CLF II*").

### B. Pending Motions

Plaintiff has moved for partial summary judgment on Counts Three, Five, Six, Fourteen and Fifteen. ECF No. 357 (Motion); ECF No. 357-1 (Memorandum). Pike opposes this motion, ECF No. 400, and, in turn, cross-moves for summary judgment on all Counts asserted against it. ECF Nos. 356 (Motion); ECF No. 356-1 (Memorandum). Plaintiff opposes Pike's summary judgment motion. ECF No. 386.

Additionally, in connection with these motions, both parties have filed motions to preclude the testimony and reports of each other's retained experts. Pike moves to exclude the testimony of Plaintiff's experts James O'Donnell, Wendi Goldsmith, Robert Nairn, Matthew Barlow, and Robert Roseen. *See* ECF Nos. 348, 349, 351, 354, 355. Plaintiff, in turn, moves to exclude the testimony of Pike's experts Nancy Gardiner, Christopher Ecsedy, and Kelly Coulon. *See* ECF Nos. 350, 352, 353.

### C. Summary of Ruling

As more fully set forth below, the Court issues the following rulings. First, it concludes that Plaintiff's request for declaratory relief is moot, but its request for civil penalties may proceed. Next, the Court finds that the Permit is not impermissibly vague so as to be rendered invalid as a matter of law. The Court then concludes that Plaintiff's Climate Change Counts fail because (1) Plaintiff has not shown a genuine dispute of material fact as to whether Pike failed to implement any technologically available and economically practicable and achievable control measures; and

(2) Plaintiff lacks standing to pursue its Climate Change Counts with respect to Pike's alleged failure to consider climate change in its SWPPP because it has not demonstrated a concrete injury. The Court also finds that Count Two fails for the additional basis that it seeks to enforce state standards that exceed federal standards.

Then, the Court concludes that Pike has proffered sufficient evidence to establish that it did not violate the Permit for purposes of Counts Ten (only as to the allegations concerning Outfalls 001-2 and 001-3) and Eleven, and that it may therefore benefit from the CWA's permit shield protections. Finally, as to Counts Fourteen and Fifteen, the Court concludes that (1) a 2019 Consent Order does not bar these claims; (2) there was no requirement for Plaintiff to exhaust administrative remedies and, in any event, Plaintiff has complied with the CWA's procedural prerequisites; and (3) Pike cannot invoke the permit shield doctrine based on a corrective action plan proposed in its SWPPP. With respect to the substantive merits of Count Fifteen, the Court finds that Plaintiff has established that Pike failed to maintain an impermeable containment area. And with respect to the substantive merits of Count Fourteen, the Court finds that there is no need for Plaintiff to establish that any pollutants migrated from groundwater to a U.S. regulated body of water for this claim and that there is a genuine dispute of fact regarding whether Appendix C of the Permit applies to the Terminal.

Accordingly, the Court GRANTS Pike's summary judgment motion as to Counts One through Nine and, consequently, DENIES Plaintiff's summary judgment motion as to Counts Three, Five and Six. The Court also GRANTS IN PART AND DENIES IN PART Pike's summary judgment motion as to Count Ten, and GRANTS Pike's summary judgment motion as to Count Eleven. As to Count Fourteen, the Court DENIES both parties' motions for summary judgment. As to Count Fifteen, the Court GRANTS Plaintiff's summary judgment motion and DENIES

11

Pike's summary judgment motion.  In light of the Court's rulings, it DENIES as moot the various motions to preclude expert testimony, without prejudice to renewal before trial.

## IV.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).  "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Id.*  (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward

with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## V.    MOOTNESS

First, the Court finds that Plaintiff's request for declaratory relief is moot, but the case remains live with respect to Plaintiff's request for civil penalties.

The doctrine of mootness stems from Article III's case-or-controversy requirement. *Laidlaw*, 528 U.S. at 180. "To sustain jurisdiction, a dispute must not only be alive when filed, but throughout its pendency." *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025). Thus, "a case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' . . . making it 'impossible for the court to grant any effectual relief whatever to the prevailing party.'" *Id.* (first quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) and then quoting *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (*per curiam*)).

In the context of citizen suits brought under the CWA, the U.S. Supreme Court has held that "'[a] case might become moot if subsequent events made it absolutely clear that the allegedly

13

wrongful behavior could not reasonably be expected to recur.'" *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)); *see also Gwaltney*, 484 U.S. at 66.   The party asserting mootness bears the "heavy burden" of persuading the Court that the "challenged conduct cannot reasonably be expected to start up again." *Laidlaw*, 528 U.S. at 189.

In its prior ruling on Pike's motion to dismiss the SAC, the Court, relying on *Laidlaw* and *Building and Constr. Trades Council of Buffalo, New York and Vicinity v. Downtown Development, Inc.*, 448 F.3d 138, 152 (2d Cir. 2006) ("*Trades Council*"), concluded that Pike had not sustained its burden of demonstrating mootness with respect to Plaintiff's request for declaratory relief, despite the fact that Pike represented that it no longer owned or operated the Terminal.  *CLF II*, 810 F. Supp. 3d at 322.  In its ruling, the Court acknowledged Pike's counsel's assertion at oral argument that Pike does not "own any coastal terminals anymore" and no longer has "a Connecticut permit," as well as Plaintiff's own concession in its SAC that Pike sold the Terminal on April 9, 2024.  *Id.*  Nonetheless, since Pike had not "submitted any *evidence* to sustain its heavy burden of establishing that the challenged conduct cannot reasonably be expected to recur," the Court could not find that Plaintiff's claim for declaratory relief was moot by virtue of the sale.  *Id.* (emphasis in original).  The Court further concluded that, in any event, Plaintiff's claims for civil penalties remained live, as the law in the Second Circuit is that "even if a claim may be moot for purposes of injunctive relief, a request for civil penalties may keep the claim alive."  *Id.* at 323; *see also Atl. States Legal Found. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1021 (2d Cir. 1993).  Thus, Plaintiff's requests for both declaratory relief and civil penalties were allowed to proceed.

In its summary judgment motion, Pike has renewed its argument that Plaintiff's claims are moot because it no longer owns or operates the Terminal. Pike has now supplemented the record with evidence establishing that it: (1) sold all of its bulk fuel storage terminals in 2024; (2) no longer owns or operates any coastal bulk fuel storage facilities anywhere in the country; (3) no longer conducts any business in Connecticut, including any business that would be subject to the New Permit; and (4) no longer employs any of the individuals who operated or oversaw the coastal bulk fuel storage facilities.

Plaintiff, for its part, does not dispute that Pike no longer owns or operates any *coastal* bulk fuel storage facilities. It instead contends that recurrence of the alleged wrongful conduct remains possible because Pike owns and operates at least eleven bulk fuel storage facilities in Pennsylvania, its parent company remains involved in the bulk fuel storage business, and Pike remains a registered business in the State of Connecticut. Plaintiff argues that "there is nothing stopping Pike from purchasing another Connecticut facility subject to the CWA after this litigation ends." ECF No. 403 at 39.

Based on the present record, the Court finds that Pike has met its heavy burden of establishing that the alleged violations cannot reasonably be expected to recur. The SAC alleges that Pike violated the CWA by failing to consider climate change impacts in connection with its operation of the *Terminal*, not any other facility. It is thus immaterial that Pike owns or operates non-coastal terminals in a different state. The record reflects—and the parties do not dispute— that Pike no longer owns or operates the Terminal, which is the subject of this action, and that Pike no longer conducts any business in the state of Connecticut that would be subject to the New Permit. Plaintiff's contention that Pike could reenter the coastal bulk fuel storage business or otherwise engage in similar misconduct in the future rests on speculation. And the investments of

Pike's parent company are not at issue in this suit.  Accordingly, the Court finds that Pike has met its burden of showing that the alleged violations cannot reasonably be expected to recur.  The Court therefore finds that Plaintiff's request for declaratory relief is moot.

Whether Plaintiff's request for civil penalties is moot is a closer call, but the Court ultimately concludes that it is not moot.  There are three circumstances that make adjudication of this issue difficult.  First, the Court notes that the present record is different than what was before the Court when it decided Pike's motion to dismiss.  As discussed above, the present record now reflects the undisputed fact that Pike no longer owns or operates the Terminal or any coastal bulk fuel storage business, and the Court is persuaded that the alleged violations cannot be expected to recur.

Second, albeit in its discussion on standing, *Laidlaw* itself recognized that civil penalties should have a "deterrent effect."  *Laidlaw*, 528 U.S. at 185 (quoting *Hudson v. United States,* 522 U.S. 93, 102 (1997)); *see also Department of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 778 (1994).  In CWA cases, civil penalties are designed to do more than "promote immediate compliance"; they also "deter future violations."  *Laidlaw*, 528 U.S. at 185.  Because the Court has determined that Pike has met its burden of establishing that any future violations cannot reasonably be expected to recur, the imposition of any civil penalties may be of no deterrent value in this instance.

Third, at least two courts in outside jurisdictions have recently held that intervening events may render even requests for civil penalties moot; under the reasoning applied in those cases, Plaintiff's requests for civil penalties would be considered moot based on the present record.  *See Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC*, 158 F.4th 1052, 1064 (9th Cir. 2025) (finding that the defendant's post-suit acquisition of the required fireworks discharge permit mooted claims

16

for civil penalties because the alleged violations were unlikely to recur); *Conservation L. Found., Inc. v. Chelsea Sandwich LLC*, No. CV 24-11766 (RGS), 2026 WL 1470285, at \*2–3 (D. Mass. May 26, 2026) (concluding that, where the defendant established that it was "absolutely clear" that the alleged wrongful behavior could not reasonably be expected to recur because the subject terminal was permanently closed and its permit was irrevocably terminated, the plaintiff's claim for civil penalties was moot).

Notwithstanding, the Court is bound by Second Circuit law unless and until it is overruled by the Second Circuit itself or the Supreme Court. *See 689 Eatery Corp. v. City of N.Y.*, 716 F. Supp. 3d 88, 148 (S.D.N.Y. 2024) (collecting cases). And as explained in its ruling on Pike's motion to dismiss, the law in the Second Circuit is that a request for civil penalties defeats mootness even if other forms of relief are rendered moot. *See CLF II*, 810 F. Supp. 3d at 323; *see also Pan Am. Tanning*, 993 F.2d at 1021; *Trades Council*, 448 F.3d at 152. Thus, although the Court finds that Plaintiff's request for declaratory relief is moot, its request for civil penalties is not.

## VI. CLIMATE CHANGE COUNTS (COUNTS ONE THROUGH NINE)

Next, with respect to Plaintiff's Climate Change Counts, the Court holds that Plaintiff has failed to demonstrate a genuine issue of material fact with respect to whether Pike failed to implement any technologically available and economically practicable and achievable control measures; and Plaintiff lacks standing to pursue these Counts with respect to Pike's alleged failure to consider climate change in its SWPPPs because it has not demonstrated a concrete injury. Accordingly, Pike's motion for summary judgment is granted with respect to Counts One through Nine, and Plaintiff's corresponding motion for partial summary judgment on Counts Three, Five and Six is denied.

"Although the NPDES permitting scheme can be complex, a court's task in interpreting and enforcing an NPDES permit is not—NPDES permits are treated like any other contract." *Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013).  "[I]f a NPDES permit provision is unambiguous, that language controls." *Am. Canoe Ass'n, Inc. v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 42 (D.D.C. 2004) (citing *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 269–70 (4th Cir. 2001)).  "But if the permit provision is ambiguous, the court may examine extrinsic evidence to uncover the provision's meaning." *Id.* at 42.  "Whether a contract is ambiguous [] is a 'threshold question of law to be determined by the court.'" *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal citation omitted).

Here, the applicable section of the Permit provides:

> Control Measures are required **Best Management Practices** (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term "minimize" means reduce and/or eliminate to the extent achievable using **control measures that are technologically available <u>and</u> economically practicable <u>and</u> achievable in light of best industry practice**.

*See* ECF No. 357-14 at 19 (emphases added).

A.  <u>Vagueness</u>

As a preliminary matter, the Court finds that the Permit is not impermissibly vague.  In its motion for summary judgment, Pike renews its argument that if the "best management practices" provision of the Permit is construed to consider climate change, as Plaintiff contends, then it is impermissibly vague because it fails to place permittees on notice of their obligations.  The Court acknowledges that the term "best management practices" is not defined in the Permit. Notwithstanding, as the Court held in its prior ruling on Pike's motion to dismiss, the U.S. Supreme Court has made clear that "common narrative provisions requiring permittees to adhere to certain

18

'best practices' or 'best-management practices'—such as the provision at issue here—*are* permissible." *CLF II*, 810 F. Supp. 3d at 329 (citing *City & Cnty. of San Francisco v. Env't Prot. Agency*, 604 U.S. 334, 341 (2025)). Thus, even assuming *arguendo* that the "best management practices" provision of the Permit imposed climate-change-related considerations, under Supreme Court precedent, the Court cannot find that the provision is *impermissibly* vague such that the provision can be rendered invalid as a matter of law.

B. The "Implementation" Violations

As noted above, many of the Climate Change Counts, to varying degrees, each allege that Pike failed to implement control measures that would minimize the risk of pollutant discharge in the event of flooding caused by storm surge or increased rainfall that results, at least in part, from climate change. *See, e.g.*, Count One (alleging Pike failed to eliminate non-stormwater discharges caused by climate change); Counts Two, Three, Five, Six and Seven (alleging Pike failed to implement certain control measures to minimize the risk of discharges).[4] Plaintiff contends that, by failing to comply with what it views as a Permit requirement to implement (and consider) climate change-related precautionary measures, Pike has, in turn, violated the CWA. The Court concludes that Plaintiff has not shown a genuine dispute of material fact about whether Pike failed to comply with the Permit and thus violated the CWA through its implementation practices.

To start, the parties do not dispute that the Permit requires "best management practices" in the implementation of control measures to reduce or eliminate pollutant discharges from the Terminal. The parties do, however, dispute the meaning of that term as it is used in the Permit. While Plaintiff argues that the Permit imposes an obligation on permittees to account for severe

---

[4] Neither party's briefing meaningfully distinguishes between the various Climate Change Counts, save for Count Two, which Pike contends unlawfully subjects it to a state standard that exceeds relevant federal standards. Accordingly, the Court groups the Climate Change Counts as well, and does not discuss them individually.

weather and climate change through its requirement to implement control measures that constitute "best industry practice," Pike contends that it does not. It is clear that this is an issue over which the parties have expended significant litigation resources throughout the life of this case.

But in its myopic focus on the meaning of "best industry practice," Plaintiff has ignored that a Permit violation, and hence a CWA violation in this context, requires proof beyond just that "best industry practice" requires implementation of control measures to address climate change. Pike correctly argues that the Permit requires it to implement control measures that are "technologically available *and* economically practicable *and* achievable in light of best industry practice." *See* ECF No. 357-14 at 19 (emphases added). These requirements are written in the conjunctive with the word "and" connecting them, meaning that each requirement must be met to show a violation of the Permit. *See United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) ("The requirements are connected by the conjunctive 'and,' meaning [the relevant party] must meet all three."); *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944) (recognizing that a plaintiff must meet all relevant statutory criteria "since those clauses are conjunctive not disjunctive"); *Green v. XPO Last Mile, Inc.*, No. 3:19-CV-1896 (JAM), 2022 WL 4380959, at *4 (D. Conn. Sept. 22, 2022) (recognizing that, where a statutory provision was written in the conjunctive, all three prongs of the test must be met). Thus, to defeat Pike's motion for summary judgment, Plaintiff must show a genuine issue of material fact concerning whether an allegedly unimplemented control measure was (1) "technologically available"; (2) "economically practicable"; *and* (3) "achievable in light of best industry practice." *See* ECF No. 357-14 at 19.

Plaintiff spills much ink on whether it is "best industry practice" for facilities like the Terminal to implement measures to account for severe weather events caused by climate change. But even assuming without deciding that "best industry practice" does require implementation of

such measures—and assuming without deciding that the opinions of Plaintiff's experts Goldsmith and Nairn are fully admissible and that they demonstrate a fact question about what "best industry practice" means—Plaintiff has not shown a genuine issue of material fact as to whether Pike failed to implement a *technologically available* and *economically practicable and achievable* control measure, which are other elements of the CWA violation in this context. *See* ECF No. 357-14 at 19.

Plaintiff's only response to Pike's argument on this point is that, because the Permit places responsibility on the permittee to identify and implement appropriate control measures, *Pike* must show that it implemented all technologically available and economically practicable control measures that were achievable in light of best industry practice. But while it is true that Pike is subject to the terms of the Permit, the burden is ultimately on *Plaintiff* to prove the elements of the CWA claims it brings against Pike in the context of this litigation. And at the summary judgment stage, Pike is permitted to argue an absence of evidence sufficient to support an essential element of a claim on which Plaintiff would bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322 ("To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *see also* Fed. R. Civ. P. 56. Based on the present record, Plaintiff has not put forth any evidence or argument identifying *any* control measure(s) that Pike should have implemented that are technologically available *and* economically practicable *and* achievable in light of best industry practice. Thus, there is an absence of evidence on essential elements of Plaintiff's Climate Change Counts, to the extent they claim Pike failed to implement required control measures and thus violated the Permit.

21

Nor can Plaintiff's public policy concerns raised for the first time at oral argument—that requiring a citizen plaintiff to demonstrate that the defendant failed to implement a specific control measure that is both technologically available and economically practicable and achievable would place citizen CWA suits out of reach—excuse its burden to meet essential elements of its claims. Accordingly, Plaintiff has not demonstrated a genuine issue of fact as to the requisite elements to sustain its claims that Pike violated the Permit and, consequently, the CWA.    The "implementation" violations alleged in varying degrees in Counts One through Nine therefore fail.

C.    The "Consideration" Violations

Next, the Court concludes that Plaintiff has not stated a concrete injury resulting from Pike's alleged failure to consider climate change in its SWPPPs, as necessary to establish Article III standing for its "consideration" violations alleged in Counts One through Nine.  Several of the Climate Change Counts allege that Pike failed to *consider* the effects of climate change or identify risks related to climate change in relevant documents.  *See, e.g.*, Count Two (alleging that Pike failed to consider climate change and thus acted inconsistently with Connecticut law); Count Three (alleging that Pike's SWPPP failed to disclose risks related to climate change); Count Four (alleging Pike failed to identify possible sources of pollutants resulting from climate change in the SWPPP); Count Five (alleging Pike failed to describe best management practices to minimize unpermitted discharges); Count Seven (alleging Pike's SWPPP failed to describe best management practices to minimize the potential for leaks and spills); Count Eight (alleging Pike failed to submit required facts to the DEEP); and Count Nine (alleging Pike failed to amend or update its SWPPP regarding climate change risks, among other factors).

"Constitutional standing refers to the requirement that parties suing in federal court establish that a 'Case' or 'Controversy' exists within the meaning of Article III of the United States Constitution." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir.

2016).[5]  To establish standing, a plaintiff must demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The plaintiff bears the burden of establishing these three elements, and must demonstrate standing for each claim and form of relief it seeks.  *Lujan*, 504 U.S. at 560; *Laidlaw*, 528 U.S. at 185.  Here, Pike contends that Plaintiff has failed to allege it has suffered a concrete injury with respect to its allegations that Pike failed to consider or report on control measures related to climate change.  The Court agrees.

An injury is "particularized" if it impacts the plaintiff in a "personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560, n.1).   It is "concrete" if it is "real, and not abstract." *Id.* at 340.  Courts assess whether a harm is concrete by evaluating whether the plaintiff has a "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo*, 578 U.S. at 341).  These can include traditional tangible harms, such as physical harms and monetary harms, as well as certain intangible harms.  *Id.* at 425.

The U.S. Supreme Court has made clear that the injury-in-fact requirement is not automatically satisfied "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U.S. at 341.  In most cases, it is not enough that a plaintiff show a "bare procedural violation." *Id.* at 341–42.  Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 341.  As the

---

[5] As this Court has previously explained, general Article III principles apply to claims brought pursuant to the CWA. *See Conservation L. Found., Inc. v. Gulf Oil Ltd. P'ship*, No. 3:21-CV-00932 (SVN), 2022 WL 4585549, at *5 (D. Conn. Sept. 29, 2022) ("*CLF I*").

23

Supreme Court noted in *TransUnion*, for standing purposes, an "important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 594 U.S. at 426–27.

Applying these principles here, the Court finds that Plaintiff has failed to demonstrate that it suffered a concrete injury resulting from Pike's purported failure to consider climate change, or identify climate change-related risks, in its SWPPPs or other relevant documents. In its SAC, Plaintiff alleges that Pike failed to include adequate climate change considerations in its SWPPP, and avers that to the extent that Pike prepared such plans for the Terminal at all, they were incorrectly placed in its Facility Response Plan. *See, e.g.*, SAC ¶¶ 381–82. The parties now appear to dispute whether the notations in the Facility Response Plan were adequate. *See* ECF No. 403 at 32; ECF No. 356-1 at 37.

But regardless of whether the disclosures in either the SWPPPs or the Facility Response Plan were sufficient to satisfy Pike's obligations under the Permit, Plaintiff has not identified any concrete harm flowing from the alleged omissions. Plaintiff has not submitted any evidence demonstrating that Pike's purported failure to consider climate change or make climate-change related disclosures in its SWPPPs caused any property or environmental damage or any other tangible consequences. Nor does Plaintiff identify any intangible harm bearing a close relationship to a traditionally recognized basis for suit, or any "downstream consequences" resulting from the alleged omissions. *See TransUnion*, 594 U.S. at 442. Plaintiff merely contends that Pike failed to consider and then include purportedly required information in planning documents which, standing alone, amount to mere procedural violations—not a concrete injury to any of Plaintiff's members. Plaintiff's SAC had alleged that Plaintiff "and its members are affected by, and concerned with,

24

pollutant discharges . . . resulting from [Pike's] failure to satisfy its obligations under the Clean Water Act," because Pike's actions "currently affect[] members' ability to use and enjoy the water, including fishing, boating, and recreating in the Quinnipiac and Mill Rivers, as well as the New Haven Harbor." SAC ¶ 12. If, indeed, Pike had failed to *implement* required control measures that could result in discharges that violate the CWA, Plaintiff and its members would have a concrete injury. *See TransUnion*, 594 U.S. at 427 (describing a hypothetical plaintiff who alleges that her land is polluted by a nearby factory).

But because the Court has determined that Pike is entitled to summary judgment on Plaintiff's "implementation violations" in the Climate Change Counts, all that remains are its allegations that Pike failed to appropriately consider and/or identify climate change-related risks in relevant documents. And Plaintiff has alleged no concrete injury or distinctive harm to its members resulting from this mere failure to consider climate change. As in *TransUnion*, this lack of concrete injury means that Plaintiff lacks Article III standing. *See TransUnion*, 594 U.S. at 434 (holding that plaintiffs who alleged the mere existence of a misleading alert in their credit files, without a corresponding disclosure of that information to any potential creditors, failed to demonstrate a concrete injury); *see also Summers v. Earth Island Institute,* 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing"). Nor can Plaintiff claim standing based on an argument that Pike's failure to consider climate change causes its members risk of future harm, given that it has withdrawn its request for injunctive relief and has not argued that exposure to the risk itself caused some concrete harm; and, in any event, any risk of future harm would be speculative. *See TransUnion*, 594 U.S. at 435.

25

*TransUnion* makes clear that a statutory violation alone is not sufficient to demonstrate standing: "no concrete harm, no standing." 594 U.S. at 442. Plaintiff proffers no meaningful rebuttal to *TransUnion* and its progeny. Thus, Plaintiff's claims in the Climate Change Counts that Pike failed to consider climate change in its SWPPPs or other relevant documents are dismissed for lack of standing.

D. Count Two

Next, the Court finds that Count Two warrants dismissal on an additional basis, insofar as it seeks to enforce state requirements that exceed the scope of federal CWA standards.

In Count Two of the SAC, Plaintiff alleges that Pike violated the Permit by engaging in activities "inconsistent with the applicable goals and policies" of the Connecticut Coastal Management Act ("CMA"), as set forth in Conn. Gen. Stat. § 22a-92, and that Pike designed and operated the Terminal in a manner that could adversely impact coastal resources as defined in Conn. Gen. Stat. § 22a-93(15). *See* SAC ¶¶ 351, 357. The Court acknowledges that the Permit itself expressly incorporates these provisions of the CMA and provides that permittees shall adhere to them. *See* ECF No. 357-14 at 11. Consequently, Plaintiff's claims in Count Two could be read as merely incorporating the sections of the Permit with which Plaintiff alleges Pike failed to comply. But it could also be read as seeking to enforce requirements of the CMA that go beyond federal law. The Second Circuit has established that while *states* may enact and enforce stricter standards than those mandated by the CWA and EPA regulations, *private citizens* lack standing to do so. *Atl. States Legal Found, Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 359 (2d Cir. 1993), *as amended* (Feb. 3, 1994). Private citizens lack standing to enforce "state regulations, *including the provisions of [state-issued] permits*, which mandate 'a greater scope of coverage than that required' by the federal CWA and its implementing regulations" in citizen suits brought under 33 U.S.C. § 1365. *Id.* (emphasis added).

26

Here, a review of the CMA reflects that it contains a variety of regulations related to tidal, coastal, and navigable waters and tidal wetlands, including setting up schemes for advising municipalities about development and setting forth various requirements for the same. *See* Conn. Gen. Stat. §§ 22a-90 to 22a-112. By contrast, the CWA does not appear to impose these requirements (or at least Plaintiff has not argued that it does). Thus, to the extent that Plaintiff seeks to enforce broader state-law obligations through the CWA's citizen suit provision in Count Two, it is barred from doing so under Second Circuit precedent. *See, e.g., Long Island Soundkeeper Fund, Inc. v. New York City Dep't of Env't Prot.*, 27 F. Supp. 2d 380, 386 (E.D.N.Y. 1998) (finding that plaintiffs had no standing to sue for violations of permit provisions imposed under state law that were not required under federal law).

Plaintiff's reliance on the EPA's Framework for Protecting Public and Private Investment in Clean Water Act Enforcement Remedies ("Framework") to argue that the EPA imposes on CWA permittees a framework that requires consideration of climate change impacts on their facilities is unavailing. By its own terms, the Framework states that it is "is not a rule or final agency action; nor does this framework establish any binding legal obligations on EPA or the regulated community." *See* Framework, ECF No. 403-16 at 10. Nor does Plaintiff explain how the Framework serves to fully align the CMA with relevant federal law. Thus, Plaintiff may not rely on the Framework to argue that the CMA and CWA are coextensive. To the extent Count Two seeks to enforce state standards that exceed federal standards, it must be dismissed for this additional reason.

For these reasons, Pike's motion for summary judgment is granted as to Counts One through Nine, and Plaintiff's corresponding partial motion for summary judgment is denied as to Counts Three, Five, and Six.

27

## VII.   DISCHARGE DISCLOSURES AND MONIROTING COUNTS (COUNTS TEN AND ELEVEN)

With respect to Plaintiff's claims in Counts Ten and Eleven concerning Pike's alleged failure to conduct monitoring and identify discharges to impaired waters in its SWPPP, the Court finds that Pike is entitled to protection under the CWA's permit shield with respect to only the claims in Count Eleven and the claims concerning Outfalls 001-2 and 001-3 in Count Ten. However, Pike is not entitled to protection under the CWA's permit shield with respect to the claims concerning Outfall 001-1 in Count Ten.

### A.   Permit Shield Provision

"Under what is known as the 'permit shield' provision, an entity that adheres to the terms of its permit is deemed to be compliant with the [Clean Water] Act." *San Francisco*, 604 U.S. at 341 (citing 33 U.S.C. § 1342(k) ("Compliance with a permit . . . shall be deemed compliance . . . with [the CWA].")).   The permit shield "protects a CWA permit holder from facing suits challenging the adequacy of its permit." *Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171, 173 (2d Cir. 2008) (internal citation omitted).   "That is, compliance with an authorized permit is deemed compliance with CWA, so as long as [a defendant] was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations." *Id.*   "Because of the harsh penalties for violating the terms of a permit, the permit shield is invaluable. . . . a discharger that complies with all permit conditions can rest assured that it will not be penalized." *San Francisco*, 604 U.S. at 351.

### B.   Count Ten (Outfall Disclosure and Monitoring)

For the reasons discussed below, the Court concludes that Pike is entitled to summary judgment in part on Count Ten, and in full on Count Eleven.

Section 5(c)(2)(D)(i)(7) of the Permit requires Pike to identify in its SWPPP impaired waters the Terminal discharges into and state whether a Total Maximum Daily Load ("TMDL") has been established for them.[6]  ECF No. 357-14 at 25.  Section 5(c)(2)(K) of the Permit in turn requires the SWPPP to document schedules and procedures for implementing impaired waters monitoring.  *Id.* at 28.  In its SAC, Plaintiff alleges that Pike failed to disclose discharges into the New Haven Harbor and to document procedures for monitoring those discharges, in violation of these two Permit provisions.  *See* SAC ¶¶ 367–69 (alleging that the SWPPP "falsely states that all stormwater discharges are pumped through the treatment system and out through an outfall into the New Haven MS4 . . . when, in fact, most stormwater discharges from the tank farm are made directly to New Haven Harbor through two outfalls that are not identified in the SWPPP" and "falsely asserts" that Pike "does not need to consider additional monitoring to impaired waterbodies because all discharges are made to the New Haven MS4"); *id.* ¶¶ 411–18.  Based on the summary judgment record, it is undisputed that the Terminal discharged to three stormwater outfalls:  Outfall 001-1, which discharged to the New Haven Harbor through its MS4, and Outfalls 001-2 and 001-3, which discharged directly to the New Haven Harbor.  ECF No. 403-1 ¶ 59.

With respect to Outfall 001-1, Plaintiff argues that there is at least a genuine dispute of material fact about whether Pike was required to conduct monitoring at Outfall 001-1 (and thus document the schedules for such monitoring), despite that it does not discharge directly into New Haven Harbor.  Pike points to evidence demonstrating that: (i) the DEEP confirmed with Triton in 2011 and 2021 that impaired waters monitoring was not required at Outfall 001-1 because it

---

[6] A TMDL is "the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that particular pollutant." *See* https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls (last visited July 23, 2026).

discharged into the MS4[7]; (ii) in 2025, the DEEP again confirmed with Pike's expert Ecsedy that impaired water monitoring was not required at Outfall 001-1 because it discharged into the MS4; and (iii) in 2025, the DEEP confirmed with expert Ecsedy that impaired water monitoring is not required "if a facility's stormwater discharge was to a municipal stormwater system which subsequently discharges to an impaired water and the facility's discharge is greater than ½ mile (2,640 feet) from the outfall to the impaired water" and that here, Outfall 001-1's discharge is approximately 3,000 feet from the municipal outlet to the Harbor.  ECF No. 403-1 ¶¶ 65–68.

This evidence, however, is not sufficient to defeat summary judgment by way of invocation of the permit shield.  All the evidence Pike cites to in support of its argument concerning Outfall 001-1 is hearsay—out-of-court statements allegedly made by the DEEP to either Triton or Ecsedy offered for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  A party may not rely on impermissible hearsay to defeat summary judgment, *see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985), and, in any event, the Second Circuit has held in another context that informal correspondence from agencies does not constitute "formal agency determinations." *UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 96 (2d Cir. 2020).[8]  Moreover, as Plaintiff points out, one of the emails on which Pike relies from the DEEP states that sampling is not required for discharges that go through an MS4 "in most cases," but that there are "cases that DEEP has required sampling even if the discharge from the site goes to the MS4 first."  ECF No. 356-45 at 6.  Accordingly, even the informal correspondence from the

---

[7] Additionally, based on Section 5(c)(2)(D)(i)(10) of the Permit, it appears that permittees are required to identify map locations of discharges to a MS4, supporting Pike's view that discharges to a MS4 are treated differently than discharges directly to impaired waters. *See* ECF No. 357-14 at 94.

[8] Plaintiff has not argued in its brief that Pike's evidence concerning Count Ten is inadmissible hearsay or that the DEEP's guidance does not constitute a formal agency determination.  But it makes these points in its Rule 56(a)2 Statement. *See* ECF No. 403-1 ¶ 64.  While the Local Rule provides that "[a] party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law," D. Conn. L. Civ. R. 56(a)(2), the Court is bound by Second Circuit law and, under Second Circuit precedent, it cannot treat Pike's evidence as dispositive of its compliance with the Permit at this stage.

DEEP is far from definitive on the issue of whether monitoring, and thus documentation of monitoring schedules, was required at Outfall 001-1. Thus, the Court finds that Pike cannot benefit from the permit shield as to Outfall 001-1 at this juncture.

As to Outfalls 001-2 and 001-3, however, the Court finds that Pike has established that it complied with the terms of the Permit. First, it is undisputed that Outfalls 001-2 and 001-3 were inactive until 2020, as all outfalls from the Terminal to the New Haven Harbor were directed to Outfall 001-1 and then to the MS4 until then. *See* 403-1 ¶ 60. Outfalls 001-2 and 001-3 were thus not subject to disclosure/monitoring requirements until 2020. Second, it is also undisputed that Pike disclosed discharges for Outfalls 001-2 and 001-3 starting in its August 2020 SWPPP and in its subsequent iterations of its SWPPP. *Id.* ¶¶ 61, 71.

In the parties' Rule 56 statements, Plaintiff does not challenge the sufficiency of the September 2023 SWPPP (ECF No. 356-58) and agrees that it meets the Permit's requirements. ECF No. 403-1 ¶ 71. But Plaintiff appears to challenge the sufficiency of the SWPPPs submitted in August 2020 (ECF No. 356-47), September 2021 (ECF No. 356-56), October 2022 (ECF No. 356-57), and January 2024 (ECF No. 356-59), contending that while these SWPPPs addressed Pike's semi-annual benchmark monitoring, they did not address its impaired waters monitoring schedules and procedures. ECF No. 403-1 ¶ 71. In its brief, Plaintiff makes no argument to distinguish semi-annual benchmark monitoring from impaired waters monitoring. Nor does Plaintiff otherwise proffer any evidence to rebut Pike's evidence that its disclosures and monitoring were sufficient. Accordingly, the Court cannot conclude that there is a genuine dispute of material fact about whether Pike complied with the Permit with respect to Outfalls 001-2 and 001-3, based on Plaintiff's conclusory arguments.

31

Thus, the Court finds that Pike complied with Permit Sections 5(c)(2)(D)(i)(7) and 5(c)(2)(K)(1) by appropriately disclosing discharges via Outfalls 001-2 and 001-3 into the impaired New Haven Harbor, and finds that all necessary monitoring procedures for these Outfalls were documented in the relevant SWPPPs.  But the Court cannot find on the present record that Pike complied with these provisions of the Permit with respect to Outfall 001-1.  Pike's motion for summary judgment as to Count Ten is therefore granted in part (with respect to Outfalls 001-2 and 001-3) and denied in part (with respect to Outfall 001-1).

C.  Count Eleven (Impaired Waters Monitoring)

Next, the Court concludes that Pike is entitled to summary judgment on Count Eleven.

Section 5(e)(1)(D)(i) of the Permit requires discharges into impaired waters without a TMDL "for which a standard analytical method exists" to be monitored annually for certain indicator pollutants.  ECF No. 357-14 at 36.  The Permit provides that "[t]his monitoring requirement does not apply after the first year of monitoring if the indicator pollutant is not detected above natural background levels, as determined by the [DEEP] Commissioner, in the stormwater discharge or is the result of run-on entering from offsite and the permittee has documented that diversion of this off-site run-on is not feasible or practicable."  *Id.*  While the SAC is somewhat unclear, Plaintiff appears to allege that throughout 2016, the Terminal's stormwater monitoring reports were compliant, but after 2016, Pike allegedly failed to do necessary monitoring for certain pollutants, such as dissolved oxygen, nutrients, oil and grease, and polychlorinated biphenyls ("PCBs").  SAC ¶¶ 421–22; *see also id.* ¶ 369.

Pike has submitted evidence from its consultant, Triton, outlining the specific monitoring parameters for each pollutant.  *See* Triton Report, ECF No. 356-45 at 8–9.[9]  That Report reflects

---

[9] These pages of Triton's Report appear to be drawn from the Impaired Waters Monitoring Table pertinent to the Permit, which Plaintiff references as the "Connecticut Integrated Water Quality Report."  *See* ECF No. 403-1 ¶ 74.

that oil and grease are required to be monitored; PCBs are not required to be monitored by the Permit unless the Terminal indicated as much during the registration process; and, with respect to dissolved oxygen and nutrients, the Permit required impaired waters monitoring for parameters total Kjeldahl nitrogen, nitrate, and total phosphorous—not dissolved oxygen or nutrients themselves. *Id.*; *see also* ECF No. 403-1 ¶¶ 75–77. Based on these considerations, Pike points to its September 2023 SWPPP, contending that its description of monitoring for certain pollutants is correct. *See* ECF No. 356-58. Plaintiff, in turn, has cited to Pike's own documents for the proposition that Pike failed to monitor for enterococcus, fecal coliform, or PCBs at any of its outfalls from 2010 to 2024. Pl.'s Add'l Material Facts, ECF No. 403-1 ¶ 56. But as Pike points out, Plaintiff did not allege in its SAC that Pike failed to monitor for enterococcus and fecal coliform, and it cannot raise this issue for the first time at the summary judgment stage.[10] *See Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6, 8–9 (2d Cir. 2015) (summary order). Plaintiff also has not put forth any evidence to call into question Pike's conclusion that PCBs would not be present at a site like the Terminal and, thus, it was not required to monitor for them. Additionally, as Pike has established that it was not subject to pollutant monitoring obligations for Outfalls 001-2 and 001-3 until 2020—and Plaintiff has not introduced any conflicting evidence—the Court finds that there is no genuine dispute of fact as to whether Pike complied with its impaired waters monitoring obligations as to oil and grease. Pike can therefore properly wield the permit shield as to the allegations of Count Eleven.

Thus, Pike's motion for summary judgment is granted as to Count Eleven.

---

[10] Plaintiff alleged that the New Haven Harbor and nearby rivers were impaired for, among other things, fecal coliform and enterococcus. SAC ¶ 110. But Pike is correct that Plaintiff did not allege that Pike *violated the CWA* by failing to monitor for these items.

## VIII.    DISCHARGE COUNTS (COUNTS FOURTEEN AND FIFTEEN)

In Counts Fourteen and Fifteen, Plaintiff alleges that Pike violated the Permit by allowing unpermitted discharges of stormwater into the ground and failing to make its secondary containment area impermeable.  *See* SAC ¶¶ 425–32, 433–38.  Both parties move for summary judgment on these counts.  The Court concludes that Plaintiff is entitled to summary judgment, and denies Pike's motion for summary judgment.

### A.  Additional Relevant Facts

For any storage area, tank or container installed after the date of authorization of the Permit, the Permit required Pike to maintain an impermeable secondary containment area that "hold[s] at least 110% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow."  ECF No. 400-1 ¶ 14; ECF No. 357-14 at 21.  Pike certified in eight SWPPPs that the Terminal's secondary containment area met this requirement.  ECF No. 400-1 ¶ 17.  Between January 2011 and 2020, the tank farm floor under and around the tanks was earthen, surrounded by a combination of a concrete dike wall and an earthen berm.  *Id.* ¶ 18.

In 2011, Triton found that a section of the Terminal's secondary containment area was permeable, and recommended that Pike install a liner to address these concerns.  ECF No. 400-1 ¶¶ 21–24.  It is undisputed that Pike did not begin updating its Spill Prevention, Control, and Countermeasure Plan for the Terminal to address the permeability requirements until 2016, though Pike contends this fact is irrelevant.  *Id.* ¶ 25.

On December 20, 2019, Pike and the DEEP entered into a Consent Order related to an October 22, 2019, release of petroleum product in the secondary containment area in which some amount of petroleum product infiltrated into the ground (*i.e.*, a gas spill).  *Id.* ¶ 88; *see also* Consent Order, ECF No. 356-48.  Pike contends that the Consent Order required it to submit for the DEEP

Commissioner's "review and written approval" "a plan for best management practices for preventing and appropriately responding to releases at the Site," "a scope of study for investigating the potential impact of [the] pollution," and a "comprehensive and thorough report which . . .proposes a detailed program and schedule to perform the remedial actions." Pike Add'l Mat. Facts, ECF No. 400-1 (pages 34–36) ¶ 8; ECF No. 356-48 at 5–6. The Consent Order further stated that the remedial action plan should "define[ ] the existing and potential extent and degree of soil, sediment, surface water, and ground water pollution which is on, is emanating from or has emanated from the site" and then "evaluate[ ] the alternatives for remedial action to abate such pollution." Pike Add'l Mat. Facts, ECF No. 400-1 ¶ 9; ECF No. 356-48 at 6. In other words, Pike contends that it was required to submit Best Management Practices, a Scope of Study, and a Remedial Action Plan. ECF No. 403-1 ¶ 88. The Consent Order also imposed a fine in the amount of $64,500, which Pike represents it paid on December 4, 2019. Pike Add'l Mat. Facts, ECF No. 400-1 ¶ 11.

Pike contends that it submitted its Scope of Study in January of 2020, which it revised at the DEEP's request in April of 2021. ECF No. 403-1 ¶ 89. In its Scope of Study, Pike's proposed remedial activities included installation of "[a] 60 mil thick High Density Polyethylene (HDPE) liner with a permeability of under 1 x 10-8 cm/sec." *Id.* ¶ 90. Pike described the liner as "serv[ing] as a significant facility upgrade which will provide long term protection . . . from potential future releases." *Id.* Pike contends that the DEEP approved the use of a liner as a remedial action step. *Id.* ¶ 91. The parties dispute when Pike began installing the liner; while Pike states that it began installing the liner in late 2020, Plaintiff avers that this process did not begin until September of 2021. *Id.* It is undisputed, however, that the process of installing the liner was not yet complete as of the date of the sale of the Terminal on April 9, 2024. ECF No. 400-1 ¶ 42.

35

B. Effect of Consent Order

First, the Court finds that Plaintiff's claims in Counts Fourteen and Fifteen are not barred by 33 U.S.C. § 1319(g)(6), based on the 2019 Consent Order entered between Pike and the DEEP.

Section 1319(g)(6) of the CWA provides, in relevant part, that violations "for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be . . . shall not be the subject of a civil penalty action under [the citizen suit provision, § 1365] of this Act." *See* 33 U.S.C. § 1319(g)(6)(A)(iii).  Section 1319(g)(6)'s limitation on citizen suits "applies only to CWA claims for civil penalties, not to claims for declaratory judgments or injunctive relief." *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 155-56 (S.D.N.Y. 2010) (emphasis omitted), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011) (summary order).

Pike contends that because of the Consent Order, pursuant to which it paid a penalty, Section 1319(g)(6) of the CWA bars Plaintiff from pursuing its claims in Counts Fourteen and Fifteen.  In response, Plaintiff argues that its claims are not barred under this statute because (1) the DEEP did not act under comparable state law in issuing the Consent Order due to procedural differences; and (2) the Consent Order was expressly limited to Pike's October 22, 2019, gas spill, not the claims asserted in Counts Fourteen and Fifteen of the SAC.  The Court addresses each of these points in turn.

As a preliminary matter, the Court finds that the Consent Order is a "final order not subject to further judicial review" for purposes of Section 1319(g)(6).  The parties do not dispute this, and courts have held that administrative consent orders are final orders not subject to further review for purposes of Section 1319(g)(6).  *See, e.g., St. Johns Riverkeeper, Inc. v. Jacksonville Elec. Auth.*, No. 3:07-CV-739-J-34TEM, 2010 WL 745494, at *8 (M.D. Fla. Mar. 1, 2010).

36

Next, the Court concludes that the Consent Order was issued under comparable state law. In Plaintiff's opposition, it primarily challenges Pike's reliance on the 2019 Consent Order because of procedural differences between Connecticut law and Section 1319(g).  Plaintiff contends that Conn. Gen. Stat. § 22a-6, the provision under which the Consent Order was issued, does not have the same public notice and hearing requirements set forth in Section 1319(g).  However, courts in this district have held that Connecticut's laws are comparable to Section 1319(g) for this purpose. *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 777 F. Supp. 173, 183 (D. Conn. 1991), *aff'd in part, rev'd in part on other grounds*, 989 F.2d 1305 (2d Cir. 1993) (finding that the elements that the state department must meet, such as considering the specific circumstances before assessing civil penalties, providing a public hearing on request, and submitting to judicial review are comparable to Section 1319(g)).  And Conn. Gen. Stat. § 22a-6, as well as other state statutory provisions, allow for public participation and challenges to administrative orders.  *See* Conn. Gen. Stat. §§ 22a-6(e), 22a-436 through 437, 22a-19, and 22a-43(a).  Thus, the Court concludes that the Consent Order was issued under comparable state law.

But the Consent Order was not issued for the same allegations raised in Plaintiff's SAC. Based on the face of the Consent Order, it is clear that it was issued to address the October 22, 2019, gas spill, *see* ECF No. 356-48 at 4–5, not the more general permeability issues alleged in Counts Fourteen and Fifteen of the SAC.  *See Soundkeeper, Inc. v. A & B Auto Salvage, Inc.*, 19 F. Supp. 3d 426, 438 (D. Conn. 2014) ("The words '*any violation*,' which are contained at § 1319(g)(6)(A), makes evident the Congressional intent that the sole sort of final orders and judgments which would operate to preclude future civil penalty actions brought pursuant to § 1319(g)(6) must concern the same alleged *violation*.") (emphasis in original).  The SAC makes no mention of the October 2019 gas spill.  The fact that the Consent Order references that Pike

37

violated Conn. Gen. Stat. § 22a-427 (concerning the discharge of any state waters in violation of the various requirements of the law) and § 22a-430 (requiring a permit for discharging stormwater, substances, or materials into the waters of Connecticut) does not demonstrate that the Order applies beyond the gas spill. Indeed, if that were the case, a defendant could be incentivized to create and resolve with the state a more minor issue, with the hope that doing so would immunize it from responsibility for more serious violations. As in *Soundkeeper,* the Court cannot find that the violation with which the 2019 Consent Order was concerned "is the same, or sufficiently so, as those alleged violations with which this lawsuit is now concerned." 19 F. Supp. 3d at 438. Thus, the 2019 Consent Order does not shield Pike from liability related to the allegations set forth in Counts Fourteen and Fifteen.

C. Exhaustion of Administrative Remedies

The Court next finds that there was no requirement for Plaintiff to exhaust administrative remedies prior to bringing this suit, as Pike contends.

Pike argues that Plaintiff failed to exhaust administrative remedies before bringing Counts Fourteen and Fifteen because it did not comment on the Terminal's SWPPP when Pike first submitted it to the DEEP as part of its initial registration in 2011. In support of this argument, Pike cites to certain provisions of Section 4 of the Permit, entitled "Registration Requirements," which, in relevant part, outline procedures for members of the public to submit written comments on SWPPPs and to request a hearing with the DEEP Commissioner to address concerns regarding a permittee's registration and/or proposed plan. *See* ECF No. 356-10 at 16–18. In Pike's view, since Plaintiff did not publicly comment on the Terminal's SWPPP or commence an administrative challenge within thirty days as permitted by statute, *see* Conn. Gen. Stat. §§ 22a-436 and 22a-430, it is barred from bringing the instant suit.

The Court finds this argument unpersuasive.  As an initial matter, the CWA does not include an express requirement that plaintiffs exhaust administrative remedies prior to commencing a citizen suit.  *See Citizens for a Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111, 1119 (9th Cir. 1996), *as amended* (July 16, 1996) (noting that the CWA "makes no mention of exhaustion of state remedies as a prerequisite for bringing a citizen suit" and the doctrine of exhaustion is "simply not relevant where the federal action is not seeking a ruling on the validity of the state action"); *see also* 33 U.S.C. § 1365.

As the Third Circuit has observed, there "are only two limitations on the right of the citizen to bring suit."  *Proffitt v. Rohm & Haas*, 850 F.2d 1007, 1011 (3d Cir. 1988).  First, there is a notice requirement.  The "citizen must give sixty days' notice to the Administrator, the State and the alleged polluter to allow the alleged violator the opportunity to cure his violation or to allow the EPA or the state to commence its own enforcement action."  *Id.* (citing 33 U.S.C. 1365(b)(1) and *Gwaltney*, 484 U.S. at 59).  Second, "a citizen may not bring his or her own action if the 'Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State' against the alleged polluter."  *Id.* (citing 33 U.S.C. § 1365(b)(1)(B)).  Here, Plaintiff has proffered evidence showing that it complied with the CWA's notice requirement by timely informing Pike, the EPA and the DEEP of its intention to file this suit.  *See* Pl.'s Notice of Intent to File Suit, dated July 28, 2020, ECF No. 230-1; s*ee* also 33 U.S.C. 1365(b)(1).  That notice was provided to the requisite parties on July 28, 2020, more than one year before Plaintiff commenced this lawsuit in July of 2021.  Additionally, it is undisputed that neither the EPA nor the DEEP has commenced or is "diligently prosecuting" an action against Pike for the CWA violations alleged in Plaintiff's SAC.  Thus, the Court finds that Plaintiff was not

39

required to exhaust administrative remedies to pursue its claims in Counts Fourteen and Fifteen and, in any event, Plaintiff has complied with the CWA's procedural prerequisites.

The cases cited in Pike's brief are inapposite, as they largely concern challenges to agency decisions. In *Connecticut Fund for the Env't v. Job Plating Co.*, 623 F. Supp. 207, 216 (D. Conn. 1985), for example, environmental organizations brought a CWA citizen suit against the operator of an electroplating plant, alleging that it discharged pollutants in excess of the amount allowed by its permit. *Id.* at 208–09. In its motion to dismiss and in opposition to the plaintiffs' motion for summary judgment, the defendant did not contest the discharge of pollutants, but argued, in relevant part, that the permit itself was unenforceable because it was not properly promulgated. *Id.* at 209. The court rejected this argument, finding that the defendant failed to avail itself of fora to timely challenge the permit. *Id.* at 216. The court explained that the defendant could have either commenced an administrative challenge to the permit within thirty days of its issuance, *see* Conn. Gen. Stat. §§ 22a-430 and 22a-436, or filed an application for review in the federal circuit court to challenge the EPA's approval of the allegedly invalid permit program. *Id.* at 216–17. Consequently, the court held that the defendant could not raise the issue of the validity of the permit as a defense in an enforcement proceeding. *Id.* at 217.

But that case, and the authority on which it relies, dealt with allegations of a permit's purported deficiency by the *defendant* and an administrator's action in issuing the permit. Here, by contrast, there is no allegation that the Permit itself was in some way deficient or that *Plaintiff* is making any other collateral attack on a state agency's determination. Nor do the parties dispute that the Permit governs the Terminal and that it required permittees to develop a SWPPP. On the present record, the Court cannot find that Plaintiff's allegation that Pike failed to maintain an impermeable secondary containment area somehow shifts the burden onto Plaintiff to challenge

40

the *DEEP's decision* to issue Pike a permit after reviewing its registration materials, including its SWPPP, or otherwise necessitates an exhaustion requirement.

### D.  The Merits of Counts Fourteen and Fifteen

Having determined that none of Pike's procedural arguments bar Plaintiff's claims in Counts Fourteen and Fifteen, the Court next analyzes the merits of these claims.  As to Count Fifteen, the Court grants Plaintiff's summary judgment motion and denies Pike's summary judgment motion.  As to Count Fourteen, the Court denies both parties' summary judgment motions.

### 1.  Count Fifteen

The Court addresses Count Fifteen first, and finds that there is no genuine dispute of fact that Pike failed to maintain an impervious containment area, as required under the Permit.

Section 5(b)(9)(A)(i)(3) of the Permit requires permittees to "minimize the potential for leaks and spills" by maintaining an "impermeable secondary containment area" that holds "at least 110% of the volume of the largest tank or container or 10% of the total volume of all tanks and contains in the area, whichever is larger, without overflow."  ECF No. 357-14 at 21.  Although the Permit does not define the term "impermeable," some federal courts have provided insight on its meaning.  As stated by one district court, permeability is the "ability of a porous material, such as soil or rock, to allow the passage of liquid, such as pore water."  *In re Katrina Canal Breaches Consol. Litig.*, No. CA 10-866, 2013 WL 1562765, at *14 (E.D. La. Apr. 12, 2013) (citing expert testimony).  In a similar vein, Merriam-Webster's Dictionary defines "impermeable" as "not permitting passage (as of a fluid) through its substance."[11]  Thus, to satisfy the Permit's

---

[11] *See* Merriam-Webster, impermeable, https://www.merriam-webster.com/dictionary/impermeable (last accessed on July 23, 2026).

impermeability requirements, Pike's secondary containment system was required to prevent water and other substances from passing through its protective layers.

Here, Plaintiff has submitted substantial evidence demonstrating that during the period of 2011 through April of 2024, the Terminal did not meet this standard. First, Plaintiff introduces evidence showing that Pike's own consultant, Triton, concluded that a portion of the Terminal's secondary containment area was permeable in 2011, and recommended that Pike install a liner to address these concerns.[12]    ECF No. 400-1 ¶¶ 21–22. In its 2011 report, Triton found that a permeable section of the secondary containment area, representative of locations with slow infiltration rates, was 164 times more conductive than the $1.0 \times 10\text{-}6$ cm/sec standard that Triton recommended for compliance. *Id.* ¶ 22. Triton explained that, "[t]o put the data in perspective, if a 10 cm pool of water was present directly on top of the low permeability unit . . . , it would begin to infiltrate into that layer at a rate of 4.7 inches per hour." *Id.* Despite Triton's evaluations, it is undisputed that Pike did not begin addressing the permeability requirements until 2016. *Id.* ¶ 25.

Second, it is undisputed that in August of 2016, a Pike environmental, health and safety compliance employee emailed Pike's Director of Corporate Integration to express concerns with existing permeability issues. *Id.* ¶ 26. That email stated:

> The New Haven SPCC is about 90% complete. You can pay someone to do the work I already have put in to that plan. *I only need the Gulf Engineering and Operations people to make up their minds about what they want to do about the permeability issues that Gulf has known about for 8 years.*

---

[12] Plaintiff also points to a 2008 evaluation conducted by Triton, which is referenced in Triton's 2011 report, to argue that the Terminal's secondary containment area was permeable. But this report does not definitely establish that the area was permeable. Rather, as Pike points out in the parties' Rule 56 statements, the 2008 report notified Pike that two of its soil samples "contained gray/brown silty sand embedded with small stones (fine gravel). According to the laboratory, the stone incorporated in these two samples caused voids or preferential pathways, which prohibited proper testing. As such, the data obtained from these samples was considered invalid." *See* ECF No. 400-1 ¶¶ 19–20; *see also* Triton Report, ECF No. 370 at 5. Thus, the Court does not construe the 2008 evaluation as demonstrating that the Terminal's secondary containment area was permeable.

42

*Id.* (emphasis added); *see also* Email Correspondence, ECF No. 372 at 2.

Third, Plaintiff cites to evidence showing that on November 30, 2016, Triton advised Pike that it could not "certify that the tank farm secondary containment system is sufficiently impervious to prevent spilled product from reaching navigable waters per EPA regulation." ECF No. 400-1 ¶ 27; *see also* Triton Letter, ECF No. 373.

Fourth, it is undisputed that during the fall of 2016, Pike contracted with another consultant, ATC Group, to conduct yet another permeability analysis. ECF No. 400-1 ¶ 28. That report, issued on July 27, 2018, assumed a spill involving the contents of Pike's largest tank in each of the two sections of the Terminal's secondary containment area, *id.* ¶ 31, and stated that its testing "suggested that the permeability in the majority of the container would not meet the 72-hour retention time threshold to be 'sufficiently impervious.'" ATC Group Eval., ECF No. 357-8 at 4. ATC Group's evaluation also suggested that "the secondary containment areas were not engineered or constructed using uniform materials and/or an impervious liner," and "varying degrees of silt and/or clay were observed throughout the containment areas." ECF No. 400-1 ¶ 34. It is undisputed that ATC Group, like Triton, recommended that a liner be installed in the secondary containment area. *Id.* ¶ 36. ATC Group told Pike's predecessor that a "catastrophic release of an entire tank would result in significant short and long-term liabilities associated with soil and groundwater cleanup, at a minimum." *Id.* And in 2019, Triton reminded Pike that to meet its permeability obligations, it needed to install a liner in the secondary containment area subject to applicable regulations. *See id.* ¶ 37.

Additionally, the record demonstrates that Pike did not begin installing the liner—as recommended by two of its consultants to address the permeability issues—until 2020 at the earliest, when it declared as much in its August 2020 SWPPP, characterizing this move (curiously)

43

as a "proactive stance." *Id.* ¶ 39. It is also undisputed that the liner installation remained incomplete as of the date that Pike sold the Terminal, on April 9, 2024. *Id.* ¶ 42.

The Court finds that this overwhelming evidence establishes that from at least 2011 to April of 2024, the Terminal's secondary containment area was permeable; that Pike knew about this issue; and that Pike failed to rectify it, particularly given that it did not begin work on the liner until 2020 at the earliest, and the liner installation remained incomplete during Pike's ownership of the Terminal.[13]

Indeed, Pike does not endeavor to dispute this evidence. Instead, Pike again invokes the permit shield doctrine, arguing that there is a genuine dispute of fact as to whether the DEEP allowed it to certify its SWPPP pursuant to a corrective action plan ("CAP"). In support of this argument, Pike contends that its consultants and other third parties sought guidance from the EPA and the DEEP on how to comply with the Permit in light of the Terminal's permeability issues, and received confirmation that a CAP was acceptable. For instance, Pike explains that in 2016, Triton reached out to the DEEP and the EPA on "several occasions" to seek "direction for certifying" the combined SWPPP/Spill Prevention Control and Countermeasure Plan given that the known impermeability "of [the] secondary containment cannot be immediately addressed." ECF No. 373 at 2. Triton reported to Pike that "[b]oth agencies have indicated that it would be acceptable to certify the plan with a plan of action and associated schedule." *Id.* Furthermore, Pike points to a Triton communications log stating that even prior to that, on April 16, 2012, Triton had a call with Nisha Patel of the DEEP to discuss what to do about certifying a SWPPP "when there are identified deficiencies/outstanding compliance items at a site." Triton Comm. Log, ECF

---

[13] Plaintiff also cites to the testimony of its experts Robert Roseen and Kelly Coulon to support its claim in Count Fifteen. Pike has moved to exclude this expert testimony. The Court need not resolve Pike's motions because, even without this expert testimony, Plaintiff has demonstrated it is entitled to summary judgment on Count Fifteen.

No. 400-11 at 2.  In that log, in which a Triton employee relays Ms. Patel's alleged statements, Ms. Patel apparently confirmed that "the use of a [CAP], built into the SWPPP which would identify the deficiency and a schedule to implement corrective actions" "would be an acceptable method to finalize a plan in cases where deficiencies were identified."  *Id.*

Relying on this guidance, Pike contends that Triton prepared and included a CAP "as Appendix D [to the SWPPP] that provides a summary of anticipated tasks to achieve imperviousness."  ECF No. 373 at 2; *see also* Pike's SWPPP, ECF No. 366 at 120.  Pike further contends that it included a CAP in each subsequent iteration of its SWPPP as it continued to work on the permeability improvement project.  *See, e.g.,* ECF Nos. 379, 380, 367, 368, 369, 377, 361. Additionally, Pike points to its August 2020 SWPPP, which noted that it would be installing a liner pursuant to the 2019 Consent Order.  In Pike's view, since it complied with the EPA's and the DEEP's guidance, it is entitled to protection under the CWA's permit shield.

The Court concludes that these events do not cure Pike's Permit violations and finds much of Plaintiff's rebuttal arguments persuasive.  First, the applicable section of the Permit does not provide that a permittee may submit a CAP in lieu of complying with the terms of the Permit. Second, in referencing the guidance it received from Triton and other third parties, Pike largely relies on hearsay without demonstrating any exceptions apply, which is not permissible at the summary judgment stage.  *See Burlington Coat Factory Warehouse Corp.*, 769 F.2d at 924 (noting that a party may not rely on inadmissible hearsay in opposing a motion for summary judgment and collecting cases); *see also* Fed. R. Evid. 801(c) (describing hearsay as an out of court statement offered for the truth of the matter asserted).

Third, even assuming that the evidence concerning guidance Triton and other third parties received from the EPA and the DEEP is admissible, informal correspondence from an agency fall

45

short of "affirmative formal agency determination[s]." *UnitedHealthcare of New York, Inc.*, 967 F.3d at 95 ("We would marvel if a few casual communications in the guise of informal calls and a staff email constituted an agency's formal position or determination that a state scheme was permissible under the [Affordable Care Act] and its implementing regulations.") (cleaned up). Thus, to the extent that Pike proffers this evidence to demonstrate any formal determination by either the EPA or the DEEP regarding its compliance with the Permit, it may not do so.

Moreover, to the extent that Pike invokes Section 1319(g)(6) based on the installation of the liner, which was approved by the DEEP pursuant to the 2019 Consent Order, this statutory provision does not bar Plaintiff's claims for the reasons discussed above. But even assuming *arguendo* that the DEEP's implied approval of the liner project demonstrates that it was aware of the Terminal's permeability issues and had no issue with the fact that the SWPPP was being certified with a CAP, these circumstances do not unequivocally show that Pike complied with the Permit such that it can benefit from the CWA's permit shield protections. *See, e.g., Puget Soundkeeper All. v. Rainier Petroleum Corp.,* No. C14-0829 (JLR), 2015 WL 13655379, at *13 (W.D. Wash. Dec. 16, 2015) (finding that even if the state department approved the pervious floor in a defendant's tank farm, it would not establish that the tank complied with the permit to defeat summary judgment, though it would be evidence of compliance); *see also Soundkeeper*, 19 F. Supp. 3d at 432–35 (finding that plaintiff had standing in CWA citizen suit even though the DEEP determined defendants did not need CWA permit).

The Court finds that the undisputed evidence submitted by Plaintiff is sufficient to establish that Pike failed to maintain an impervious containment area, in violation of the Permit, from at least 2011 through April of 2024, when it sold the Terminal, and that Pike is not entitled to the

protection of the CWA's permit shield.  Thus, Plaintiff is entitled to summary judgment on Count Fifteen.

### 2. *Count Fourteen*

Finally, the Court denies both parties' summary judgment motions related to Count Fourteen.

In Count Fourteen, Plaintiff contends that Pike infiltrated stormwater at the Terminal without first (1) obtaining the DEEP's approval and (2) utilizing appropriate pretreatment, in violation of Section 5(b)(7) and Appendix C of the Permit.  In its summary judgment motion, Plaintiff submits evidence showing that Pike complied with neither of these two requirements. Pike argues in both its cross-motion for summary judgment and opposition to Plaintiff's summary judgment motion that Appendix C of the Permit does not apply to the Terminal because Appendix C applies only to aquifer protection areas and groundwater drinking supply areas, and the Terminal is not located in any such areas.[14]  Pike makes an additional argument in its opposition brief, contending that, in any event, Plaintiff has not identified any evidence showing that pollutants actually infiltrated or migrated from the ground at the Terminal site into any body of water of the United States.  Plaintiff, in turn, argues that Appendix C applies to the Terminal, and that Pike's argument that it failed to establish migration of pollutants into navigable waters is a red herring based on inapplicable case law.

---

[14] It is undisputed that the Terminal is not located in an area designated as an "Aquifer Protection Area" by the State of Connecticut.  ECF No. 403-1 ¶ 82.  In the parties' Rule 56 statements, the parties dispute whether the Terminal is in a groundwater drinking supply area; Pike contends that the Terminal is in a groundwater drinking supply area, while Plaintiff states that the term has not been defined by Connecticut law.  *Id.*  Plaintiff also states that the Terminal is located within 1.5 miles of a Private Well Parcel and 2.25 miles of a drinking watershed.  *Id.* While Pike repeats in its briefs that the Terminal is not located in an aquifer protection area or groundwater drinking supply area, Plaintiff does not squarely address this point, focusing instead on the argument that Appendix C applies to the Terminal for other reasons discussed herein.

As noted above, NPDES permits are treated like contracts. *Nat. Res. Def. Council, Inc.*, 725 F.3d at 1204. If a NPDES permit provision is unambiguous, that language controls; but if the permit provision is ambiguous, the court may evaluate extrinsic evidence to ascertain the provision's meaning. *Am. Canoe Ass'n, Inc.*, 306 F. Supp. 2d at 42. "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). But where "contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment is improper." *Id.* (quoting *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975)). Ambiguity alone, however, is "not enough to preclude summary judgment." *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994). Typically, "in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." *Id.*; *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000); *Murtha v. City of Hartford,* 303 Conn. 1, 8 (2011) ( "When the language of a contract is ambiguous, . . . the determination of the parties' intent is a question of fact.").

The Court first reviews the applicable sections of the Permit. Section 5(b)(7) of the Permit, which outlines control measures for the management of runoff, requires permittees to "investigate the need for stormwater management or treatment practices that shall be used to divert, infiltrate, reuse, or treat stormwater runoff in a manner that minimizes pollutants in stormwater discharges from the site." ECF No. 357-14 at 20. The Permit then incorporates by reference another section of the Permit, Appendix C, stating: "In implementing infiltration practices, care must be taken to

avoid ground water contamination in accordance with Appendix C." *Id.* Section 5(b)(7) does not indicate that Appendix C applies to only certain types of sites in the sentence that references it, but within that same paragraph, there is a discussion about state regulations that apply to facilities located in aquifer protection areas.

In turn, Appendix C, entitled "Aquifer Protection Areas and Other Groundwater Drinking Supply Areas Guidance," provides that infiltration of stormwater should be restricted under certain enumerated site conditions, including land uses or "activities with potential for higher pollutant loads." *Id.* It further provides that "[i]nfiltration of stormwater from these land uses, or activities may be allowed by the review authority with appropriate treatment." *Id.* at 80. Appendix C also references a table listing examples of such land uses and activities—among those listed are "[i]ndustrial facilities subject to the DEEP Industrial Stormwater General Permit." *Id.* at 80–81.

Based on the Court's review of these provisions, the Court concludes that the Permit's language is susceptible to at least two fairly reasonable interpretations, such that it is ambiguous. On one hand, the plain language of Appendix C's title clearly indicates that it applies to aquifer protection areas and groundwater drinking supply areas, and Plaintiff's broader interpretation would render this title surplusage. *See Stiegler v. City of Meriden*, 348 Conn. 452, 473 n.12 (2024) (noting that "every word and phrase" in a contract is "presumed to have meaning so as not to render certain words and phrases surplusage") (cleaned up). And although Section 5(b)(7) makes no mention that Appendix C's application is limited to certain geographical locations, Appendix C is referenced in a paragraph that discusses state regulations for aquifer protection areas. Moreover, although the body of Appendix C states that its restrictions apply to sites involving land uses and activities with a high potential for pollutant discharge—and the Court assumes without deciding that a bulk fuel storage facility, like the Terminal, could have potential for high pollutant

49

loads—this language may simply indicate that such land uses and activities conducted *in aquifer protection and groundwater drinking supply areas* are subject to the heightened restrictions, not that the restrictions apply to each and every facility with a high likelihood of pollutant discharge. These considerations suggest that the Permit's drafters intended for Appendix C to only govern facilities in areas listed in its title, as Pike suggests.

On the other hand, when construing the Permit as a whole, Appendix C's title may not be dispositive, as Plaintiff contends. Section 5(b)(7) expressly incorporates by reference the requirements in Appendix C to guide permittees with managing runoff (without any indication that its application is limited). As the Connecticut Supreme Court has explained, when a contract incorporates or clearly refers to another document, it reflects the parties' intent for the terms and conditions of the other document to be part of the parties' agreement, "so long as both parties are aware of the terms and conditions of that other document." *Allstate Life Ins. Co. v. BFA Ltd. P'ship*, 287 Conn. 307, 315 (2008). Nor does the body of Appendix C indicate that the enumerated land uses and activities to which it applies are limited to certain geographical areas. Notably, Appendix C references a table listing examples of land uses and activities, which include facilities subject to the Permit—thereby suggesting that Appendix C and Section 5(b)(7) incorporate and reference each other. These factors could suggest that Appendix C is intended to apply generally to all facilities subject to the Permit in the management of runoff.

In light of these conflicting interpretations, the Court finds that the language in Section 5(b)(7) is ambiguous, insofar as it is "reasonably or fairly susceptible of different constructions or interpretations." *Am. Canoe Ass'n, Inc.,* 306 F. Supp. 2d at 42. While the Court would ordinarily look to extrinsic evidence to ascertain the meaning of ambiguous contractual provisions, here, neither party has presented extrinsic evidence in support of their view. While a court may grant

50

summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation, *see Compagnie Financiere*, 323 F.3d at 158; *Mellon Bank, N.A.*, 31 F.3d at 116, each party is a non-moving party here given that there are cross-motions for summary judgment on Count Fourteen. Thus, on the present record, and based on *both* parties' failures to supply the Court with extrinsic evidence from which it might discern the meaning of the ambiguous language of the Permit, the Court cannot determine whether Appendix C applies, and neither party has demonstrated entitlement to judgment as a matter of law on Count Fourteen. *See id.* In light of this ruling, the Court cannot resolve whether Pike violated Section 5(b)(7) and Appendix C.

Pike nevertheless argues in its opposition to Plaintiff's motion that, even assuming Plaintiff's interpretation of Section 5(b)(7) and Appendix C is correct and Plaintiff has demonstrated that some stormwater infiltrated into the ground, Count Fourteen fails because Plaintiff has not established that any pollutants from the groundwater migrated into navigable waters. Pike's argument does not carry the day. In support of this argument, Pike cites to two cases, *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020) and *Stone v. High Mountain Mining Co., LLC*, 89 F.4th 1246 (10th Cir. 2024). The CWA prohibits the discharge of any pollutant into waters of the United States from a point source. *See* 33 U.S.C. 1311(a), 1362(12)(A). In *Maui*, the U.S. Supreme Court addressed the issue of whether the CWA "requires a permit when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source"—for example, if "a sewage treatment plant discharges polluted water into the ground where it mixes with groundwater, which, in turn, flows into a navigable river." *Maui*, 590 U.S. at 170. It answered this question in the affirmative, concluding that the relevant CWA provisions require a permit if the addition of the pollutants through groundwater is the "functional

equivalent of a direct discharge from the point source into navigable waters." *Id.* at 170. The U.S. Supreme Court then set out a list of seven non-exhaustive factors for lower courts to consider when examining whether a discharge to groundwater is the functional equivalent of a direct discharge, for purposes of determining whether permitting requirements apply. *Id.* at 184–85. *Stone* similarly raised the issue of whether the defendant discharged pollutants from its property via groundwater without a CWA permit, and analyzed the *Maui* factors. 89 F.4th at 1253–61.

The Court finds these cases inapposite. As an initial matter, while the Court understands from the parties' briefing that Plaintiff's theory is that there was a likelihood that leaks and spills from the containment area migrated from the groundwater to the New Haven Harbor, a U.S. body of water, *see* ECF No. 386 at 21 and ECF No. 400 at 27–28, and that at least one of Plaintiff's experts opines on this issue, Count Fourteen itself makes no allegation that pollutants migrated into a U.S. body of water. *See* SAC ¶ ¶ 425–32. Rather, Count Fourteen focuses solely on the infiltration of stormwater into the ground, in violation of Permit Section 5(b)(7) and Appendix C. These provisions of the Permit do not appear to address the migration of pollutants into navigable waters. And, as set forth above, a violation of the Permit is itself a CWA violation. *Laidlaw,* 528 U.S. at 175; 40 C.F.R. § 122.41(a). Thus, the Court is not convinced that there is a need for Plaintiff to establish that pollutants actually migrated into navigable waters to prove Count Fourteen.

Moreover, the Court construes *Maui* as merely setting forth the parameters that courts should consider when determining *whether a permit is required* when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source. Here, Plaintiff asks the Court to determine whether Pike violated the express terms of an existing permit, not whether it was required to obtain a permit to engage in certain activity. *Cf. Conservation L. Found., Inc. v.*

52

*Town of Barnstable, Massachus*etts, 615 F. Supp. 3d 14, 27 (D. Mass. 2022) (applying *Maui* test at motion to dismiss stage where the plaintiff alleged in its complaint that the defendant discharged nitrogen pollution into the surface waters of the Lewis Bay Watershed, a U.S. body of water, without a permit). Thus, the Court finds that Pike is not entitled to summary judgment on the basis that Plaintiff must establish that pollutants migrated into waters of the United States for Count Fourteen.

Accordingly, both parties' motions for summary judgment are denied as to Count Fourteen.

## IX.   MOTIONS TO PRECLUDE

In light of the Court's holding(s) above, it need not decide the parties' motions to preclude experts at this juncture. Thus, the motions to preclude the expert testimony and/or reports of James O'Donnell, ECF No. 348, Wendi Goldsmith, ECF No. 349, Nancy Gardiner, ECF No. 350, Robert Nairn, ECF No. 351, Christopher Ecsedy, ECF No. 352, Kelly Coulon, ECF No. 353, Matthew Barlow, ECF No. 354, and Robert Roseen, ECF No. 355, are denied as moot, without prejudice to renewal before or during trial.

## X.   CONCLUSION

For the reasons described herein, the Court GRANTS Pike's summary judgment motion as to Counts One through Nine and, consequently, DENIES Plaintiff's summary judgment motion as to Counts Three, Five and Six. The Court also GRANTS IN PART AND DENIES IN PART Pike's summary judgment motion as to Count Ten, and GRANTS Pike's summary judgment motion as to Count Eleven. As to Count Fourteen, the Court DENIES both parties' motions for summary judgment. As to Count Fifteen, the Court GRANTS Plaintiff's summary judgment motion and DENIES Pike's summary judgment motion. In light of the Court's rulings, it DENIES as moot the various motions to preclude expert testimony.

54

The Court will convene a status conference with the parties to discuss scheduling this matter for trial on the remaining Counts, and a renewed referral of the action to U.S. Magistrate Judge Garcia for purposes of a pre-trial settlement conference.


**SO ORDERED** at Hartford, Connecticut, this 24th day of July, 2026.


            */s/ Sarala V. Nagala*
            SARALA V. NAGALA
            UNITED STATES DISTRICT JUDGE